## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

_____

**JOHN DOE**,

              Plaintiff,                      Case No. 1:19-cv-226

                                                Hon.


vs.



**MICHIGAN STATE UNIVERSITY;**
**ROBERT KENT,** in his individual and official capacity,
**RICK SCHAFER,** in his individual and official capacity,
**ARON SOUSA, M.D.,** in his individual and official capacity,
jointly and severally,

              Defendants.
_____/
Keeley Blanchard (P68661)
**BLANCHARD LAW**
Attorneys for Plaintiff
309 S Lafayette St., Ste 208
P.O. Box 938
Greenville, MI 48838
616-773-2945 / fax: 616-328-6501
keeley@blanchard.law
_____/

### COMPLAINT AND DEMAND FOR JURY TRIAL

    **NOW COMES** the Plaintiff, John Doe, by and through counsel and for his

complaint against Defendants states as follows:

## INTRODUCTION

1. Plaintiff John Doe brings this action for a declaratory judgment, injunctive relief, violation of Title IX, violation of the Due Process Clause of the United States Constitution, violation of the Equal Protection Clause of the United States Constitution, and other related claims.

2. This case arises out of the decision of Michigan State University to impose disciplinary sanctions against John Doe in violation of his constitutional and statutory rights.

## PARTIES

3. Plaintiff John Doe is a medical student at the College of Human Medicine at Michigan State University ("CHM").

   a. John Doe is a citizen of Michigan with a residence in Grand Rapids, Michigan.

   b. John Doe is near the end of his third year of medical school at the CHM. He would graduate and enter residency in approximately one year.

   c. The disclosure of John Doe's identity will cause the student irreparable harm as this case involves matters of the utmost personal intimacy, including education records protected from disclosure by the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g; CFR Part 99.

4. Defendant Michigan State University is a land grant university established by the State of Michigan. The main campus of Michigan State University is located

in East Lansing, Michigan. Michigan State University is the beneficiary of state appropriations and the recipient of state and federal grants.

5. Defendant Robert Kent is the Interim Associate Vice President, Office for Civil Rights and Title IX Education and Compliance for Michigan State University. He has a principal place of business at Olds Hall, 408 W. Circle Dr., Suite 4, East Lansing, Michigan 48824.

   a. Defendant Kent is sued in his individual and official capacities for declaratory and injunctive relief and for money damages.

   b. On information and belief, Defendant Kent is acting under the policies, procedures, and practices of Michigan State University.

   c. Defendant Kent is responsible for administering the Policy on Relationship Violence and Sexual Misconduct for Michigan State University.

6. Defendant Rick Schafer is the Associate Director of Student Conduct and Conflict Resolution for Michigan State University. He has a principal place of business at Student Services Building, 556 E. Circle Dr., Room 101, East Lansing, Michigan 48824.

   a. Defendant Schafer is sued in his individual and official capacities for declaratory and injunctive relief and for money damages.

   b. On information and belief, Defendant Schafer is acting under the policies, procedures, and practices of Michigan State University.

    c.   Defendant Schafer is responsible for the administration of disciplinary action under the Policy on Relationship Violence and Sexual Misconduct for Michigan State University.

7.  Defendant Aron Sousa, M.D. is a Senior Associate Dean for the Michigan State University College of Human Medicine. He has a principal place of business at East Fee, 909 Fee Rd., A118, East Lansing, Michigan 48824.

    a.   Defendant Sousa is sued in his individual and official capacities for declaratory and injunctive relief and for money damages.

    b.   On information and belief, Defendant Sousa is acting under the policies, procedures, and practices of Michigan State University, including the Medical Student Rights and Responsibilities ("MSRR").

    c.   Defendant Sousa is responsible for administering the MSRR and imposing discipline for violations of conduct under the MSRR.

8.  On information and belief, Defendants Kent, Schafer, and Sousa are authorized to grant all of the injunctive relief sought in the Complaint.

## JURISDICTION AND VENUE

9.  This case arises, in part, under the laws of the United States, specifically 42 U.S.C. § 1983 and Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 et seq. Accordingly, this Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1331 and 1343.

10. The injunctive relief sought in this matter is authorized by 28 U.S.C. §§ 2201 and 2202 and Fed. R. Civ. P. 57 and 65.

11. This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. § 1391. The individual defendants are residents of the State in which this district is located and a substantial part of the events or omissions giving rise to the claim occurred in this district.

**FACTS**

12. This case arises amidst both a national controversy stemming from the Federal Department of Education, Office of Civil Rights' ("OCR") threats to withhold federal education funds to compel colleges and universities to address "sexual violence" on their campuses, and a sexual abuse scandal involving Dr. Larry Nassar, a Michigan State University employee who sexually abused hundreds of women and girls, and resulted in payment by Michigan State University of over a half billion dollars in settlements.

13. These two controversies have resulted in significant criticism of Michigan State University for being too lax in its investigations of campus sexual misconduct.

14. Michigan State University's response to this criticism has been to crack down on alleged perpetrators of sexual misconduct.

15. Michigan State University is ill-equipped to handle and adjudicate matters of alleged sexual misconduct, and their response to the criticism has gone too far, resulting in the deprivation of the rights of students accused of sexual misconduct.

16. Instead of requiring accusers to prove that they were assaulted, the accused students must prove that they had consent for sexual contact.

17. When adjudicating allegations of sexual assault, Michigan State University applies the lowest standard of proof available – preponderance of the evidence.

18. Michigan State University effectively treats male students accused of sexual misconduct with a presumption of guilt.

**The Alleged Incidents with Jane Roe 1 and Jane Roe 2**

19. On April 23, 2016, John Doe, Jane Roe 1, Jane Roe 2, and K.B. were all first-year medical students at Michigan State University.

20. The four students, along with several other friends, planned to attend the Med Ball, which was taking place at Noto's Old World Italian Dining, a restaurant located in Grand Rapids, Michigan.

21. Prior to the Med Ball, John Doe, Jane Roe 1 and Jane Roe 2 gathered at the off-campus residence of K.B., where they all began to consume alcohol.

