UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**JOHN DOE**,

      Plaintiff,                        Case No.     1:19-cv-226

                                                    Hon. Paul L. Maloney

vs.

**MICHIGAN STATE UNIVERSITY;**
**ROBERT KENT,** in his individual and official capacity,
**RICK SCHAFER,** in his individual and official capacity,
**ARON SOUSA, M.D.,** in his individual and official capacity,
jointly and severally,

      Defendants.

_____/

**BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION**

**STATEMENT OF FACTS**

John Doe brought this action for a declaratory judgment, injunctive relief, violation of Title IX, and violation of 42 U.S.C. § 1983. This case arises out of the decision of Michigan State University ("MSU") to impose disciplinary sanctions against John Doe in violation of his Constitutional due process and federal statutory rights.

1

John Doe is a medical student at Michigan State University College of Human Medicine ("CHM"). He completed his undergraduate degree at Harvard University, and returned to his home state of Michigan to complete his medical education and be close to his mother, who has been suffering from breast cancer. He has completed nearly three years of coursework and was on schedule to graduate in 2020. He had plans to enter the field of neurology.

On April 23, 2016, John Doe was a first-year medical student at CHM. Each year, CHM's student council hosts a Med Ball, which generally includes dinner, awards, dancing, and — inevitably — consumption of alcohol. John Doe made a last-minute decision to attend the festivities with some fellow medical students and headed to Grand Rapids where the Med Ball was taking place. John Doe gathered with those friends at the home of K.B., another medical student, where everyone began consuming alcohol.

John Doe made his way to the Med Ball venue, Noto's Old World Italian Dining, with his friends and fellow students Jane Roe 1, Jane Roe 2, K.B., and others. Prior to this event, Jane Roe 1 had been in a sexual relationship with K.B., which K.B. did not consider to be exclusive. (FIR[1],, p. 15). However, Jane Roe 1 believed that her relationship with K.B. was ongoing. Jane Roe 2 was attending the Med Ball with her then-husband, J.M.. (FIR, p. 6).

During the Med Ball, Jane Roe 2 and her then-husband, J.M. became involved in a serious argument that resulted in J.M. asking Jane Roe 2 for a divorce

---

[1] "FIR" will be used as the citation for the "Final Investigative Report" issued on February 11, 2019 by Kroll Associates, Inc. on behalf of the Office of Institutional Equity for Michigan State University. A copy of the FIR is attached as Exhibit 1.

and leaving the venue. (FIR, p. 6). After this happened, Jane Roe 1 went looking for Jane Roe 2 in order to comfort her. (FIR, p. 9). Instead, Jane Roe 1 found Jane Roe 2 outside the venue engaged in a kiss with Jane Roe 1's paramour, K.B.. (FIR, p. 6, 9). Jane Roe 1 became very upset and ran back inside the venue. She found a staircase, sat down, and began texting Jane Roe 2, stating "Just done. Don't expect me to be ur friend anymore. I've done nothing but try to be a good friend to u and be supportive of whatever u need." (FIR, p. 9, 33).

Shortly after her text to Jane Roe 2, Jane Roe 1 was joined on the stairway by John Doe. Jane Roe 1 reported to him what had happened between Jane Roe 2 and K.B.. (FIR, p. 9, 12). Eventually their conversation turned to the stress of medical school and their mutual friends. Earlier in the night, John Doe and Jane Roe 1 had danced together, with John Doe teaching Jane Roe 1 the steps to the Waltz and the Cha-Cha. (FIR, p. 12). The dancing had progressed to sexually grinding against each other on the dance floor. (FIR, p. 12). Now, sitting on the stairs, John Doe kissed Jane Roe 1. She responded by kissing him back, with tongue. (FIR, p. 13).

The pair continued to make out while on the stairwell for a few minutes, until they got up and moved to the second floor of the venue. (FIR, p. 9, 13). The two ducked into a stairwell, where there would be more privacy. (FIR, p. 9. 13). There, Jane Doe 1 removed her dress, and got down on her hands and knees, using John Doe's suit jacket as a cushion for her knees on the floor. (FIR, p. 13). John Doe recalls Jane Doe 1 acting with eagerness while engaging in sexual contact. (FIR, p. 13). Jane Doe 1 presented herself for sexual intercourse, and John Doe attempted to

3

oblige her. Due to his alcohol consumption, John Doe was unable to complete the act because he could not maintain an erection. After approximately 15 minutes of trying, John Doe told Jane Roe 1 that "it wasn't going to work," and the two got dressed and exited the stairwell. They stood arm-in-arm in the hallway of the venue, and later were holding hands. (FIR, p. 13).

