**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

JOHN DOE,

     Plaintiff,

                            Case No.: 1:19-cv-226

v

                            Hon. Paul L. Maloney

MICHIGAN STATE UNIVERSITY;
ROBERT KENT, in his individual and official
capacity, RICK SCHAFER, in his individual and
official capacity, ARON SOUSA, M.D., in his
individual and official capacity, jointly and
severally,

     Defendants.

---

BLANCHARD LAW
Keeley Blanchard (P68661)
Attorneys for Plaintiff
309 S. Lafayette St., Ste 208
P.O. Box 938
Greenville, MI 48838
(616) 773-2945
keeley@blanchard.law

MILLER, CANFIELD, PADDOCK AND
STONE, P.L.C.
Scott R. Eldridge (P66452)
Brian M. Schwartz (P69018)
Attorneys for Defendants
One Michigan Avenue, Suite 900
Lansing, MI 48933
(517) 483-4918
eldridge@millercanfield.com
schwartzb@millercanfield.com

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR TEMPORARY**
**RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION**

**Hearing Date: April 11, 2019 at 1:30 P.M.**
**107 Federal Building**
**410 W. Michigan Avenue**
**Kalamazoo, Michigan, 49007**

# TABLE OF CONTENTS

**Page**

INDEX OF AUTHORITIES.................................................................................................ii

I.      INTRODUCTION ................................................................................................. 1

II.     STATEMENT OF RELEVANT FACTS .............................................................. 3

    A.      Background ................................................................................................. 3

    B.      MSU'S RVSM Policy And The Investigation Into The Sexual Assault
        Allegations ................................................................................................. 4

    C.      Plaintiff Had Nonconsensual Intercourse With An Incapacitated Jane
        Roe 1 ......................................................................................................... 6

    D.      Plaintiff Sexually Assaulted Jane Roe 2 Without Her Consent............................7

    E.      MSU's College of Human Medicine Suspends Plaintiff After An
        Additional Hearing..................................................................................... 8

    F.      *Baum* And MSU's Amended RVSM Policy................................................ 9

III.    ARGUMENT ....................................................................................................... 10

    A.      Standard Of Review................................................................................. 10

    B.      Plaintiff Cannot Receive Preliminary Injunctive Relief Because He Seeks
        To Modify, Not Preserve, The Status Quo ............................................... 10

    C.      Plaintiff Has Not Shown An Entitlement To Emergency Injunctive Relief........ 11

        1.      Plaintiff Is Unlikely To Succeed On The Merits Of His Due
            Process Claim That A Hearing With Cross-Examination Is
            Required Before Any Interim Measures Are Imposed ........................... 11

        2.      Plaintiff Would Not Suffer Irreparable Harm If An Injunction Is
            Denied ............................................................................................... 16

        3.      There Will Be Harm To Jane Roe 1, Jane Roe 2, And The Public
            Interest If An Injunction Is Issued ..................................................... 19

        4.      The Balance Of Harms Weighs In The University's Favor.................... 20

IV.     CONCLUSION.................................................................................................... 21

# INDEX OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg.*,
   511 F. App'x 398 (6th Cir. 2013) ............................................16

*C.Y. ex rel. Antone v. Lakeview Public Schools*,
   557 F. App'x 426 (6th Cir. 2014) ............................................13

*Bd. of Curators of Univ. of Mo. v. Horowitz*,
   435 U.S. 78 (1978)............................................12

*Bonnell v. Lorenzo*,
   241 F.3d 800 (6th Cir. 2001) ............................................10, 19

*Cleveland Bd. of Educ. v. Loudermill*,
   470 U.S. 532 (1985)............................................15

*Cox v. Jackson*,
   579 F. Supp. 2d 831 (E.D. Mich. 2008)............................................10, 11

*Crook v. Baker*,
   813 F.3d 88, 92 (6th Cir. 1987) ............................................19

*Davis v. Monroe County Bd. of Educ.*,
   526 U.S. 629 (1999)............................................20

*Doe v. Baum*,
   903 F.3d 575 (6th Cir. 2018) ............................................ *passim*

*Doe v. Cummins*,
   662 F. App'x 437 (6th Cir. 2016) ............................................12

*Doe v. Middlebury College*,
   2015 WL 5488109 (D. Vt. Sept. 16, 2015)............................................18

*Doe v. Ohio State Univ.*,
   136 F. Supp. 3d 854, 871 (S.D. Ohio 2016) ............................................18, 19

*Stiles ex rel DS v. Grainger Cty*,
   819 F.3d 834 (6th Cir. 2016) ............................................20

*Flaim v. Medical College of Ohio*,
   418 F.3d 629 (6th Cir. 2005) ............................................11, 12, 14, 15

*Goss v. Lopez,*
    419 U.S. 565 (1975) ................................................................................. *passim*

*Hill v. Bd. of Trustees of Michigan State Univ.,*
    182 F. Supp. 2d 621 (W.D. Mich. 2001) ............................................................. 13

*Jahn v. Farnsworth,*
    617 F. App'x 453 (6th Cir. 2015) ...................................................................... 13

*Jaksa v. Regents of the Univ. of Mich,*
    597 F. Supp. 1245 (E.D. Mich. 1984), *aff'd*, 787 F.2d 590 (6th Cir. 1986) ............ 12

*Lucero v. Detroit Pub. Sch.,*
    160 F. Supp. 2d 767 (E.D. Mich. 2001) ............................................................. 16

*Marshall v. Ohio Univ.,*
    2015 WL 1179955 (S.D. Ohio Mar. 13 2015) ................................................ 18, 19

*Mathews v. Eldridge,*
    424 U.S. 319 (1976) ...................................................................................... 12

*Nguyen v. Univ. of Louisville,*
    2006 WL 1005152 (W.D. Ky. Apr. 14, 2006) ...................................................... 13

*Overstreet v. Lexington–Fayette Urban County Gov't,*
    305 F.3d 566 (6th Cir. 2002) ...................................................................... 10, 17