22. Prior to the night of the Med Ball, Jane Roe 1 had been engaged in a sexual relationship with K.B.

23. K.B. reported to investigators that his sexual relationship with Jane Roe 1 was not exclusive.

24. Jane Roe 1 believed her romantic relationship with K.B. to be ongoing at the time of the Med Ball.

25. Jane Roe 2 had planned to attend the Med Ball with her then-husband, J.M.

26. Jane Roe 2 and J.M. had gathered at K.B.'s home along with the other parties before leaving for the Med Ball.

27. After gathering at K.B.'s home, the parties all traveled by Uber to Noto's, the venue for the Med Ball.

28. While at the Med Ball, all of the parties report voluntarily consuming alcohol and dancing.

29. Jane Roe 1 and John Doe danced together.

30. John Doe taught Jane Roe 1 the steps to the Waltz and the Cha-Cha.

31. When dancing, John Doe and Jane Roe 1 discussed that they were the only ones at the Med Ball without a date.

32. Jane Roe 1 told John Doe, "I guess you're my date for the Med Ball."

33. John Doe and Jane Roe 1 continued to talk about friends, medical school stress, and drinking.

34. John Doe and Jane Roe 1 continued to dance with each other which progressed to sexually grinding on each other while on the dance floor.

35. Jane Roe 1 reported that she drank more than she usually does because Med Ball "was a big event to celebrate a stressful year."

36. John Doe, who was a first-year medical student at the time, had also had a particularly stressful year, as his mother had been recently diagnosed with breast cancer for the second time in addition to the obvious stressors of medical school.

37. Early in the evening, Jane Roe 2 and her then-husband, J.M., had a serious argument that led J.M. to ask Jane Roe 2 for a divorce and leave the venue.

38. Jane Roe 1 sought out Jane Roe 2 after Jane Roe 2's argument with J.M. in order to comfort her.

39. Later, Jane Roe 1 became separated from her group of friends and went looking for Jane Roe 2.

40. When Jane Roe 1 went outside the venue to search for Jane Roe 2, she discovered Jane Roe 2 and K.B. engaged in a kiss.

41. Jane Roe 1 ran back inside the venue and up a set of stairs where she sat down and began texting Jane Roe 2.

42. Jane Roe 1 wrote to Jane Roe 2, "Just done. Don't expect me to be ur friend anymore. I've done nothing but try to be a good friend to u and be supportive of whatever u need."

43. After Jane Roe 1 engaged in a text conversation with Jane Roe 2, John Doe approached her and sat down next to her on the stairway.

44. Jane Roe 1 recounted to John Doe what she had witnessed between Jane Roe 2 and K.B.

45. Their conversation continued, and eventually John Doe initiated a kiss with Jane Roe 1.

46. Jane Roe 1 responded by kissing John Doe back, using her tongue.

47. Jane Roe 1 and John Doe shared multiple kisses while sitting on the stairs.

48. John Doe and Jane Roe 1 had their hands on each other's arms and faces while kissing each other.

49. John Doe and Jane Roe 1 got up and moved from the stairway to the second floor of the venue.

50. John Doe and Jane Roe 1 then went into a stairwell off of the second floor of the venue.

51. John Doe and Jane Roe 1 began to kiss and "make out."

52. John Doe and Jane Roe 1 continued to progress from making out to touching underneath the clothes.

53. John Doe recalls Jane Roe 1 acting with eagerness while engaging in the sexual contact.

54. John Doe also recalls Jane Roe 1 taking off her own dress at this point in the interaction.

55. Jane Roe 1's memory does not dispute this assertion.

56. Jane Roe 1 then got down on her hands and knees, on her own accord, to present herself for sexual intercourse.

57. Jane Roe 1 asked John Doe if she could use his jacket to cushion her knees.

58. Jane Roe 1 and John Doe attempted to engage in sexual intercourse.

59. John Doe could not achieve a full erection due to his alcohol consumption and was unable to complete the act.

60. After approximately fifteen minutes of trying to achieve intercourse, John Doe told Jane Roe 1 that "it wasn't going to work."

61. John Doe and Jane Roe 1 got dressed and exited the stairwell.

62. John Doe and Jane Roe 1 stood in the lobby of the venue, arm in arm.

63. John Doe and Jane Roe 1 also held hands.

64. John Doe, Jane Roe 1, Jane Roe 2, and K.B. left the venue and headed to The B.O.B., a bar in Grand Rapids, Michigan.

65. In the Uber on the way to The B.O.B., Jane Roe 1 and John Doe continued to hold hands.

66. Jane Roe 1 placed her head on John Doe's shoulder during the car ride.

67. When the parties arrived at The B.O.B., Jane Roe 1 went downstairs with K.B. while their other friends, including John Doe and Jane Doe 2, went upstairs into the club.

68. Jane Roe 1 talked to K.B. about seeing him engaging in a kiss with Jane Roe 2.

69. Jane Roe 1 cried during this conversation with K.B.

70. K.B. observed that Jane Roe 1 was upset and attributed it to her being upset about seeing him kissing Jane Roe 2 at the Med Ball.

71. K.B. apologized to Jane Roe 1 about the kiss between himself and Jane Roe 2, telling her "sorry, that wasn't fair to you."

72. Jane Roe 1 did not tell K.B. that she had engaged in sexual contact with John Doe.

73. While Jane Roe 1 and K.B. were having this discussion downstairs at The B.O.B., Jane Roe 2 and John Doe were upstairs, together on the dance floor.

74. While on the dance floor together, Jane Roe 2 suggested to John Doe that he and Jane Roe 1 "would make a good couple."

75. John Doe indicated to Jane Roe 2 that he and Jane Roe 1 had already reached that conclusion on their own.

76. Despite this, while Jane Roe 2 and John Doe continued to dance in the club at The B.O.B., Jane Roe 2 told John Doe that he was "very cute."

77. Jane Roe 2 put her finger down the angle of John Doe's jaw and felt his stubble.

78. Jane Roe 2 and John Doe then began kissing, with tongue, while on the dance floor.

79. Jane Doe 1, Jane Doe 2, K.B., and John Doe left The B.O.B. and went to the residence of K.S., another medical student.

80. Jane Doe 1, Jane Doe 2, K.B., and John Doe left the home of K.S. and returned to K.B.'s private residence in Grand Rapids, Michigan.

81. Jane Doe 1 went into K.B.'s bedroom.

82. Jane Doe 2, K.B., and John Doe spent some time hanging out and talking in the kitchen.

83. Later, after John Doe had left the kitchen, he walked by and observed Jane Roe 2 and K.B. having sexual intercourse in the kitchen.

84. John Doe went into K.B.'s bedroom in order to go to sleep.

85. John Doe laid down on the bed next to Jane Roe 1.

86. Jane Roe 1 and John Doe laid in the bed, facing each other.

87. John Doe did not touch Jane Roe 1.

88. John Doe was unable to fall asleep, so he later left the room and went to the living room.

89. When John Doe entered the living room, Jane Roe 2 was on the sectional couch.

90. Jane Roe 2 was awake and moved to make room for John Doe to lay down next to her on the couch.

91. John Doe laid down behind Jane Roe 2.

92. Jane Roe 2 began to grind her buttocks against John Doe's genitals.

93. Jane Roe 2 and John Doe began kissing, and engaged in touching of the waist, breast, and shoulders.

94. After several minutes, John Doe pulled Jane Roe 2's dress upward and placed his hand on her buttocks.

95. Jane Roe 2 stated "I'm tired" or "no."

96. John Doe did not continue to touch Jane Roe 2.

97. John Doe moved to another part of the couch, and John Doe and Jane Roe 2 slept the remainder of the night on separate parts of the couch.