John Doe then left the venue with Jane Roe 1, Jane Roe 2, and K.B., and headed to The B.O.B., another bar in Grand Rapids. (FIR, p. 6,10,14,16). There, Jane Roe 1 and K.B. went off to be alone and reconciled. While at The B.O.B., Jane Roe 2 kissed John Doe on the dance floor, and Jane Roe 2 told John Doe that he was "very cute." (FIR, p. 8).

The four medical students eventually made their way back to the home of K.B., where they planned to stay for the remainder of the night. (FIR, p. 7, 8, 14, 16). Jane Roe 1 and K.B. went to sleep in K.B.'s bedroom, while Jane Roe 2 was awake on the sectional couch in K.B.'s living room. When John Doe came into the living room to sleep on the sectional couch, instead of allowing John Doe to lay down on the other end of the couch, Jane Roe 2 moved her body and invited John Doe to lay down behind her. (FIR, p. 8). John Doe laid down behind Jane Roe 2 on the couch, and Jane Roe 2 began to grind her buttocks into John Doe's genitals. John Doe responded by touching Jane Roe 2's body over her clothing and above the waist. The two kissed. (FIR, p. 8).

As this progressed, John Doe reached down and began to pull up Jane Roe 2's dress. At this point, Jane Roe 2 said either "I'm tired" or "no." It is undisputed that

4

at this point, John Doe stopped touching Jane Roe 2, and moved to another part of the couch. (FIR, p. 7, 8). He did not make any further attempts to have sexual contact with Jane Roe 2. [2],

For two years following the Med Ball, John Doe lived his life and continued with his medical education at CHM. It wasn't until April 17, 2018 that John Doe was notified that a complaint had been filed with MSU's Office for Institutional Equity ("OIE") by Jane Roe 2 regarding John Doe's sexual contact with her back in April of 2016. In fact, complaints had been filed by both Jane Roe 2 and Jane Roe 1, on February 26, 2018 and February 28, 2018, respectively. (FIR, p. 1). It was alleged that John Doe had violated the University's Relationship Violence and Sexual Misconduct Policy ("RVSMP").

John Doe was first notified of Jane Roe 2's report to OIE via a letter from Kroll and Associates, Inc. ("Kroll"), who investigated the report on behalf of MSU, on April 17, 2018. John Doe was interviewed regarding Jane Roe 2's report on April 20, 2018.

John Doe was first notified of Jane Roe 1's report to OIE via a letter from Kroll on July 31, 2018. John Doe was interviewed regarding Jane Roe 1's report on August 15, 2018.

The reports had been made to OIE by a professor at CHM, Dr. Angela Busch. During the time while the investigation by Kroll was being conducted, CHM took no action to file a complaint against John Doe under CHM's code of conduct, Medical

---

[2] A more comprehensive statement of the facts surrounding the alleged incidents on April 23, 2016 is contained within Plaintiff's Complaint, at PageID.6 through PageID.14, paragraphs 19 through 114.

5

Student Rights and Responsibilities ("MSRR") (*see* § 5, attached as Exhibit 4) and took no action to impose an interim suspension of John Doe.

On February 8, 2019, Kroll completed their investigation and issued a Final Investigative Report ("FIR"). John Doe was not afforded a hearing or any opportunity to cross-examine either Jane Roe 1 or Jane Roe 2. Kroll, the same party who conducted the investigation, made the finding in this matter. Kroll purported to use a preponderance of the evidence standard in making their findings. (FIR, p. 32).

Regarding Jane Roe 2's report, Kroll concluded that a preponderance of the evidence supported a finding that John Doe engaged in sexual contact with Jane Roe 2 without her consent and in violation of the RVSMP. (FIR, p. 32). Regarding Jane Roe 1's report, Kroll concluded that a preponderance of the evidence supported a finding that John Doe engaged in sexual intercourse with Jane Roe 1 while she was incapacitated in violation of the RVSMP. (FIR, p. 32).