*Paw Paw Wine Distributors v. Joseph E. Seagram & Sons,*
    603 F. Supp. 398 (W.D. Mich. 1985) ................................................................. 16

*Pierre v. Univ. of Dayton,*
    143 F. Supp. 3d 703 (S.D. Ohio 2015) ............................................................... 17

*Pirschel v. Sorrell,*
    2 F. Supp. 2d 930 (E.D. Ky. 1998) .................................................................... 12

*Ramik v. Darling Int'l,*
    161 F. Supp. 2d 772 (E.D. Mich. 2001) ............................................................. 10

*Rock & Roll Hall of Fame & Museum v. Gentile Prods.,*
    134 F.3d 749 (6th Cir. 1998) ........................................................................... 10

*Sampson v. Murray,*
    415 U.S. 61 (1974) ........................................................................................ 17

*Seal v. Morgan,*
    229 F.3d 567 (6th Cir. 2000) ...................................................................... 11, 19

*Tri-Cities Holdings LLC v. Tennessee Health Servs. & Dev. Agency*,
    598 F. App'x 404 (6th Cir. 2015) ............................................................................. 16

*Univ. of Tex. v. Camenisch*,
    451 U.S. 390 (1981) .................................................................................................. 10

*Wells Fargo v. WhenU.com*,
    293 F. Supp. 2d 734 (E.D. Mich. 2003) .................................................................. 16

*Winter v. Nat. Res. Def. Council*,
    555 U.S. 7 (2008) ...................................................................................................... 16

## Constitutional Provisions

Const 1963, art XIII, §5 ................................................................................................ 19

## I.      Introduction

Distilled down to its essence, Plaintiff's request for preliminary injunctive relief[1] asserts that Plaintiff's February 2019 interim suspension by the College of Human Medicine ("CHM") – after Michigan State University's ("MSU" or the "University") investigators concluded that he raped an incapacitated classmate and later the *same night* sexually fondled a second classmate under her dress without her consent – is unconstitutional and that he is entitled to cross-examine those classmates at a live hearing under *Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018) before MSU can impose any interim measures.  Applicable law does not support his claim.

Regarding the "*Baum* hearing" argument, MSU has already granted Plaintiff's request for such a hearing (scheduled for May 2019), before making a final determination about Plaintiff's status as a medical student.  Thus, MSU has satisfied its constitutional obligations regarding cross-examination in student disciplinary proceedings when the outcome depends on the credibility of the accused.  Further, contrary to Plaintiff's contention, MSU has never acknowledged that its pre-*Baum* investigative policies or practices were unconstitutional.  They were not.  Rather, MSU has notified stakeholders that it has adjusted its policies in light of *Baum*, affording those eligible – including Plaintiff – an opportunity for a *Baum* hearing.

Plaintiff's Due Process challenge to his interim suspension is likewise misplaced.  No authority, including *Baum*, prohibits MSU from taking and sustaining interim measures, such as an interim suspension, to keep its students and community safe pending further investigation and consideration.  This is particularly true under the circumstances presented here, where a medical student is initially found to have raped one classmate and sexually assaulted a second **on the**

---

[1] On March 27, 2019, the Court denied Plaintiff's request for a temporary restraining order. (Dkt#15).

**same night.** Supreme Court precedent recognizes that such students may be immediately removed from school. *Goss v. Lopez*, 419 U.S. 565, 582-83 (1975). That MSU did not suspend him sooner is merely a byproduct of the timing of Jane Roe 1's and Jane Roe 2's reports.[2] Immediately after the Final Investigative Report concluded that Plaintiff egregiously violated MSU's Relationship Violence and Sexual Misconduct Policy ("RVSM Policy"), MSU determined that it was in the best interests of Jane Roe 1, Jane Roe 2, the community, and the integrity of the RVSM Policy to impose an **interim** suspension pending further consideration. Plaintiff has merely been suspended. He remains an MSU student, and has not been expelled.[3]

Plaintiff's assertion that he was denied notice and opportunity to be heard prior to his interim suspension is not supported by fact or law. MSU provided ample, advance notice of the complaints against Plaintiff and allowed him to fully participate and develop his own record throughout the course of the investigation. Before he was ever interviewed, Plaintiff received a detailed letter explaining the complaints made against him by Jane Roe 1 and Jane Roe 2. MSU then interviewed Plaintiff twice, permitting him to review and comment on the preliminary report before it became final, and allowing him to submit questions to the claimants.

As for the interim suspension, MSU's Medical Student Rights and Responsibilities ("MSRR") policy provided Plaintiff with ample notice of the potential interim measure. It states, in relevant part: "When student conduct that threatens immediate or irreparable harm is alleged, the student shall be suspended by the appropriate dean/designated college administrator." (Ex 1,

---

[2] As set forth in the Final Investigative Report, during the two years following the incident, Jane Roe 2 did not see Plaintiff until they were placed in the same OBGYN rotation around the time she filed her complaint. (Pl's Ex 1, Final Investigative Report, p 7, PageID#202). And Jane Roe 1's complaint was prompted after she was informed that Plaintiff may be placed on her same clinical rotation track. (*Id.*, p 11, PageID#206).

[3] Under the Medical Student Rights and Responsibilities, dismissal from the medical college is effective only after approval by the Dean of the relevant medical college and the University's Provost. (Ex 1, MSRR, §5.7.1.4).

MSRR, §§5.6.2, 5.6.3; *see also* Dkt#1, Complaint, ¶179, PageID#22).  The RVSM Policy, which was provided to Plaintiff via a link when he received notice of the allegations, also states that interim measures may include suspensions.  (Ex 2, RVSM Policy, §(XI)(L)(7), at pp 29-30).

Plaintiff's motion does not dispute that he will receive a *Baum* hearing.  Instead, he asserts that he is entitled to a live hearing with cross examination before MSU can impose any interim measures.  Well-established Supreme Court and Sixth Circuit authority, however, permits interim suspensions prior to a more formal hearing.  Plaintiff cannot establish that he is likely to succeed on the merits of his Due Process claim or that the other preliminary injunction factors weigh in his favor.  Accordingly, MSU requests that the Court deny Plaintiff's motion for preliminary injunctive relief.