98. The next morning, John Doe received a ride to his car from K.B.

99. John Doe revealed to K.B. during this car ride that he had sexual contact with Jane Roe 1.

100.  Jane Roe 2 was picked up from K.B.'s home by her husband, J.M., the following morning.

101.  When K.B. returned to his home from driving John Doe to his car, he confronted Jane Roe 1 about having sexual contact with John Doe.

102.    During this conversation with K.B., Jane Roe 1, for the first time, begins to allude that her encounter with John Doe was not consensual when confronted by her paramour, K.B., with this information.

103.    Later that morning, Jane Roe 1 texted John Doe and asked about condom use.

104.    Jane Roe 1 and John Doe discussed by text that Jane Roe 1 should obtain Plan B from a pharmacy in order to prevent a possible pregnancy.

105.    Jane Roe 1 later texts to John Doe, "Look, I need you to know that Saturday was a mistake and nothing like that can happen again."

106.    At no time during this text conversation with John Doe does Jane Roe 1 state that what happened between her and John Doe was not consensual.

107.    After John Doe asks Jane Roe 1 to lunch, she declines his invitation, indicating that she cared about K.B. and that is her priority.

108.    John Doe's contact with Jane Roe 1 after these text messages was limited to just seeing her at school functions.

109.    John Doe was later placed on a rotation for Obstetrics and Gynecology with Jane Roe 2.

110.    John Doe and Jane Roe 2 worked together in a professional manner, treating each other with courtesy and respect.

111.    Neither Jane Doe 1 or Jane Doe 2 had made their complaints at that point, and John Doe had no indication that either Jane Roe 1 or Jane Roe 2 had any issue with their interactions on the night of the Med Ball.

112.   It was nearly two years after the 2016 Med Ball that Jane Roe 1 and Jane Roe 2 reported their claim to the Office of Institutional Equity ("OIE") for Michigan State University.

113.   Jane Roe 2's report was made to OIE on February 26, 2018.

**114.**   Jane Roe 1's report was made to OIE on February 28, 2018.

## Michigan State University's Investigation Process

115.   John Doe was first notified of Jane Roe 2's report to OIE via a letter from Kroll Associates, Inc. ("Kroll"), who was hired by OIE to investigate the allegations, on April 17, 2018.

116.   John Doe was interviewed regarding Jane Roe 2's report on April 20, 2018.

117.   John Doe was first notified of Jane Roe 1's report to OIE via a letter from Kroll on July 31, 2018.

118.   John Doe was interviewed regarding Jane Roe 1's report on August 15, 2018.

119.   Regarding Jane Roe 1's report, Kroll's investigators interviewed Jane Roe 1's witnesses K.B., A.B., C.K., E.P, H.R., K.S., L.T., and A.V.

120.   None of Jane Roe 1's witnesses were eyewitnesses to the actual alleged incident.

121.   Regarding Jane Roe 1's report, Kroll's investigators interviewed no witnesses for John Doe.

122.   Regarding Jane Roe 2's report, Kroll's investigators interviewed Jane Roe 2's witnesses K.B., A.B., E.R., K.S., and L.T.

123.    None of Jane Roe 2's witnesses were eyewitnesses to the actual alleged incident.

124.    Regarding Jane Roe 2's report, Kroll's investigators interviewed no witnesses for John Doe.

125.    Jane Roe 2 was first interviewed by Kroll's investigators on March 20, 2018.

126.    Jane Roe 2 had nearly a month to prepare for her initial interview with investigators.

127.    Nearly a month after Kroll's interview with Jane Roe 2, on April 17, 2018, Kroll investigator Nicole Y. Lamb-Hale send John Doe correspondence via email notifying John Doe that Michigan State University intended to formally investigate him for an alleged violation of the university's Relationship Violence and Sexual Misconduct Policy ("RVSMP").

128.    Ms. Lamb-Hale's April 17, 2018 correspondence stated as to the allegations against John Doe, "[Jane Roe 2] alleges that you engaged in sexual harassment, and specifically made unwanted sexual contact with her in violation of Section X of the University's RVSM policy on or about April 23, 2016 at a classmate's house in Grand Rapids, Michigan."

129.    Ms. Lamb-Hale's April 17, 2018 correspondence provided John Doe only vague and inadequate notice of the charges and allegations against him by Jane Roe 2.

130.    John Doe, at the time he received the letter, was academically engaged in his internal medicine rotation. He was engaged in furious preparation for the

internal medicine shelf exam, which is widely held to be the toughest shelf exam faced by medical students.

131.   John Doe's internal medicine shelf exam took placed on April 20, 2018.

132.   Kroll scheduled the interview with John Doe for immediately following his internal medicine shelf exam on April 20, 2018, only three days after providing John Doe with the vague notice of the allegations.

133.   Given the rigorous nature of the requirements of the rotation and studying to pass the shelf exam, John Doe had no opportunity to engage in any preparation for this interview by Kroll, or to consult with an attorney or advisor regarding the interview.

134.   John Doe was not given adequate time, particularly given his rigorous academic requirements, to even read through the university's RVSMP.

135.   Further, the April 17, 2018 letter from Ms. Lamb-Hale did not detail the potential consequences that John Doe was facing as a result of these allegations.

136.   John Doe, going into the interview, had no idea that suspension or dismissal from the university were likely consequences if he were to be found responsible for the alleged sexual misconduct in violation of the RVSMP.

137.   Even more, when John Doe questioned Ms. Lamb-Hale and her fellow Kroll investigator, Tyler Falish, about the potential consequences, he was given a very vague answer in the vein of "many things," and was told that their largest concern was ensuring the safety of the parties going forward.

138.   Even more, when John Doe questioned whether he should continue with the interview or first obtain an attorney to represent him, Ms. Lamb-Hale and Mr. Falish downplayed the potential consequences and the need for legal representation in order to induce John Doe to engage in the interview that day.

139.   When John Doe walked into the interview on April 20, 2018, he did so without being given meaningful notice of the allegations for which he was being investigated.