As a result of the findings of the Kroll investigation, CHM imposed an interim suspension upon John Doe. (*See* Feb 13, 2019 Letter, Exhibit 2). CHM then held a "hearing" on February 14, 2019 for the sole purpose of determining whether or not the interim suspension would continue. This hearing was a one-hour hearing wherein John Doe was not permitted to challenge the findings in the FIR. CHM relied upon the findings in the FIR in imposing the sanction of an interim suspension against John Doe. Most of the CHM hearing was spent on the hearing panel reading the findings contained in the FIR.

On February 26, 2019, MSU issued a sanction of dismissal from MSU. On February 28, 2019, CHM filed a separate complaint, pursuant to the Medical Student Rights and Responsibilities ("MSRR") recommending a sanction of dismissal.

On March 8, 2019, John Doe submitted his appeal of both the findings and the sanction issued by MSU. Later that day, after submission of his appeal, John Doe was notified that his appeal was placed "on hold" and that his case was being reviewed to determine whether a hearing should have been offered. On March 11, 2019, John Doe requested, through his counsel, that MSU offer him a hearing and lift the sanction of interim suspension. On March 12, 2019, MSU communicated to John Doe's counsel that the matter was still under review for hearing, but that if a hearing was offered, the interim suspension would not be lifted.

On March 13, 2019, John Doe received a letter from OIE acknowledging that the process used to make findings against him did not comport with the law in the Sixth Circuit and offered John Doe a hearing. (*See* March 13, 2019 Letter, attached as Exhibit 3). The March 13, 2019 correspondence from OIE required that John Doe request a hearing by March 20, 2019.

On March 20, 2019, John Doe requested a hearing in writing. Further, John Doe requested, again through counsel, that the interim suspension be lifted and that the findings against him be formally withdrawn. Despite acknowledging that an unconstitutional process was utilized to reach the findings against John Doe and

7

offering a hearing, MSU has not withdrawn the finding against John Doe, and has refused to lift the interim suspension.

## LAW AND ARGUMENT

### I. Standard of Resolution

The purpose of a temporary restraining order or a preliminary injunction is to preserve the *status quo*. *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 227 (6th Cir. 1996) citing Fed. R. Civ. P. 65(a). The standard for issuing a temporary restraining order is the same as for a preliminary injunction, however the temporary restraining order standard places an emphasis on the element of irreparable harm. *See Motor Vehicle Bd. of Calif. V. Fox*, 434 U.S. 1345, 1347 n.2 (1977). In considering a preliminary injunction, the court considers four elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is denied; (3) whether the preliminary injunction would cause substantial harm to others; and (4) that the injunction will not disserve the public interest. *City of Pontiac Retired Employees Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014); *Ohio State Conf. of the NAACP v. Husted*, 768 F.3d 524, 523-33 (6th Cir. 2014). "The four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met." *Jones v. City of Monroe*, 341 F.3d 474, 476 (6th Cir. 2003).

Although it is "generally useful for the district court to analyze all four of the preliminary injunction factors," *Certified Restoration Dry Cleaning v. Tenke Corp.*,

511 F.3d 535, 542 (6th Cir. 2007), a court is not required to make specific findings concerning each of the four factors used in determining a motion for preliminary injunction if fewer factors are dispositive of the issues. *Jones*, 341 F.3d at 476.

**II.     The Plaintiff has a substantial likelihood of success on the merits.**

The due process implication in higher education disciplinary decisions has been well-established. *See Flaim v. Med. Coll. Of Ohio*, 418 F.3d 629, 633 (2005). Time and time again, the Sixth Circuit has reiterated that students have a substantial interest at stake when it comes to school disciplinary hearings for sexual misconduct. *Doe v. Miami Univ.*, 882 F.3d 579, 600 (6th Cir. 2018); *Doe v. Cummins*, 662 Fed. Appx. 437, 446 (6th Cir. 2016). The Supreme Court has repeatedly made clear that there are two basic due process requirements: (1) notice, and (2) an opportunity to be heard. *Goss v. Lopez*, 419 U.S. 565, 579 (1975).

The Sixth Circuit in *Flaim* held that in disciplinary actions in colleges and universities where facts are disputed and the penalties are serious, must involve a hearing which "must be meaningful and must provide the accused with the opportunity to 'respond, explain, and defend.'" *Flaim*, 418 F.3d at 635 citing *Gorman v. Univ. of R.I.*, 837 F.2d 7, 13 (1st Cir. 1988). Furthermore, the *Flaim* Court held that "in the most serious of cases" an accused student must have the right to cross-examine adverse witnesses. *Flaim*, 418 F.3d at 636. The most serious of cases involve those which "resolve itself in a problem of credibility…" *Id.* at 641.