## II.     Statement Of Relevant Facts

### A.     Background

Plaintiff, Jane Roe 1, and Jane Roe 2 are students in MSU's College of Human Medicine. On February 7, 2019, MSU's Office of Institutional Equity ("OIE"), through its investigative partner, Kroll, issued a Final Investigative Report concluding that Plaintiff violated the RVSM Policy *twice* on the same evening vis-à-vis *two separate* women.  (Pl's Ex 1, Final Investigative Report (hereinafter cited as "FIR"), PageID##196-232).[4]  Specifically, on February 26, 2018 and February 28, 2018, OIE received reports that Jane Roe 1 and Jane Roe 2 had separately been subjected to nonconsensual sexual misconduct on the same night by Plaintiff.  (FIR, p 1, PageID#196).

Jane Roe 1 told investigators that on the evening of April 23, 2016, during a reception for MSU medical students, Plaintiff had nonconsensual intercourse with her in a stairwell while she

---

[4] Plaintiff's recitation of the factual background consists only of those portions of the Final Investigative Report that he cherry-picked from his version of the sexual assaults.

was inebriated and incapacitated.  (FIR, pp 9-10, PageID##204-205).  Jane Roe 2 told investigators that – later the same night – she woke up on a couch to Plaintiff sexually assaulting her by fondling her under her underwear and attempting to kiss her without her consent.  (FIR, p 7, PageID#202).  Both incidents are described in more detail below.

After a thorough investigation during which Plaintiff was provided (and took advantage of) ample opportunity to be heard, MSU imposed an interim suspension.  Whether that suspension continues will depend on the outcome of a hearing procedure that will permit Plaintiff to cross-examine the claimants, consistent with *Baum*.  That is all that *Baum* requires and Plaintiff has received, or imminently will receive, all the process to which he is entitled.

**B.    MSU'S RVSM Policy And The Investigation Into The Sexual Assault Allegations**

MSU maintains and enforces its RVSM Policy through its OIE.  (Ex 2, RVSM Policy).[5] The RVSM Policy prohibits certain behaviors by its students, staff, and faculty consistent with the proscriptions of Title IX of the Educational Amendments of 1972 and the Violence Against Women Act, such as:  relationship violence, stalking, and sexual misconduct, including rape and unwanted sexual touching.  MSU encourages individuals who believe they have been subjected to conduct that might violate the RVSM Policy to report to OIE.  (*Id.*, §XI, pp 14-35).

After receiving Jane Roe 1's and Jane Roe 2's complaints, Kroll began a thorough and objective investigation, which included separate interviews of Jane Doe 1 and Jane Doe 2.  (FIR, pp 6-7, 9-11; PageID##201-202, 204-206).  Contrary to Plaintiff's assertions that he did not receive adequate notice of the complaints against him, Kroll thereafter notified Plaintiff in writing of the investigation and explained in no uncertain terms:  "[Jane Roe 1] alleges that you engaged in sexual violence, and specifically raped her in violation of Section VIII(D) of the

---

[5] Plaintiff's conduct is evaluated under the version of the RVSM Policy that was in effect at the time of the alleged conduct.  (FIR, p 1, PageID#196).

University's RVSM policy attached, on or about April 23, 2016 at a restaurant in Grand Rapids, Michigan."  (Ex 3, 7/31/18 email and letter).  Regarding Jane Roe 2, Plaintiff received the following notice:  "[Jane Roe 2] alleges that you engaged in sexual harassment, and specifically made unwanted sexual contact with her in violation of Section X of the University's RVSM policy, on or about April 23, 2016 at a classmate's house in Grand Rapids, Michigan."  (Ex 4, 4/17/18 email and letter).

Kroll thereafter interviewed Plaintiff twice, on April 20, 2018 and August 15, 2018, providing him with additional detail regarding the allegations and affording him an opportunity to provide his side of the story.  (FIR, pp 7, 12, PageID#202, 207).  Plaintiff did not deny that he, Jane Roe 1, and Jane Roe 2 were drinking heavily, "drunk," "very drunk," and "inebriated" on April 23, 2016.  (FIR, pp 8, 12, PageID#203, 207).  Nor does he deny engaging in separate sexual conduct with both Jane Roe 1 and Jane Roe 2 that night.  (FIR, pp 8, 13, PageID#208).  Rather, Plaintiff told investigators that both incidents (described in more detail below) were consensual, despite not receiving affirmative indications of agreement for the sexual conduct from either claimant.  (*Id.*)

Consistent with OIE's usual practice, Kroll provided Plaintiff and each claimant the opportunity to submit questions in writing to OIE to be asked of the other party as part of the investigation hearing process.  (FIR, pp 9, 15, PageID##204, 210).  Neither Plaintiff nor the claimants submitted questions.  (*Id.*)

During its investigation, in addition to the interviews of Jane Roe 1, Jane Roe 2, and Plaintiff, Kroll reviewed text messages provided by Jane Roe 1, a class schedule provided by a witness, and two typed statements regarding the events of April 23, 2016 provided by Jane Roe 2.  (FIR, pp 5, 33, PageID##200, 228).  Kroll also interviewed seven other people with potential

knowledge of the incidents, including fellow medical students and medical professionals who treated Jane Roe 1.  (FIR, pp 4-5, 15-27, PageID##199-200, 210-222).

Consistent with the RVSM Policy, on November 15, 2018, Kroll issued a Preliminary Investigative Report, inviting Plaintiff, Jane Roe 1, and Jane Roe 2 the opportunity to "provide feedback, additional information, or corrections."  (FIR, pp 27-28, PageID#222-223).  The Preliminary Investigative Report included a summary of the investigation, but did not reach any conclusions about whether Plaintiff's conduct violated the RVSM Policy.  (*See* Ex 5, Preliminary Investigative Report).  Neither Jane Roe 1 nor Jane Roe 2 provided Kroll with a response to the Preliminary Investigative Report.  (FIR, pp 27-28, PageID#222-223).  On November 20 and 21, 2018, however, Plaintiff provided written responses to both complaints, identifying additional facts and denying any wrongdoing.  (*Id*.)  On February 7, 2019, after considering the additional information, Kroll completed its 32-page Final Investigative Report (plus attachments).