140.   Despite the university's, and thereby Kroll's, obligation to conduct an impartial investigation, the vague notice provided to John Doe indicates that the investigation was tainted from the outset by gender bias and a presumption of John Doe's guilt.

141.   The April 17, 2018 letter from Ms. Lamb-Hale was the only notice John Doe was afforded prior to his interview.

142.   According to the letter, this meeting "is your opportunity to be heard. During the meeting you will have the opportunity to provide a statement, submit evidence, and identify potential witnesses."

143.   Given the vague and inadequate notice provided by the university regarding the underlying allegations, John Doe was placed at an immediate disadvantage in preparing for his interview with investigators.

144.   John Doe was not adequately given an opportunity to be heard, provide a complete statement, gather evidence to submit to investigators, or identify potential witnesses.

145.   With regard to Jane Roe 2's allegations, this interview constituted John Doe's only opportunity to be heard.

146.   Prior to the findings made by Kroll's investigators, John Doe was not offered a live hearing or an opportunity for live cross-examination of Jane Roe 2 or any of her witnesses.

147.   On February 28, 2018, two days after OIE received a complaint from Jane Roe 2, OIE received a complaint from Jane Roe 1.

148.   Jane Roe 1's case was closed on March 5, 2018 due to non-participation by Jane Roe 1.

149.   At no time did Kroll or Michigan State University notify John Doe of the claim by Jane Roe 1, either before the OIE's request for an interview regarding the claim by Jane Roe 2, or during the interview regarding the allegations surrounding Jane Roe 2.

150.   This was despite the fact that Kroll intended to interview Jane Roe 1 regarding Jane Roe 2's allegations.

151.   Jane Roe 1 requested to revive her claim against John Doe after being interviewed by Kroll regarding Jane Roe 2's allegations on June 15, 2018.

152.   John Doe was not given notice of Jane Roe 1's claim until he received a letter from Kroll's investigator, Nicole Lamb-Hale, on July 31, 2018.

153.   Once again, the notice provided by the university through Kroll was vague and inadequate.

154.   Ms. Lamb-Hale's July 31, 2018 correspondence stated as to the allegations against John Doe, "[Jane Roe 1] alleges that you engaged in sexual violence, and specifically raped her in violation of Section VIII(D) of the University's RVSM policy attached, on or about April 23, 2016 at a restaurant in Grand Rapids, Michigan."

155.   During the time frame that John Doe was notified of the allegations by Jane Roe 1, he had recently completed a difficult surgery rotation, and had been a few weeks into a pediatrics rotation.

156.   John Doe was pulled off the pediatrics rotation as a result of his performance on the surgery rotation. John Doe had been under tremendous stress, not only dealing with the investigation into false allegations by Jane Roe 1 and Jane Roe 2, but also continuing to care for his mother who was recovering from breast cancer and had continued to deal with significant pain after her surgeries.

157.   Dealing with possible academic dismissal and a facing a hearing in that matter, John Doe again was not afforded adequate time to sufficiently prepare for his interview with Kroll's investigators, and was required to complete his interview on August 15, 2018.

158.   John Doe again appeared without counsel or an advocate, with no advance notice of the details of the allegations made by Jane Roe 1.

159.   The vague and inadequate notice provided by Kroll to John Doe regarding Jane Roe 1's allegations again reflects that the investigation was tainted by gender bias and a presumption that John doe was guilty.

160.   On February 8, 2019, Kroll completed their investigation and issued a Final Investigative Report.

161.   John Doe was not afforded a hearing or any opportunity to cross-examine either Jane Roe 1 or Jane Roe 2 prior to the findings issued by Kroll.

162.   Kroll, the same party who conducted the investigation, made the finding in this matter.

163.   Kroll purported to use a preponderance of the evidence standard in making their findings.

164.   Regarding Jane Roe 2's report, Kroll concluded that a preponderance of the evidence supported a finding that John Doe engaged in sexual contact with Jane Roe 2 without her consent and in violation of the Policy on Relationship Violence and Sexual Misconduct.

165.   Regarding Jane Roe 1's report, Kroll concluded that a preponderance of the evidence supported a finding that Respondent engaged in sexual intercourse with Jane Roe 1 while she was incapacitated in violation of the Policy on Relationship Violence and Sexual Misconduct.

166.   Kroll's wildly biased interpretation of the evidence gathered in their investigation further demonstrates that Kroll approached this matter not as a neutral investigator, but rather as a prosecutor attempting to prove the guilt of John Doe.

167.   On February 12, 2019, as a direct result of the findings made by Kroll, the CHM issued an interim suspension of John Doe.

168. CHM had previously been aware of these allegations for more than one year and had never taken action to suspend John Doe during the course of the investigation.

169. In fact, CHM staff member, Dr. Angela Busch, made Jane Roe 2's report to OIE on February 26, 2018.

170. On February 14, 2019, John Doe was given a one-hour "hearing" to address the imposition of the interim suspension.

171. During this one-hour hearing, the hearing panel was given the Final Investigative Report issued by Kroll, including their findings that John Doe violated the RVSMP by a preponderance of the evidence.

172. The purpose of the February 14, 2019 "hearing" was only for the purpose of determining whether CHM would continue the interim suspension.

173. John Doe was not permitted to bring a challenge to the findings of Kroll and OIE during the February 14, 2019 "hearing."

174. John Doe was only permitted to argue why the interim suspension should not continue.

175. The February 12, 2019 interim suspension was imposed by Defendant Aron Sousa, M.D.

176. Defendant Aron Sousa, M.D. then chose the three hearing panelists who decided the matter of the continuation of the interim suspension.

177. Defendant Aron Sousa, M.D. ran the "hearing" for the panelists.

178.    Defendant Aron Sousa, M.D. acted as the prosecutor during the hearing, presenting evidence against John Doe and arguing to the panelists that the interim suspension should be continued.

179.    The MSRR provides that in order to impose an interim suspension, the fact-finder must find "sufficient evidence that the student has engaged in conduct of a sort that, if continued, threatens immediate or irreparable harm and no compelling evidence has been provided by the student that the conduct will be or has already been discontinued…."

180.    Defendant Aron Sousa, M.D. argued a standard for imposition of the interim suspension that did not comport with the standard imposed by the MSRR.

181.    Defendant Aron Sousa, M.D. stated in his closing argument to the hearing panel that "at some level while you could read this as a story of four dozen people behaving badly and hurting each other, the core story in here is, is about somebody who, um, based on the findings, took advantage of a friend, and um, when they were, at least not entirely, um, and that is the fundamental root of our concern and was why I thought the suspension was reasonable and should be continued."

182.    John Doe submitted a psychological evaluation and risk assessment at the "hearing" on the interim suspension which indicated that he was not a risk to the students, staff, or patients.