In *Doe v. University of Cincinnati*, 872 F.3d 393 (6th Cir. 2017) the Sixth Circuit reiterated the minimal due process requirement for a hearing in disciplinary

9

proceedings. The Sixth Circuit again stated that a "student's opportunity to share his version of events must occur at 'some kind of hearing,' though that hearing need not 'take on … [the] formalities' of a criminal trial." *Id.* at 400 (internal citations omitted). The court in the *University of Cincinnati* case again held that the plaintiff's due process rights are violated where there was no opportunity to cross-examine the accuser in a case that hinged on credibility. *Id.* at 402.

As if the well-established Sixth Circuit precedence was not clear enough, the Court again stated, "(1) if a student is accused of misconduct, the university must hold some sort of hearing before imposing a sanction as serious as expulsion or suspension, and (2) when the university's determination turns on credibility of the accuser, the accused, or witnesses, that hearing must include an opportunity for cross-examination." *Doe v. Baum*, 903 F.3d 575, 581 (6th Cir. 2018).

Despite long-standing, well-established law to the contrary, MSU did not afford John Doe a hearing, nor did he have any opportunity to cross-examine the claimants. Instead, the OIE engaged Kroll Associates, Inc. to conduct an investigation, make credibility determinations, and ultimately decide whether or not a violation of the University's Policy on Relationship Violence and Sexual Misconduct (RVSMP) occurred. The investigation, where Kroll acted as prosecutor, investigator, judge, and jury, resulted in an erroneous finding that John Doe had violated the RVSMP. John Doe was not provided the opportunity for a hearing and was not afforded the minimal due process rights to which he was entitled.

MSU has acknowledged that relying solely on the investigation violated John Doe's constitutional rights. MSU conceded that in the case against John Doe, credibility is at issue and determined that the case requires the opportunity for a hearing as required by the Sixth Circuit. Despite these admissions, MSU has refused to reverse the discipline imposed by CHM as a direct result of the findings reached using an unconstitutional process.

Because MSU has admitted that it has violated John Doe's constitutional rights in failing to provide him with adequate due process, John Doe has a substantial likelihood of success on the merits. The temporary restraining order and/or preliminary injunction seeks to lift the interim suspension imposed by CHM that is based only on the findings made by Kroll in what has already been determined by MSU to be a constitutionally deficient process. CHM should not continue the interim suspension that is based solely on findings that occurred as a result of deprivations of John Doe's constitutional rights.

### III. There is a substantial threat to irreparable harm to the Plaintiff if the injunction is denied.

If Defendants are not enjoined, John Doe's reputation and educational and career prospects will suffer irreparable harm. "To demonstrate irreparable harm, the plaintiff[] must show that . . . [he] will suffer actual and imminent harm rather than harm that is speculative or unsubstantiated." *Abney v. Amgen*, Inc. 443 F.3d 549, 552 (6th Cir. 2006). Harm is irreparable if it cannot be fully compensated by monetary damages. *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002). If a constitutional right is being threatened or impaired,

the Court must find that plaintiff will suffer irreparable injury. *Bonnel v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001).

When a student confronts removal from a university, irreparable harm is easily demonstrated. See, e.g., *Jones v. Bd. of Governors of Univ. of N.C.*, 704 F.2d 713, 716 (4th Cir. 1983) (affirming the grant of a preliminary injunction ordering reinstatement of a nursing student pending resolution of her due process challenge to disciplinary action taken against her); *Marshall v. Ohio Univ.*, 2015 WL 1179955, at *9 (S.D. Ohio Mar. 13, 2015) (finding irreparable harm to plaintiff where a suspension from defendant university "effectively denied him the benefit of the work already performed in the classes this semester and delayed the completion of his degree," and because plaintiff would "forever have this disciplinary action on his academic record, which my impact his ability to enroll at another institution, or affect his future career possibilities"); *Boman v. Bluestem Unified Sch. Dist. No. 205*, 2000 WL 297167, at *3 (D. Kan. Jan. 28, 2000) (noting that suspension of student constitutes irreparable harm); *Bhandari v. Trs. of Columbia Univ. in N.Y.*, 2000 WL 310344, at *15–16 (S.D.N.Y. Mar. 27, 2000) (finding irreparable injury because requiring Plaintiff to "repeat[] the courses he is currently taking after serving his suspension . . . would forever deny him the benefit of the work he has already performed this semester and would necessarily delay his ultimate fulfillment of the requirements for a degree.").