**C.  Plaintiff Had Nonconsensual Intercourse With An Incapacitated Jane Roe 1**

A thorough review of all of the evidence led to the conclusion that Plaintiff engaged in nonconsensual intercourse with Jane Roe 1 while she was incapacitated during the stairwell incident.  (FIR, p 32, PageID#227).  Jane Roe 1 described to investigators a very different sexual encounter compared to the version provided by Plaintiff in his motion and brief.

On April 23, 2016, Jane Roe 1 attended an event known as "Med Ball," which some equate to a "medical school prom."  (FIR, p 6, PageID#201).  Other CHM students attended, including Jane Roe 2, Plaintiff, and their classmate identified in the complaint as K.B., along with Jane Roe 2's husband J.M. (FIR, p 6, PageID#201).  The group was drinking heavily and dancing together throughout the evening.  (FIR, p 6-14, PageID#201-209).  Late in the evening, while Jane Roe 1 sat near the top of a set of stairs at the event venue, Plaintiff sat next to her.

(FIR, p 9, PageID#204).  They began kissing, and Plaintiff led her into a nearby stairwell.  (*Id.*)  Although she could not recall all specific details due to her level of intoxication, Jane Roe 1 reported to Kroll that Plaintiff demanded that she remove her dress and had unwanted, sexual intercourse with her in the stairwell without her consent, while she was intoxicated.  (FIR, pp 9-10, PageID#204-205).

Kroll interviewed Plaintiff about Jane Roe 1's report twice.  (FIR, p 12, PageID#207).  Plaintiff reported that "everyone was inebriated" and that he and Jane Roe 1 danced together.  (*Id.*)  When he met Jane Roe 1 at the top of the stairs, he admitted that they were both "very drunk."  (*Id.*)  Plaintiff led Jane Roe 1 into the nearby stairwell, where they had intercourse "from behind" and at one point he inserted his fingers into her vagina because he had difficulty maintaining an erection.  (FIR, p 13, PageID#208).

In the Final Investigative Report, Kroll concluded that Jane Roe 1 was incapacitated due to her alcohol consumption and, thus, incapable of providing consent.  (FIR, pp 31-32, PageID#226-227; *see also* Ex 2, RVSM Policy, §(VIII)(F), (G), at pp 11-13).  Kroll notified Plaintiff of its findings on February 8, 2019.  (Ex 6, 2/8/19 email).

**D.      Plaintiff Sexually Assaulted Jane Roe 2 Without Her Consent**

After thorough review of all of the evidence, Kroll concluded that, on the same night, Plaintiff engaged in sexual contact with Jane Roe 2 without her consent in violation of the University's RVSM Policy.  (FIR, p 32, PageID#227).  As with Jane Roe 1, Jane Roe 2 described to investigators a very different sexual encounter than Plaintiff's version in his motion and brief.

Jane Roe 2 stated that after the Med Ball and a stop at a downtown Grand Rapids bar, Plaintiff, Jane Roe 1, and Jane Roe 2 went to K.B.'s house.  (FIR, p 7, PageID#202).  Because

she did not have a ride home, Jane Roe 2 decided to sleep on one side of a sectional couch.  (*Id.*)

Jane Roe 2 fell asleep wearing her formal dress.  (*Id.*)  She woke up in the middle of the night

with Plaintiff positioned behind her on the couch, "pulling up her dress, putting his hands on her

hips and under her underwear."  (*Id.*)  Plaintiff attempted to kiss Jane Doe 2 "and became more

persistent."  (*Id.*)  Once Jane Doe 2 was fully awake, she told Plaintiff "no" and "then got up and

moved to a different room."  (*Id.*)

In the Final Investigative Report, Kroll concluded that the evidence supported a finding

that Plaintiff engaged in sexual contact with Jane Roe 2 without her consent, in violation of the

RVSM Policy.  (FIR, pp 31-32, PageID#226-227; *see also* Ex 2, RVSM Policy, §(VIII)(F), (G),

at pp 11-13).  Kroll notified Plaintiff of its findings on February 8, 2019.  (Ex 6, 2/8/19 email).

**E.    MSU's College of Human Medicine Suspends Plaintiff After An Additional Hearing**

On February 12, 2019, after consideration of Kroll's Final Investigative Report, the

College of Human Medicine issued an interim suspension.  (Ex 7, 2/12/19 letter; *see also* Ex 1,

MSRR, §§2.414, 5.6).  On February 14, 2019, a fact-finding panel was convened to determine

whether there was sufficient evidence to justify continuation of the suspension.  (Ex 8, 2/13/19

letter; *see also* Ex 1, MSRR, §5.6.2).  Plaintiff was informed that he would have an opportunity

to "present [his] material" and was, in fact, supported during the meeting by his lawyer.  (Ex 8,

2/13/19 letter; Ex 9, 2/15/19 letter).  Following the fact-finding, the panel decided to uphold the

suspension.  (Ex 9, 2/15/19 letter).

Although a recommendation of dismissal was made on February 28, 2019, (*see* Ex 10,

2/28/19 letter), Plaintiff has remained in suspension status since February 12, 2019, and will

remain suspended until a neutral Resolution Officer conducts the more formal *Baum* hearing in

May 2019 and makes a determination, at which time MSU will further assess Plaintiff's status.

F.     *Baum* and MSU's Amended RVSM Policy

MSU initiated and Kroll conducted the investigation in this matter under the version of the RVSM Policy in existence at the time of the incident.   (FIR, p 1, fn1, PageID#196).   On September 7, 2018, the Sixth Circuit issued its decision in *Baum*, in which it held for the first time that Due Process considerations require public institutions of higher education to permit a respondent to cross-examine a claimant in a live hearing when a disciplinary determination depends on the credibility of the accused.