183.   John Doe protested his innocence and stated his disagreement with the findings in the Final Investigative Report during the "hearing" but was not given the opportunity to meaningfully respond to the findings or question witnesses.

184.   The panelists determined, based on Defendant Aron Sousa, M.D.'s erroneous argument and the Final Investigative Report, that the interim suspension should be continued.

185.   The hearing panelists relied upon the findings in the Final Investigative Report in order to reach their conclusion that the interim suspension would be continued indefinitely.

186.   The decision to impose the interim suspension resulted in John Doe being immediately pulled from his surgery rotation, of which he was within approximately two weeks of completion.

187.   The decision to impose the interim suspension resulted in John Doe being unable to begin his scheduled six-week pediatric rotation.

188.   The interim suspension, if not lifted, threatens to interfere with John Doe's ability to take his Step 2 examination, scheduled for May 22, 2019 and June 27, 2019, for which John Doe has already incurred expenses in the amount of $1,920.00.

189.   On February 18, 2019, John Doe submitted his mitigation statement to the Dean of Students Office regarding the proposed sanction in this matter.

190.   On February 26, 2019, John Doe received a notification from the Dean of Students Office recommending a sanction of dismissal.

191.   On March 8, 2019, John Doe submitted his appeal of both the findings and the sanction issued by Michigan State University.

192.   On March 8, 2019, after submission of his appeal, John Doe was notified that his appeal was placed "on hold" and that his case was being reviewed to determine whether a hearing should have been offered.

193.   On March 11, 2019, John Doe requested, through his counsel, that Michigan State University offer him a hearing and lift the sanction of interim suspension.

194.   On March 12, 2019, Michigan State University communicated to John Doe's counsel that the matter was still under review for hearing, but that if a hearing was offered, the interim suspension would not be lifted.

195.   On March 13, 2019, John Doe received a letter from OIE acknowledging that the process used to make findings against him did not comport with the law in the Sixth Circuit.

196.   The March 13, 2019 correspondence from OIE offered John Doe a hearing.

197.   The March 13, 2019 correspondence from OIE required that John Doe request a hearing by March 20, 2019.

198.   On March 20, 2019, John Doe requested a hearing in writing.

199.   On March 20, 2019, John Doe further requested, again through counsel, that the interim suspension be lifted.

200.   On March 20, 2019, John Doe requested through counsel that the finding against him be formally withdrawn.

201.   Despite acknowledging that an unconstitutional process was utilized to reach the findings against John Doe and offering a hearing, Defendant Michigan State University has not formally withdrawn the finding against John Doe and has refused to lift the interim suspension against John Doe.

202.   John Doe, during the course of the investigation, paid approximately $46,110.00 in tuition to Defendant Michigan State University.

203.   John Doe has thus far incurred $283,319.83 in student loans for his medical education at Michigan State University, with interest rates of up to 7.6%.

204.   During the pendency of this investigation, which lasted for nearly one year, Defendant Michigan State University continued to permit John Doe to pay tuition at a rate of $46,110.00 per year, and to continue to incur student loans in order to pay that tuition and living expenses.

205.   CHM took no action to file a complaint or issue an interim suspension against John Doe during the pendency of the investigation, despite being fully aware of the allegations made by Jane Roe 1 and Jane Roe 2.

206.   John Doe, but for the interim suspension imposed by CHM, would have completed his medical degree in 2020.

207.   In order to complete his education at CHM, John Doe must complete the final two weeks of his surgery rotation, complete a pediatrics rotation, and complete the curriculum for his fourth year of medical school.

208. If the interim suspension is not lifted while this matter is sent to a hearing, John Doe's graduation from medical school could be delayed by as much as two years.

**COUNT I**
**DECLARATORY JUDGMENT – VIOLATION OF DUE PROCESS PROVISIONS OF THE UNITED STATES AND MICHIGAN CONSTITUTIONS (DEFENDANTS KENT, SHAFER, AND SOUSA)**

209. Plaintiff repeats and incorporates all of the allegations of this Complaint, as if fully set forth herein.

210. This count is brought against Defendants Robert Kent, Rick Schafer, and Aron Sousa, M.D. in their individual and official capacities.

211. The Fifth Amendment to the United States Constitution, made applicable to the State of Michigan by the Fourteenth Amendment, provides that no person shall "be deprived of life, liberty, or property, without due process of law."

212. The Fourteenth Amendment to the United States Constitution provides that no state shall deprive "any person of life, liberty, or property, without due process of law."

213. Section 17, Article I of Michigan Constitution guarantees that no person shall be "deprived of life, liberty, or property, without due process of law."

214. The Due Process Clauses of the Michigan and United States Constitutions are implicated by higher education disciplinary decisions, including the disciplinary decisions under the Relationship Violence and Sexual Misconduct

Policy ("RVSMP") and the Medical Student Rights and Responsibilities ("MSRR").

215. Michigan State University, acting through Defendants Robert Kent, Rick Schafer, and Aron Sousa, M.D. in their official capacity, has a constitutional obligation to provide a fundamentally fair and reliable hearing process.

216. John Doe is entitled under the Constitutions of Michigan and the United States to the opportunity to be heard in a meaningful manner at a hearing.

217. John Doe's interests in the results of a hearing are significant.

    a. Dismissal or suspension from Michigan State University would deny him the benefits of education at his chosen school.

    b. Dismissal, suspension, or other sanctions would damage John Doe's academic and professional reputation.

    c. Dismissal, suspension, or other sanctions are likely to affect John Doe's ability to enroll at other institutions of higher education and to pursue a career in his desired field of neurology, or as a medical doctor at all.

    d. Dismissal, suspension, or other sanctions are likely to affect John Doe's ability to obtain a residency upon graduation, should he even have the ability to graduate from a medical school.