In *Doe v. Middlebury College*, the plaintiff brought suit in the District of Vermont against Middlebury College ("Middlebury") seeking a preliminary

12

injunction enjoining Middlebury from expelling him and from preventing him from attending courses for the Fall 2015 semester. *See* 2015 WL 5488109, at *1 (D. Vt. Sept. 16, 2015). The plaintiff had been accused of sexual misconduct by another student while he was on a study abroad program through the School for International Training ("SIT"). *Id.* SIT investigated the complaint, held a hearing, and exonerated the plaintiff. *Id.* One month later, Middlebury conducted its own de novo investigation, determined that the plaintiff had violated school policy, and expelled the plaintiff. *Id.* In the meantime, the plaintiff had completed an internship that resulted in a job offer to begin in July 2016, contingent upon the plaintiff graduating from Middlebury. *Id.* at *2.

The *Middlebury* Court recognized that the plaintiff was in a "unique situation where [p]laintiff was exonerated of the charge of sexual assault by one U.S. institution following an investigation and hearing, allowed to continue his studies the next term, and subsequently determined by his college following a second investigation of the same allegation to have committed sexual assault, after which he was expelled." *Id.* at *3.

The *Middlebury* Court granted the plaintiff's motion for preliminary injunction, finding that the plaintiff was likely to suffer irreparable harm if he was expelled from the college because:

> If Plaintiff is not permitted to begin his senior year in September 2015, he will not complete his degree before July 2016 and will lose the job [offer]. Plaintiff asserts another job in this field will be difficult to secure because the job offers stem from successful completion of an internship offered to students entering their senior year of college. While Plaintiff may recover money

13

> damages to compensate for lost wages, money damages cannot compensate for the loss of his senior year in college with his class, the delay in the completion of his degree, or the opportunity to begin his career in July 2016 with this particular employment. Further, Plaintiff would have to explain, for the remainder of his professional life, why his education either ceased prior to completion or contains a gap. Money damages cannot provide an adequate remedy for such imminent and non-speculative harm.

*Id.* (internal citations omitted).

In this case, the interim suspension imposed upon Plaintiff has severely impacted his ability to timely complete his medical education at CHM, even if he is ultimately reinstated after finally being offered a hearing. The interim suspension has resulted in Plaintiff being removed from a surgery rotation within two weeks of completion. Presumably, if Plaintiff is not reinstated to his rotation within a reasonable period of time, he will lose the benefit of multiple weeks of work that he had already completed on the surgery rotation.

Further, Plaintiff is currently being prevented from completing required curriculum that will no longer be offered by CHM as they are implementing a change in their curriculum. This could delay Plaintiff's graduation from CHM by up to two years. Plaintiff could potentially be required to recomplete his entire third year of medical school because CHM will no longer be offering the classes required for Plaintiff to finish out his third year under the current curriculum.

Additionally, Plaintiff is currently registered and has paid to take the Step 2 examination, required to be completed for the fourth year of medical school. Plaintiff is scheduled to take those examinations on May 22, 2019 and June 27,

14

2019. He has incurred expenses of $1,920.00 for those examinations, and is unable to complete the examinations while he is suspended from CHM.

Plaintiff faces a significant delay in his graduation as a result of the interim suspension, which also threatens to impact his ability to obtain a residency of his choosing. He will forever be required to explain this gap in his educational history to other schools and employers. Additionally, CHM has notified professors, students, and members of the local medical community of Plaintiff's interim suspension and the findings against Plaintiff by Kroll. Without lifting the interim suspension, Plaintiff will continue to suffer a loss of career opportunities, diminished earnings capacity, loss of reputation, humiliation, embarrassment, inconvenience, and mental and emotional anguish and distress.

**IV. The injunction will not cause harm to others.**

There are two potential "parties" that could possibly be harmed by imposing the injunctive relief Plaintiff seeks: the Claimants and the University. However, reinstating John Doe as a student of CHM will not harm either party.