On February 8, 2019, after Kroll completed its Final Investigative Report, MSU issued its revised RVSM Policy to permit, under certain circumstances consistent with *Baum*, a respondent to cross-examine in a live, controlled setting the complaining parties and other witnesses, before the University reaches a final determination about a respondent's status as a student or employee. (Ex 11, 2/8/19 RVSM Policy, §(XI)(G), pp 37-41; Ex 12, Martinez Aff, ¶¶8-13).

On March 8, 2019, Plaintiff appealed Kroll's decision and the interim suspension.   MSU confirmed receipt of Plaintiff's appeal.   On March 13, 2019, MSU's OIE wrote to Plaintiff advising that his case was eligible for a more formal hearing under *Baum*, if he wished to pursue such a hearing.[6]   (Ex 13, 3/13/19 letter; Ex 12, Martinez Aff, ¶15).   On March 20, 2019, Plaintiff's counsel sent MSU a Request for Hearing.   (Ex 14, 3/20/19 email).   A hearing is scheduled to occur in May 2019, with a pre-hearing conference in April 2019.   (Ex 12, Martinez Aff, ¶15).

---

[6] Plaintiff did not previously request a hearing with live cross-examination.   (Ex 12, Martinez Aff, ¶¶9-10).

### III.    Argument

#### A.    Standard of Review

In evaluating a motion for a preliminary injunction, the court considers four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *Rock & Roll Hall of Fame & Museum v. Gentile Prods.*, 134 F.3d 749, 753 (6th Cir. 1998). "A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his … burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington–Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). "A preliminary injunction is reserved for only the most egregious case, and should not be extended to cases which are doubtful or do not come within well-established principles of law." *Bonnell v. Lorenzo*, 241 F.3d 800, 826 (6th Cir. 2001).

#### B.    Plaintiff Cannot Receive Preliminary Injunctive Relief Because He Seeks To Modify, Not Preserve, The Status Quo

The Supreme Court has made clear that the primary purpose of emergency injunctive relief is "to preserve the relative positions of the parties" until a merits determination can be made. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *see Ramik v. Darling Int'l*, 161 F. Supp. 2d 772, 778 (E.D. Mich. 2001). There are "three types of *particularly disfavored* preliminary injunctions: (1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." *Cox v. Jackson*, 579 F. Supp. 2d 831, 855 n.8 (E.D. Mich. 2008) (emphasis added) (internal quotation marks omitted).

Under this well-established precedent, Plaintiff's requested emergency injunctive relief is doubly disfavored.  **First**, he seeks to alter the status quo – more than a month later – by undoing an already-implemented interim suspension rather than forestalling its implementation.  **Second**, Plaintiff seeks a mandatory injunction, affirmatively requiring the University to reinstate Plaintiff as student as though no allegations of serious sexual misconduct have been levied against him, and no investigatory findings have been made.  Accordingly, Plaintiff's request for injunctive relief here "must be more closely scrutinized than the already-disfavored motion for preliminary [in]junction which seeks to maintain the status quo."  *Cox*, 579 F. Supp. 2d at 855 n.8.

**C.    Plaintiff Has Not Shown An Entitlement To Emergency Injunctive Relief**

**1.    Plaintiff Is Unlikely To Succeed On The Merits Of His Due Process Claim That A Hearing With Cross-Examination Is Required Before Any Interim Measures Are Imposed**

As the Sixth Circuit has recognized, "[s]chools, of course, have an unquestionably powerful interest in maintaining the safety of their campuses and preserving their ability to pursue their educational mission."  *Seal v. Morgan,* 229 F.3d 567, 574 (6th Cir. 2000).  The Supreme Court has further explained that "schools [are] vast and complex.  Some modicum of discipline and order is essential if the educational function is to be performed. . . . Suspension [or other discipline] is considered not only to be a necessary tool to maintain order but a valuable educational device."  *Goss v. Lopez*, 419 U.S. 565, 580 (1975).  These interests are directly implicated by MSU's efforts to ensure students are protected from sexual misconduct, efforts mandated by federal law and, more precisely, the requirements of Title IX.

Courts have emphasized that federal court review of university disciplinary actions is "circumscribed" and "limited to determining whether the procedures used … were constitutional."  *Flaim v. Medical College of Ohio*, 418 F.3d 629, 638 (6th Cir. 2005), *see also*

*Pirschel v. Sorrell*, 2 F. Supp. 2d 930, 934 (E.D. Ky. 1998) ("[W]hile students clearly are not stripped of their constitutional rights at the schoolhouse gate, decisions made by school officials in imposing discipline are afforded considerable deference."). All that is required is "some kind of notice" and "some kind of hearing." *Goss*, 419 U.S. at 579. "In the school-disciplinary context, an accused student must at least receive the following pre-expulsion: (1) notice of the charges; (2) an explanation of the evidence against him; and (3) an opportunity to present his side of the story before an unbiased decisionmaker." *Doe v. Cummins*, 662 F. App'x 437, 446 (6th Cir. 2016) (applying *Mathews v. Eldridge*, 424 U.S. 319 (1976)).[7] The University's ongoing disciplinary proceedings here more than comply with due process.

As noted above, a student accused of misconduct must be given "an opportunity to present his [or her] side of the story." *Goss*, 419 U.S. at 581. This opportunity to be heard, "whether formal, informal, live or not, must be meaningful and must provide the accused with the opportunity to 'respond, explain, and defend.'" *Flaim*, 418 F.3d at 635 (citation omitted). Provided the disciplinary review process affords a student an "opportunity to characterize his conduct and put it in what he deems the proper context," the procedures can fall well short of a formal, trial-like proceeding.[8] *Goss*, 419 U.S. at 584.

Due process limitations do not preclude a university from imposing interim measures—such as a suspension pending a final determination—prior to any constitutionally required

---

[7] Unpublished cases are attached alphabetically as Exhibit 16.