218. Defendants Robert Kent, Rick Schafer, and Aron Sousa, M.D. have violated John Doe's due process rights in the following manner:

a. The investigators, administrators, and the hearing panel involved in the adjudicatory process were biased against students accused of sexual assault;

b. CHM issued a suspension of John Doe based on the findings contained in the Final Investigative Report, which was issued without a hearing and without providing John Doe the opportunity to cross-examine witnesses. In particular, John Doe was not permitted to cross-examine the investigators, witnesses, Jane Roe 1, or Jane Roe 2.

c. Michigan State University, through Defendants Robert Kent, Rick Schafer, and Aron Sousa, M.D., have adjudicated Jane Roe 2's claim and imposed discipline upon John Doe even though it does not fall under the university's jurisdiction under Title IX because it occurred at an off-campus location at an event not sanctioned by the university.

d. Michigan State University, through Defendants Robert Kent, Rick Schafer, and Aron Sousa, M.D., has imposed a burden of proof of preponderance of the evidence for sexual misconduct allegations, despite that for any other type of alleged misconduct, John Doe would be afforded the benefit of a burden of proof of clear and convincing evidence.

e. Michigan State University, through Defendants Robert Kent, Rick Schafer, and Aron Sousa, M.D., has failed to afford John Doe a presumption of innocence.

f. John Doe was denied the ability to consult with an attorney.

g. CHM issued a suspension of John Doe in violation of its own written policy, the MSRR. The CHM complaint was filed on February 28, 2019, almost three years after the alleged incident occurred. The MSRR, in § 5.3.3 provides, "Grievances/complaints must be filed no later than mid-term of the semester following the one in which the alleged violation occurred (exclusive of the scheduled vacation periods during which students in the medical colleges are not enrolled for classes). If either party to a grievance/complaint is absent from the University during that semester, or if other appropriate reasons exist, an exception to this time limit may be granted by the designated college administrator. If either party to the grievance or complaint leaves the University prior to its resolution, the grievance/complaint may proceed at the discretion of the chair of the hearing body." No "appropriate reasons" existed to delay filing the complaint against John Doe in this matter for nearly three years after the alleged incident and for over a year after CHM became aware of the allegations. Further, the MSRR requires that in order to suspend a medical student on an interim basis, the student's conduct must threaten "immediate and irreparable harm." Despite making no such showing, CHM issued a suspension of John Doe following CHM's receipt of findings from Kroll and OIE that were made without the benefit of a hearing and other sufficient due process.

219.   The Plaintiff and Defendants Robert Kent, Rick Schafer, and Aron Sousa, M.D., acting in their official capacity, have a dispute about whether the RVSMP and MSRR, as applied to John Doe, violates the Due Process Clauses of the United States Constitution and the Michigan Constitution.

220.   Defendants Robert Kent, Rick Schafer, and Aron Sousa, M.D. have a duty to enforce the provisions of the RVSMP and MSRR and have actually enforced those provisions against John Doe.

221.   The declaratory relief sought would enable this Court to order prospective remedial injunctive relief. *See* Prayer for Relief, *infra.*

    a.   The declaratory judgment sought is permissible under the Eleventh Amendment because it is ancillary to a prospective injunction designed to remedy a continuing violation of federal law.

    b.   Defendants Robert Kent, Rick Schafer, and Aron Sousa, M.D. may be prohibited from imposing discipline upon John Doe, and further, compelled to remove any notation from John Doe's disciplinary records that resulted from the allegedly unconstitutional disciplinary process.

222.   John Doe is entitled to a declaration that the RVSMP and MSRR, as applied to John Doe, violates the Due Process Clauses of the United States Constitution and Michigan Constitution.

223.   Pursuant to 42 U.S.C. §1988, John Doe is entitled to his attorney's fees incurred in bringing this action.

## COUNT II
### 42 U.S.C. §1983 – VIOLATION OF DUE PROCESS PROVISIONS OF UNITED STATES CONSTITUTION – REQUEST FOR INJUNCTIVE RELIEF (DEFENDANTS KENT, SHAFER, AND SOUSA)

224.   Plaintiff repeats and incorporates all of the allegations of this Complaint, as if fully set forth herein.

225.   This count is brought against Defendants Robert Kent, Rick Schafer, and Aron Sousa, M.D. in their individual and official capacities for injunctive relief.

226.   Defendants Robert Kent, Rick Schafer, and Aron Sousa, M.D. have acted under color of law in violating the Plaintiff's rights under the Fifth and Fourteenth Amendments to the United States Constitutions.

227.   Defendants Robert Kent, Rick Schafer, and Aron Sousa, M.D. have acted intentionally and with callous disregard for the Plaintiff's clearly established constitutional rights.

228.   As a direct and proximate result of the Defendants' violations of the Plaintiff's constitutional rights, John Doe, in the absence of injunctive relief will suffer severe and substantial damages. These damages include diminished earnings capacity, lost career opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress, and other compensatory damages, in an amount to be determined by a jury and the Court.

   a.   Pursuant to 42 U.S.C. §1983, the Plaintiff is entitled to compensation for any damages suffered as a result of the unconstitutional actions of the Defendants.

b.  A Preliminary Injunction issued by this Court likely will prevent much, if not all, of the damages suffered by John Doe.

229.  The Defendants' continued actions against the Plaintiff under the RVSMP and MSRR are causing substantial, immediate, and continuing damage to the Plaintiff.

230.  Pursuant to 42 U.S.C. §1983, the Plaintiff is entitled to an Injunction from this Court prohibiting the imposition of, or reporting of, any disciplinary actions under the RVSMP and MSRR against Plaintiff.

231.  Pursuant to 42 U.S.C. §1988, the Plaintiff is entitled to his attorney's fees incurred in bringing this action.

**COUNT III**
**TITLE IX**
**(DEFENDANTS MICHIGAN STATE UNIVERSITY, KENT, SHAFER, AND SOUSA)**

232.  Plaintiff repeats and incorporates all of the allegations of this Complaint, as if fully set forth herein.

233.  This count is brought against Defendant Michigan State University and individual Defendants Robert Kent, Rick Schafer, and Aron Sousa, M.D., in their individual and official capacities.

234.  Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 et seq., and its implementing regulations, 34 C.F.R. Part 106, prohibit discrimination on the basis of sex in education programs or activities operated by recipients of Federal financial assistance. Title IX provides in pertinent part: "No person … shall, on the basis of sex, be excluded from participation in, be

denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

235.   Defendant Michigan State University is an education program or activity operated by recipients of Federal financial assistance.

236.   Title IX bars the imposition of university discipline where gender is a motiving factor in the decision to discipline.

237.   Michigan State University committed impermissible gender bias against the Plaintiff in the investigation and adjudication of Jane Roe 1 and Jane Roe 2's accusations.

238.   The investigators and reviewing administrators reached conclusions that were incorrect and contrary to the weight of the evidence.