The accusations lodged against John Doe concerned events that were alleged to have occurred on April 23, 2016, nearly two years prior to the beginning of the OIE investigation. In fact, CHM became aware of the allegations prior to the investigation by the OIE, at which point CHM had the option of suspending John Doe if it found that the conduct threatened immediate or irreparable harm. *See* MSRR 5.6.2. CHM apparently did not deem it necessary to suspend John Doe then, but instead allowed John Doe to continue his studies while it reaped the benefits of

the significant amount of tuition paid by John Doe during that time period, amounting to approximately $46,110.00.

The claims were made to OIE on February 26, 2018 and February 28, 2018. (FIR, p. 1). The investigation dragged on for nearly a year, and the Final Investigative Report with the findings was issued on February 8, 2019. Again, CHM had the discretion to suspend John Doe during the course of the year-long investigation but did not. CHM cannot now claim that it would be substantially harmed should this Court grant injunctive relief.

The Claimants are also not at risk of substantial harm. It has been three years since the conduct is alleged to have occurred. There have been no further allegations of any kind against John Doe. On information and belief, Jane Roe 2 has recently or will soon be completing medical school and would not be required to attend any classes with John Doe. Further, on information and belief, CHM is able to accommodate John Doe and Jane Roe 1 so that they will not be required to attend any classes together or interact in any professional capacity. It is highly unlikely that John Doe will interfere with the Claimants or their rights to an education. John Doe has further submitted a psychological evaluation and risk assessment to MSU and CHM which indicates that he is not a risk to others.

Further, it is important to note that CHM did not impose an interim suspension in this case until nearly three years after the incidents are alleged to have occurred. John Doe had continued his medical education at CHM during that period without incident and without posing a risk to staff, students, or patients.

CHM made the report to OIE. If they truly believed that John Doe posed some risk of harm, they could have issued an interim suspension at the time the investigation was initiated by their own report. Rather, they waited until findings were made through the use of an unconstitutional process before issuing the suspension of John Doe.

### V.     The injunction will not disserve public interest.

In constitutional cases, an inquiry into the public interest is difficult to separate from the likelihood of success on the merits because "the public interest is promoted by the robust enforcement of constitutional rights." *Am. Freedom Def. Initiative v. Suburban Mobility for Reg. Transp.*, 698 F.3d 885, 896 (6th Cir. 2012). An injunction in the present case is in the public interest. The Court acts to support a broad public interest in enforcing fundamental constitutional principles.

On the other hand, the failure to grant an injunction would harm the public because it would permit MSU to violate the constitutional rights of all current and future students on an ongoing basis while this case is resolved, which would necessarily cause substantial, irreparable harm to those students. *See G&V Lounge, Inc. v. Mich. Liquor Control Comm.*, 23 F.3d 1071, 1079 (6th Cir. 1994) (noting "it is always in the public interest to prevent the violation of a party's constitutional rights"); *Doe v. Lee*, U.S.D.C., D. Conn. No. NO 3:99CV314 (May 18, 2001) ("there is a distinct public interest in having this Court discharge its duty to protect and enforce [constitutional] rights").

In this case, Plaintiff has demonstrated a strong likelihood of success on the merits, especially given Defendants' concession that it had deprived Plaintiff of his due process rights in the investigation and will afford him a hearing. Further, Plaintiff has shown that he will suffer irreparable harm to his education and career if injunctive relief is not granted. Moreover, because it is always in the public interest to prevent a violation of Plaintiff's constitutional rights, the public interest would be served by granting the relief Plaintiff seeks in this case.

## CONCLUSION

Plaintiff urges this Court to enter a temporary restraining order and/or a preliminary injunction so Plaintiff may continue his education at the College of Human Medicine at Michigan State University. Plaintiff is likely to prevail on the merits as the University has already conceded his rights were violated and the suspension is only based on the findings which were produced as a result of the lack of due process. If Defendants are not enjoined by this Court, Plaintiff will suffer immediate and irreparable injury. Granting temporary injunctive relief in this case will not cause harm to Defendants or the Claimants and will be in the public's interest to ensure that Defendants are prevented from further violating fundamental due process.

                                        Respectfully submitted,

Dated: March 27, 2019              /s/ Keeley D. Blanchard
                                        _____
                                        Keeley D, Blanchard (P68661)
                                        **BLANCHARD LAW**
                                        Attorney for Plaintiff
                                        309 S. Lafayette St., Ste 208
                                        Greenville, MI 48838
                                        (616) 773-2945
                                        keeley@blanchard.law