[8] The Supreme Court has further explained that "[a] school is an academic institution, not a courtroom or administrative hearing room," *Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 88 (1978). Thus, "[f]ull-scale adversarial hearings in school disciplinary proceedings have never been required by the Due Process Clause." *Flaim*, 418 F.3d at 640; *Jaksa v. Regents of the Univ. of Mich*, 597 F. Supp. 1245, 1250 (E.D. Mich. 1984), *aff'd*, 787 F.2d 590 (6th Cir. 1986) (university not required "to transform its classrooms into courtrooms"). For this reason, "Courts have generally been unanimous … in concluding that … neither rules of evidence nor rules of civil or criminal procedure need be applied and witnesses need not be placed under oath." *Flaim*, 418 F.3d at 635-36 (internal citations omitted). *Baum* does not change this.

hearing.  When addressing the notice and hearing requirements, the Supreme Court in *Goss* held that "[t]here need be no delay between the time 'notice' us given and the time of the hearing." 419 U.S. at 582.  The Court went on to explain that while "as a general rule notice and hearing should precede removal of the student from school … there are recurring situations in which prior notice and hearing cannot be insisted upon" *Id.*  Thus, "[s]tudents whose presence poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process may be immediately removed from school," followed by "the necessary notice and rudimentary hearing … as soon as practicable."  *Id.* at 582-83.  While *Goss* recognized that suspensions longer than ten days "may require more formal procedures," *id.* at 584, the May 2019 hearing that Plaintiff will receive provides all the constitutionally-related "formal procedures" to which Plaintiff is entitled.  Moreover, when considering temporary deprivations, such as interim suspensions, as compared to a final decision to expel, "fewer procedural protections [are] required." *Nguyen v. Univ. of Louisville*, 2006 WL 1005152, at *4 (W.D. Ky. Apr. 14, 2006) (citing *Matthews v. Eldridge*, 424 U.S. 319 (2006)).  *See also C.Y. ex rel. Antone v. Lakeview Public Schools,* 557 F. App'x 426, 430-34 (6th Cir. 2014) (suspension followed by hearing satisfied due process); *Jahn v. Farnsworth*, 617 F. App'x 453, 460-62 (6th Cir. 2015) (due process satisfied where student was suspended for more than 10 days prior to hearing).

Applying these principles, courts within the Sixth Circuit have held that "[t]he Due Process Clause does not require a particular kind of investigation to support a temporary suspension of school privileges pending a formal hearing on a disciplinary matter." *Nguyen*, 2006 WL 1005152, at *4.  Moreover, courts are reluctant to "second guess" a decision to "immediately suspend [a student] without a prior hearing but with the right to an immediate hearing before an unbiased panel." *Hill v. Bd. of Trustees of Michigan State Univ*., 182 F. Supp.

2d 621, 630 (W.D. Mich. 2001) (dismissing claim alleging violation of due process where suspension occurred before the hearing).  Indeed, in *Flaim*, the student's due process rights were not violated when he was suspended at the same time he received notice of the allegations against him, *i.e.*, prior to the hearing.  418 F.3d at 638.  Even Plaintiff admits that the University "had the discretion to suspend [Plaintiff] during the course of the year-long investigation." (Dkt#8, Pl's Br at 16).

Although *Goss* permits an interim suspension at the same time "notice' is provided, Plaintiff here was not immediately suspended when he was first notified of the allegations on April 17, 2018 (Jane Roe 2) and July 31, 2018 (Jane Roe 1).  Instead, he received the benefit of numerous procedural protections and took advantage of numerous opportunities to be heard. Additionally, Plaintiff admittedly will be receiving a live hearing with cross examination in the near future consistent with *Baum*.  Here, Plaintiff's interim suspension was warranted because, once the Final Investigation Report was completed, the CHM determined, within its discretion, that his continued presence threatened immediate and irreparable harm to community, including Jane Roe 1 and Jane Roe 2, who absent Plaintiff's interim suspension would be in the same educational environment.  (Ex 7, 2/12/19 letter; *see also* Ex 1, MSRR, §§2.414, 5.6).

*Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018), does not change the result.  To be sure, *Baum* held that "if a student is accused of misconduct, the university must hold some sort of hearing before imposing a sanction as serious as expulsion or suspension."  *Id.* at 581.  The Court also held that when a disciplinary determination depends on the credibility of the accused, the accused must receive a hearing that includes an opportunity for cross-examination.  But, *Baum* does not (and cannot) abrogate the Supreme Court's holding in *Goss* that disciplinary suspensions followed by a more robust hearing are constitutionally permissible.

Moreover, the Supreme Court has confirmed pre-suspension hearings "though necessary, need not be elaborate" when post-suspension process is also provided. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545 (1985). In *Loudermill*, the Supreme Court held that "[i]n general, 'something less' than a full evidentiary hearing is sufficient prior to adverse administration action." *Id.* The Court explained that the initial hearing "need not definitely resolve" the adverse action, but instead "should be an initial check against mistaken decisions— essentially, a determination of whether there are reasonable grounds to believe that the charges against the [plaintiff] are true and support the proposed action." *Id.* at 545-46. It concluded that to require more prior to the deprivation "would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee." [9] *Id.* at 546.

Here, Plaintiff received the benefit of a detailed, thorough investigation where he had an opportunity to be heard *prior to* the interim suspension, including multiple interviews, opportunity to pose questions to the claimants, and a review of the preliminary report. That process resulted in a 32-page Final Investigation Report. After the interim suspension was imposed, Plaintiff received a hearing regarding the suspension (with his counsel present), and is set to receive a live hearing where he will be able to cross-examination the claimants and witnesses. The pre- and post-suspension protections available here for Plaintiff are significantly greater than the "the floor or lowest level of procedures acceptable" under Sixth Circuit and Supreme Court precedent. *Flaim*, 418 F.3d at 636. MSU has provided Plaintiff more than ample due process. Thus, Plaintiff cannot establish a likelihood of success on the merits.

---

[9] Although *Loudermill* arose in the context of public employment, the Due Process principles discussed relate to the process that applies to a constitutionally-protected interest and are therefore relevant to Plaintiff's claims.