239.   Particular circumstances suggest that gender bias was a motiving factor behind the erroneous findings and the decision to impose discipline upon John Doe. These circumstances include:

   a.   The Office of Institutional Equity ("OIE"), who conducts investigations under Title IX for Defendant Michigan State University, trains its investigators in a trauma-informed, victim-centered approach. This creates a general atmosphere at Michigan State University and OIE that those who lodge a complaint of sexual misconduct are immediately treated as "survivors" and, as a result, believed without any further investigation or questioning.

b. The training of OIE investigators and decision-makers from victims' advocates in an inappropriate manner designed to produce results against males accused of sexual misconduct.

c. The decision of CHM to impose an interim suspension without the benefit of a hearing on the merits of the allegations, an opportunity to cross-examine Jane Roe 1 and Jane Roe 2 or any of the witnesses, or evidence that John Doe posed an immediate threat, and Defendant Aron Sousa, M.D.'s comments in his closing argument at the hearing regarding the interim suspension.

d. The decision of Defendant Michigan State University to ignore significant evidence that tended to exonerate accused students.

e. Improper pressure upon investigators to make findings against male students accused of sexual misconduct.

f. The reluctance of Defendant Michigan State University to amend its RVSMP to permit a hearing and cross-examination in cases where male students have been accused of sexual misconduct.

240. Defendant Michigan State University committed impermissible gender bias against John Doe in the investigation and adjudication of the Complainants' accusations. The inference of bias is drawn from the following:

a. Michigan State University has been subject to significant public scrutiny based upon its handling of reports of sexual violence against its former

employee, Dr. Larry Nassar, as well as other complaints of sexual misconduct.

b. Michigan State University is subject to an investigation by the Office of Civil Rights ("OCR").

    i. On information and belief, Michigan State University was under pressure as a result of the OCR investigation to avoid Title IX liability, the possible loss of federal funding, and further public criticism; this has led to a disciplinary system that is biased against males.

    ii. On information and belief, Michigan State University pursued the matter against John Doe as a direct result of the OCR investigation. This belief is based upon the timeline of events: Members of MSU CHM were aware of the claims by Jane Roe 1 and Jane Roe 2 in late 2017 and early 2018, but did not file a complaint with OIE until February 26, 2018 – the exact same date that the United States Secretary of Education Betsy Devos announced a new Title IX directed investigation into Michigan State University's handling of reports of sexual violence against former employee, Dr. Larry Nassar.

c. There has been substantial criticism of Michigan State University, both in the student body and in the public media, including on the internet, accusing Michigan State University of not taking seriously complaints of

female students alleging sexual misconduct by male students. On information and belief, the Michigan State University administration was cognizant of, and sensitive to, these criticisms. As a result, Michigan State University's decision-makers and its investigators were motivated to favor the accusing females over the accused male, so as to protect themselves and Michigan State University from accusations that they had failed to protect female students from sexual assault.

d. On information and belief, having been severely criticized in the student body and in the public press for tolerating sexual misconduct directed at female students, Michigan State University was motivated in this instance to accept the females' accusations of sexual misconduct so as to show the student body and the public that Michigan State University is serious about protecting female students from sexual misconduct by a male student. The investigator and administration adopted a biased stance in favor of the accusing female and against the defending male in order to avoid further fanning the criticisms that Michigan State University turned a blind eye to such assaults.

241. Michigan State University, encouraged by federal officials, has instituted solutions to sexual misconduct against women that abrogate the civil rights of men and treat men differently than women.

242. Michigan State University officials and administrators who had the authority to institute corrective measures had actual notice of and failed to correct the

misconduct. The imposition of discipline on John Doe is the result of a flawed and biased process. This resulted in a deprivation of access to educational opportunities at Michigan State University and CHM.

243. The decision of Kroll on behalf of OIE against John Doe resulted in an erroneous outcome, including the filing of a new complaint by CHM, the imposition of an interim suspension by CHM, and the recommendation of dismissal from CHM, which were the direct result of a flawed and biased proceeding.

   a. In a fair and unbiased system, whether someone is a "victim" is a conclusion to be reached at the end of a fair process, not an assumption to be made at the beginning. Michigan State University has reversed this process and assumed that John Doe was guilty because he was a male accused of sexual misconduct rather than evaluating the case on its own merits.

   b. On information and belief, women rarely, if ever, are accused of sexual misconduct by Michigan State University.

244. Michigan State University has discriminated against John Doe because of sex. This discrimination is intentional and is a substantial or motivating factor for Michigan State University's actions in this case.

245. As a direct and proximate result of Michigan State University's violations of John Doe's rights under Title IX, John Doe has suffered severe and substantial damages. These damages include diminished earnings capacity, lost career

opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court.

246.   Defendants are liable to John Doe for his damages.

247.   Pursuant to 42 U.S.C. §1988, John Doe is entitled to his attorney's fees incurred in bringing this action.

**COUNT IV**
**42 U.S.C. §1983 – VIOLATION OF DUE PROCESS PROVISIONS OF UNITED STATES CONSTITUTION – FAILURE TO PROVIDE A HEARING AND CROSS EXAMINATION OF THE CLAIMANTS (DEFENDANTS MICHIGAN STATE UNIVERSITY, KENT, SHAFER, AND SOUSA)**

248.   Plaintiff repeats and incorporates all of the allegations of this Complaint, as if fully set forth herein.

249.   This count is brought against Defendant Michigan State University and individual Defendants Robert Kent, Rick Schafer, and Aron Sousa, M.D., in their individual and official capacities.

250.   The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

251.   In this case, Defendants are state actors subject to the Fourteenth Amendment.

252.   42 U.S.C. § 1983 provides in pertinent part:

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory or the
> District of Columbia, subjects, or causes to be subjected, any citizen
> of the United States or other person within the jurisdiction thereof
> to the deprivation of any rights, privileges, or immunities secured
> by the Constitution and laws, shall be liable to the party injured in
> an action at law, suit in equity, or other proper proceeding for
> redress ….

253. A person has a protected liberty interest in his good name, reputation, honor, and integrity, of which he cannot be deprived without due process.

254. A person has a protected property interest in pursuing his education, as well as in future educational and employment opportunities and occupational liberty, of which he cannot be deprived without due process.

255. Plaintiff's constitutionally protected property interest in his continued enrollment at Michigan State University's College of Human Medicine and his right to complete his medical degree at Michigan State University was violated by the actions of Defendants.

256. Plaintiff has a constitutional right to be free from arbitrary suspension, dismissal, or restrictions on his ability to enter the Michigan State University campus.

257. It is well established that Fourteenth Amendment due process protections are required in higher education disciplinary proceedings.

258. A person who has been admitted to a public university has a protected property interest in continuing his education at that university until he has completed his course of study. The state cannot deprive a person of this interest without due process.

259.   As a result, if Plaintiff, as a Michigan State University medical student, faced disciplinary action that included the possibility of suspension or dismissal if found responsible for the alleged sexual misconduct, then the Due Process provisions of the Fourteenth Amendment to the United States Constitution applied to the disciplinary process that Michigan State University used.