### 2.      Plaintiff Would Not Suffer Irreparable Harm If An Injunction Is Denied

A showing of irreparable harm is an essential prerequisite to injunctive relief. *Winter v. Nat. Res. Def. Council,* 555 U.S. 7, 22 (2008) ("Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction."); *Paw Paw Wine Distributors v. Joseph E. Seagram & Sons,* 603 F. Supp. 398, 401 (W.D. Mich. 1985) ("The single most important consideration is whether the movant is likely to suffer irreparable injury if the injunction is not granted, thereby impairing the Court's ability to fashion an effective remedy.")  "To constitute irreparable harm, an injury must be certain, great, and actual." *Lucero v. Detroit Pub. Sch.,* 160 F. Supp. 2d 767, 801 (E.D. Mich. 2001).  "Irreparable harm cannot be speculative; 'the injury complained of [must be] of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm.'" *Id.* (quoting *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (alteration in original)).  Moreover, "an unreasonable delay in filing for injunctive relief will weigh against a finding of irreparable harm." *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg.*, 511 F. App'x 398, 405 (6th Cir. 2013); *Tri-Cities Holdings LLC v. Tennessee Health Servs. & Dev. Agency*, 598 F. App'x 404, 411 (6th Cir. 2015) (finding plaintiff's own delays in proceeding "undercut any suggestion of irreparable harm").

Here, on February 12, 2019, four days after the University issued a Final Investigative Report, the College of Human Medicine issued an interim suspension.  Two days later, a hearing was held to address the suspension and about a week later, Plaintiff was notified that the Dean of Student's Office was recommending dismissal.  Yet Plaintiff waited until March 25, 2019 to file his Complaint.  This delay "undermines [Plaintiff's] allegation of irreparable harm." *Wells Fargo v. WhenU.com*, 293 F. Supp. 2d 734, 772–72 (E.D. Mich. 2003).  Indeed, courts routinely

find that "[a] delay between the discovery of the allegedly infringing conduct and the request for injunctive relief can support an inference that the alleged harm is not sufficiently severe or irreparable to justify injunctive relief." *Pierre v. Univ. of Dayton*, 143 F. Supp. 3d 703, 713-14 (S.D. Ohio 2015) (internal quotation omitted).  Moreover, during the time that Plaintiff delayed filing his lawsuit, the University voluntarily agreed to provide a hearing with cross-examination.

Irreparable harm only exists where the damages that might be borne in the absence of an injunction would be difficult to calculate. *Overstreet*, 305 F.3d at 578.  "A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Id.*  The alleged harms identified by Plaintiff are not irreparable.  Many are economic harms, such as the expenses incurred for his Step 2 examination, potential loss of career opportunities, and diminished earnings capacity.

What is more, Plaintiff's irreparable harm argument is rife with speculation, not facts. (*See, e.g.,* Dkt#8, Pl's Br at 14, PageID#80) ("*Presumably*, if Plaintiff is not reinstated…." and "Plaintiff *could potentially* be required…." ) (emphasis added)).  To the extent Plaintiff alleges that the interim suspension will require him to explain a "gap" in his educational history, he ignores that he was recently suspended for academic reasons wholly unrelated to the OIE investigation.[10]  In other words, a gap in his educational history exists regardless, and is likewise of his own doing.  *See also Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("The key word in this consideration is irreparable.  Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm") (quotation omitted).

---

[10] (*See, e.g.,* Ex 15, Academic Suspension Letters).

Plaintiff's assertion that the Court "must find" irreparable harm when a constitutional violation is alleged is misplaced.[11]   Courts will not presume irreparable harm under the circumstances presented here.  This is because "if a court finds it unlikely that a plaintiff will succeed on the merits of a constitutional claim, the 'argument that he is entitled to a presumption of irreparable harm based on the alleged constitutional violation is without merit,'" and "[t]he Court must look elsewhere for irreparable harm."  *Doe v. Ohio State Univ.*, 136 F. Supp. 3d 854, 871 (S.D. Ohio 2016) (quoting *Overstreet*, 305 F.3d at 578-79) (no irreparable harm in due process challenge to Title IX investigation).   In *Ohio State University*, the court rejected an argument by a student accused of sexual misconduct that in the absence of an injunction, he would suffer "damage to his reputation" because he alleged the disciplinary proceedings were constitutionally deficient.  Rejecting this argument, the court held that "[b]ecause Doe has not shown he is likely to succeed on the merits of his constitutional claims, he is not entitled to a presumption of irreparable harm."  *Id.*  The same result applies here.

---

[11] The cases Plaintiff relies on are inapposite.  Of the few cases that involve allegations of sexual assault, *Marshall v. Ohio Univ.*, 2015 WL 1179955 (S.D. Ohio Mar. 13 2015), ultimately denied the request for injunctive relief.  And in *Doe v. Middlebury College*, 2015 WL 5488109 (D. Vt. Sept. 16, 2015), the court specifically noted the fact-specific nature of the case, stating "[t]his case presents a ***unique situation*** where Plaintiff was exonerated of the charge of sexual assault by one U.S. institution following an investigation and hearing, allowed to continue his studies the next term, and subsequently determined by his college following a second investigation of the same allegation to have committed sexual assault, after which he was expelled."  *Id.* at *3. (emphasis added).  Moreover, unlike here, the victim was "not a Middlebury student," and so the plaintiff's "attendance for the fall 2015 semester [would] not have a direct effect on her."  *Id.* at *4.   In addition, the plaintiff in that case "remained listed on Middlebury's student record account as an 'active' student enrolled in courses," indicating that the school did "not view Plaintiff as a threat to the Middlebury community."  *Id.*  Plaintiff's situation is exactly the opposite: both Jane Roes are currently enrolled at the University, and Doe seeks an affirmative injunction requiring the University to remove his interim suspension, as opposed to the negative injunction granted in *Middlebury College* preventing the University from expelling the plaintiff.