260.   Michigan State University, as a land grant university established by the State of Michigan, and the individual Defendants, as agents of Michigan State University, have a duty to provide Michigan State University's students equal protection and due process of law by and through any and all policies and procedures set forth by Michigan State University.

261.   Plaintiff obeyed all institutional rules when he was wrongly suspended and later dismissed by Michigan State University.

262.   Under both federal and state law, Plaintiff had a constitutionally protected property interest in completing his medical education at the Michigan State University College of Human Medicine at the time that he was disciplined by Michigan State University and in the future.

263.   Plaintiff was entitled to a meaningful opportunity to be heard and process commensurate with the seriousness of the allegations and the potential discipline, sanctions, and repercussions he was facing. The allegations in this case have resulted in sanctions that will have lifelong ramifications for Plaintiff.

264.   Plaintiff was entitled to fundamentally fair procedures to determine whether he was responsible for the alleged sexual misconduct.

265.   In the course of such investigation and adjudication, Defendants flagrantly violated Plaintiff's clearly established rights under the Due Process Clause of the Fourteenth Amendment through its deprivation of the minimal requirements of procedural fairness by denying Plaintiff the opportunity for a live hearing.

266.   At the time that the investigation of Jane Roe 1 and Jane Roe 2's complaints began, Michigan State University's RVSMP employed a "single investigator model" for adjudicating sexual misconduct claims.

267.   Under the single-investigator model, the OIE gave the Kroll investigators complete authority to decide whether John Doe was responsible for violations of the RVSMP while acting simultaneously as the investigator, the prosecutor, and the finder of fact who determines guilt.

268.   The single-investigator model contrasts with procedures at other colleges and universities where the accused is afforded a live hearing before a hearing panel, with an opportunity to confront the evidence against him and to cross examine his accuser.

269.   Defendant Michigan State University, while Plaintiff's case has been pending, abandoned the single-investigator model in order to comply with its constitutional obligations, and adopted a hearing model under the updated RVSMP released on February 8, 2019; however, the hearing model was not adopted before Defendants imposed discipline against John Doe following the findings that resulted from an investigation under the single-investigator model.

270.   The single-investigator model has been criticized by judges and commentators because it is an inquisitorial, as opposed to adversarial, process; it offers no checks or balances against investigator bias, including unconscious racial or sexual bias; it allows a single individual to act as prosecutor, investigator, judge, and jury in determining guilt, and crucially, it allows the investigator to find the accused guilty without ever affording him a hearing where evidence can be confronted, witnesses questioned, and the accuser cross-examined.

271.   Following Michigan State University's single-investigator procedure, Defendants subjected John Doe to an inquisitorial, rather than adversarial, adjudicatory process, in which Kroll's investigators Nicole Lamb-Hale and Tyler Falish served simultaneously as prosecutor, investigator, judge and jury adjudicating guilt, with no checks or balances on racial or sexual bias.

272.   Following the university's single-investigator procedure, Lamb-Hale and Falish made findings against John Doe, concluding by a preponderance of the evidence that John Doe was in violation of the RVSMP, without first providing John Doe with the opportunity for a live hearing.

273.   Following the university's single-investigator procedure, Lamb-Hale and Falish made findings against John Doe, concluding by a preponderance of the evidence that John Doe was in violation of the RVSMP, without first providing John Doe with the opportunity to cross-examine Jane Roe 1 and Jane Roe 2, or any of the other witnesses in the case.

274.    As a result of Lamb-Hale and Falish's findings, Defendant Aron Sousa, M.D. imposed immediate discipline against John Doe on behalf of CHM, imposing an interim suspension and immediately removing John Doe from his surgery rotation, which he was within approximately two weeks of completing.

275.    Absent the findings of Lamb-Hale and Falish made without John Doe being afforded the opportunity for a live hearing, CHM would not have imposed discipline upon John Doe.

276.    As a direct and proximate result of Defendants' violations of John Doe's rights under the Fourteenth Amendment, John Doe has suffered severe and substantial damages. These damages include diminished earnings capacity, lost career opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court.

277.    Defendants are liable to John Doe for his damages.

278.    Pursuant to 42 U.S.C. §1988, John Doe is entitled to his attorney's fees incurred in bringing this action.

### COUNT V
### 42 U.S.C. §1983 – VIOLATION OF EQUAL PROTECTION CLAUSE OF UNITED STATES CONSTITUTION – GENDER DISCRIMINATION (DEFENDANTS MICHIGAN STATE UNIVERSITY, KENT, SHAFER, AND SOUSA)

279.    Plaintiff repeats and incorporates all of the allegations of this Complaint, as if fully set forth herein.

280.   This count is brought against Defendant Michigan State University and individual Defendants Robert Kent, Rick Schafer, and Aron Sousa, M.D., in their individual and official capacities.

281.   The Fourteenth Amendment to the United States Constitution provides in pertinent part:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

282.   The allegations of gender discrimination made in this Complaint further demonstrate that Defendants violated Plaintiff's clearly established right not to be discriminated against on the basis of sex, in violation of the Fourteenth Amendment, and therefore, 42 U.S.C. § 1983.

283.   As a direct and proximate result of Defendants' violations of John Doe's rights under the Fourteenth Amendment, John Doe has suffered severe and substantial damages. These damages include diminished earnings capacity, lost career opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court.

284.   Defendants are liable to John Doe for his damages.

285.    Pursuant to 42 U.S.C. §1988, John Doe is entitled to his attorney's fees

incurred in bringing this action.

## PRAYER FOR RELIEF

Plaintiff respectfully requests the following relief:

- On Count I, Judgment declaring that Michigan State University's Relationship Violence and Sexual Misconduct Policy and Medical Student Rights and Responsibilities, as applied to John Doe, violates the Due Process Clauses of the United States Constitution and Michigan Constitution;
- On Count II, an Injunction restoring John Doe as a student and prohibiting further disciplinary proceedings in a manner that violates the United States Constitution and Michigan Constitution;
- On Counts III, IV, and V, Judgment in favor of John Doe awarding damages in an amount to be determined at trial;
- Court costs and other reasonable expenses incurred in maintaining this action, including reasonable attorney's fees as authorized by 42 U.S.C. §1988.

## JURY DEMAND

Plaintiff requests a jury for all issues so triable in this case.

Respectfully submitted,

/s/ Keeley D. Blanchard

Dated: March 25, 2019
_____

Keeley D. Blanchard (P68661)
**BLANCHARD LAW**
Attorneys for Plaintiff
309 S. Lafayette St., Ste 208
P.O. Box 938
Greenville, MI 48838
(616) 773-2945
keeley@blanchard.law