**3.      There Will Be Harm To Jane Roe 1, Jane Roe 2, And The Public Interest If An Injunction Is Issued**

Universities have an "unquestionably powerful interest in maintaining the safety of their campuses." *Seal*, 229 F.3d at 574.  Indeed, the power of a university to "regulate its student body, including investigating and disciplining its students for sexual misconduct," is required by Title IX, and a failure to do so "could jeopardize its federal funding." *Ohio State Univ.*, 136 F. Supp. at 871.  *See also Bonnell*, 241 F.3d at 822 ("A college's or university's interest in maintaining a hostile-free learning environment, particularly as it relates to its Title IX funding, is well recognized.").  Forcing the University to rescind or remove interim disciplinary sanctions, after Plaintiff has already received "some kind of hearing" to be followed up by a more robust live hearing with cross examination, diminishes the integrity of that process and the University's ability to enforce it in this and other cases.  *See Marshall v. Ohio Univ.*, 2015 WL 1179955, at *10 (S.D. Ohio Mar. 13, 2015) (agreeing that "university officials should be afforded some level of deference in their disciplinary decisions and processes" and noting that "[i]ssuing a temporary restraining order in this case, and in others similar to it, would likely interfere with [the university's] ability to enforce its disciplinary standards").

The importance of the University's ability to regulate its student body under federal law (including under Title IX) is strengthened by the administrative independence granted to it by the Michigan Constitution.  Const 1963, art XIII, §5.  This provision permits the University to rescind a degree already granted, *Crook v. Baker*, 813 F.3d 88, 92 (6th Cir. 1987), and therefore unquestionably provides the University with authority to delay a student's enrollment during the pendency of disciplinary proceedings.

Granting injunctive relief would have drastic and far-reaching consequences.  **First**, Plaintiff seeks to have the Court second-guess the University's disciplinary judgments,

19

something it should not do. *See Stiles ex rel DS v. Grainger Cty*, 819 F.3d 834, 849 (6th Cir. 2016); *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 643 (1999). **Second,** and perhaps most importantly, an injunction would undermine the University's ability to investigate and remedy sexual harassment. Under Plaintiff's theory, the University would be powerless to impose interim measures or sanction a student who has been preliminary found to have violated the RVSM Policy while an appeal is pending. Alternatively, the student would be able to unilaterally pick-and-choose sanctions, something that is inconsistent with well-established notions of disciplinary proceedings. Under the circumstances present in this case, it would put Plaintiff in the same educational environment with Jane Roe 1 and Jane Roe 2, an untenable situation.[12] In the absence of appropriate sanctions against perpetrators, claimants might be less apt to report violations of the RVSM Policy and that would make the University less safe for its students. Overall, the impact of the relief requested does not promote the public interest.

### 4. The Balance Of Harms Weighs In The University's Favor

The potential harm of denying Plaintiff's request for injunctive relief is economic. It is also speculative. Contrastingly, the harm to the University would be immeasurable. Summarily casting aside sanctions imposed would undermine the integrity of the University's disciplinary process. At the outset, Plaintiff was provided information about the investigatory process, resources for assistance and the potential sanctions. (Ex 2, RVSM Policy, §(XI)(L)(7), at pp 29-30 ("The University might also impose an interim disciplinary suspension … or other remedies which can be tailored to the involved parties to achieve the goals of this policy"). *See also* Ex 1, MSRR, §§5.6.2, 5.6.3). The University was fully within its powers to impose an interim

---

[12] Plaintiff's focus on the delay between the April 23, 2016 incident and the reporting is misplaced. During the two years before the reports, neither Jane Roe 1 nor Jane Roe 2 were in the same educational environment as Plaintiff. (FIR, pp 6, 11 PageID##202, 206. *See also* note 2, *supra*).

suspension, and Plaintiff fails to provide evidence that any part of the investigation violated his due process rights, particularly since it is undisputed that he will receive a live hearing with full cross-examination as part of his appeal.

Plaintiff's suspension is only temporary. If he is successful on appeal, he is fully capable of re-enrolling to earn his degree. Further, Plaintiff is wholly responsible for his current situation, including any "gaps" in his educational history. His conduct led to his suspension (his prior academic, and his current disciplinary, suspension) and his delay in seeking relief created the so-called "emergency" he now describes. The Court should reject his *post hoc* request to intervene. Thus, the balance of harms weighs in favor of the University.

## IV.     Conclusion

For the foregoing reasons, Defendants request that the Court deny Plaintiff's request for preliminary injunctive relief.

/s/ *Scott R. Eldridge*
Scott R. Eldridge (P66452)
Brian M. Schwartz (P69018)
Miller, Canfield, Paddock and Stone P.L.C.
**Attorneys for Defendants**
One Michigan Avenue, Suite 900
Lansing, MI  48933
(517) 483-4918
eldridge@millercanfield.com

Dated:  April 5, 2019

21

## CERTIFICATION PURSUANT TO LCivR 7.2(b)(ii)

The undersigned hereby certifies that, to the best of his knowledge, this Response to Motion for Temporary Restraining Order, in its entirety (exclusive of the cover page, table of contents, index of authorities, signature block, exhibits, affidavits, certificate of service, and this certification), contains 6,691 words (as checked with Microsoft Word 2010's word counting function).

Respectfully submitted,

/s/ *Scott R. Eldridge*
Scott R. Eldridge (P66452)
Miller, Canfield, Paddock and Stone P.L.C.
One Michigan Avenue, Suite 900
Lansing, MI  48933
(517) 483-4918
Dated:  April 5, 2019                        eldridge@millercanfield.com


## CERTIFICATE OF SERVICE

I hereby certify that on April 5, 2019, I electronically filed the foregoing document with

the Clerk of the Court using the ECF system that will send notification of such filing upon all

ECF filing participants.


MILLER, CANFIELD, PADDOCK AND
STONE, P.L.C.
 */s/ Scott R. Eldridge*
_____
Scott R. Eldridge (P66452)
**Attorneys for Defendants**
One Michigan Avenue, Suite 900
Lansing, MI 48933
(517) 483-4918
Date: April 5, 2019             eldridge@millercanfield.com