# **EXHIBIT 1**

S T A T E   O F   M I C H I G A N

MICHIGAN OFFICE OF ADMINISTRATIVE HEARINGS AND RULES

FOR MICHIGAN STATE UNIVERSITY

* * * * *

**Re:**  Matter of ▋Jane Roe 2▋ and ▋John Doe▋ Case No. 00500-2018; and
Matter of ▋Jane Roe 1▋ and ▋John Doe▋ Case No. 00530-2018

## DECISION OF THE RESOLUTION OFFICER

### Procedural History

In late February, 2018, the Office of Institutional Equity (OIE) at Michigan State University (MSU or University) received reports alleging that, on or about April 23, 2016, ▋Jane Roe 2▋ (Ms. ▋Jane Roe 2▋Jane Roe 2 or Dr. ▋Jane Roe 2▋and ▋Jane Roe 1▋ (Ms. ▋Jane Roe 1▋or ▋Jane Roe 1▋ both being students in the MSU College of Human Medicine (CHM), were subjected to separate violations of the "University Policy on Relationship Violence & Sexual Misconduct" (PRVSM, RVSM, or Policy)[1] by ▋John Doe▋ ▋(Respondent or Mr. ▋John Doe▋ also a student in CHM.

Pursuant to a letter dated April 17, 2018, Mr. ▋John Doe▋ was notified that, in regard to Ms. ▋Jane Roe 2▋he was accused of "engag[ing] in sexual harassment" and, more specifically that he had "made unwanted sexual contact with her in violation of Section X[2] of the University's RVSM policy". In addition, pursuant to a letter dated July 31, 2018, Mr.

---

[1] The Policy then in effect was the 3/7/16 version. It has been revised since.
[2] It is believed that MSU's reference to Section X was made in error. Section X addresses Privacy and Confidentiality matters that appear unrelated to this matter.

Exhibit 1

John Doe was notified that, in regard to Ms. Jane Roe 1 he was accused of "engaging in sexual violence" and, more specifically, that he had "raped her in violation of Section VIII(D) of the University's RVSM policy".

By its terms, the PRVSM applied to "all members of the University community" and dictated that they "shall not engage in relationship violence or sexual misconduct against employees, students, or third parties."  RVSM, § 2, p 4.  "Persons who do so are subject to disciplinary action, up to and including . . . dismissal for students."  RVSM, § 2, p 4. The PRVSM applies when "conduct occurs on campus", when "conduct occurs off-campus in the context of the University employment, education, or research programs or activities", and when "conduct occurs off-campus outside the context of a University program or activity but has continuing adverse effects on campus or in any University program or activity"[3].  RVSM, § 2, p 4-5.

PRVSM Section VIII. D. defined "Sexual Violence", as follows:

> Sexual violence is defined as a physical sexual act perpetrated without consent.  A number of different acts can fall within the definition of sexual violence, including rape and sexual assault.
> • "Sexual Assault" is defined as having or attempting to have sexual intercourse or sexual contact with another individual by force or threat of force; without consent; or where the individual is incapacitated.
> • "Rape" is defined as sexual penetration, however slight, of another person without that person's consent. Penetration can be of the mouth, vagina, or anus, and can be with a penis, tongue, finger, or foreign object.
> • "Sexual intercourse" includes vaginal or anal penetration, however slight, with a body part (e.g. penis, tongue, finger, hand) or object, or oral penetration involving mouth to genital contact.
> • "Sexual contact" includes intentional contact with the intimate parts of another, causing another to touch one's intimate parts, or disrobing or exposure of another without permission. Intimate parts may include the breasts, genitals, buttocks, groin, mouth or any other part of the body that is touched in a sexual manner.

---

[3] The conduct at issue in this matter, occurred outside the context of a University program or activity but has had continuing adverse effects in the programs and activities of the CHM.

PRVSM Section VIII. F. defined "Consent", as follows:

Consent means the voluntary, willful, and unambiguous agreement to engage in a specific sexual activity during a sexual encounter.  Consent cannot be given by someone who is:

• Sleeping;

• Unconscious, unaware, or otherwise mentally or physically helpless because of drugs, alcohol or other contributing factor ("incapacitated");

• Unable to understand the nature of the sexual activity due to a mental disease or condition ("mentally incapable"); or

• Under duress, threat, deception, coercion, misuse of professional authority/status, or force.

Consent must be clear and communicated by mutually understandable words or actions.  Silence, passivity, the absence of resistance, or the absence of a verbal "no" or "stop" does not imply consent and relying solely on non-verbal communications may result in a violation of this policy.  **It is important not to make assumptions**.  If confusion or ambiguity arises during a sexual interaction, it is essential that each participant stops and verbally clarifies the other's willingness to continue. Prior consent does not imply current consent or future consent; even in the context of a prior or current relationship, consent must be sought and freely given for each instance of sexual contact.

Consent to any form of sexual activity does not automatically imply consent to other forms of sexual activity.  Consent can be withdrawn at any time during a sexual encounter.  Consent to engage in sexual activity with one person does not imply consent to engage in sexual activity with another.

PRVSM Section VIII. G. defines "Incapacitation", as follows:

Incapacitation is a state where an individual cannot make an informed and rational decision to consent in sexual activity because the individual lacks conscious knowledge of the nature of the act (e.g., to understand the "who, what, where, when, why or how" of the sexual interaction) and/or is physically helpless.  An individual is also considered incapacitated, and therefore unable to give consent, when asleep, unconscious, or otherwise unaware that sexual activity is occurring.

Incapacitation may result from the use of alcohol and/or drugs. Consumption of alcohol or other drugs, inebriation or intoxication are insufficient to establish incapacitation.  The impact of alcohol and drugs varies from person to person, and evaluating incapacitation requires an assessment of how the consumption of alcohol and/or drugs impacts an individual's:

• Decision making ability;

• Awareness of consequences;

• Ability to make informed judgments; or

3

• Capacity to appreciate the nature and circumstances of the act.

Evaluating incapacitation also requires an assessment of whether a respondent knew or should have known that the claimant was incapacitated when viewed from the position of a sober, reasonable person.

In general, sexual contact while under the influence of alcohol or other drugs poses a risk to all parties. Alcohol and drugs impair a person's decision-making capacity, awareness of the consequences, and ability to make informed judgments. It is especially important, therefore, that anyone engaging in sexual activity be aware of the other person's level of intoxication. **If there is any doubt as to the level or extent of the other person's intoxication or impairment, the prudent course of action is to forgo or cease any sexual contact or activity.**

Signs of incapacitation may include:
• Slurred speech
• Bloodshot eyes
• Smell of alcohol on breath
• Clumsiness
• Inability to focus
• Confusion
• Shaky balance
• Stumbling or falling down
• Vomiting
• Poor judgment
• Difficulty concentrating
• Combativeness or emotional volatility
• Outrageous or unusual behavior
• Unconsciousness

Being intoxicated or impaired by drugs or alcohol is never an excuse for misconduct and does not diminish one's responsibility to obtain consent.

On April 24, 2019, this Administrative Law Judge (ALJ) was assigned to preside over this matter as MSU's Resolution Officer (RO).  That evening, MSU made available to this RO the cloud-based Hearing Case Files that, pursuant to MSU's rules, are to be considered by the RO in making this decision.[4]  Hearing Case File, number 00530-2018,

---

[4] Hearing Rule B reads, in part: "At the conclusion of the hearing, the Resolution Officer will analyze the information presented and will make a decision based upon the information that was available at the time of the hearing, including the investigative report."  The Hearing Case Files for each case includes the Preliminary Investigative Report, the Final Investigative Report, and their associated attachments.

4

related to the complaint of ▮Jane Roe 1▮ and Hearing Case File, number 00500-2018, for ▮Jane Roe 2▮ both contain similar Preliminary Investigation Reports (PIR) and Final Investigation Reports (FIR) prepared by Kroll Associates, Inc (Kroll).   The FIRs are both dated February 7, 2019.

According to both FIRs, in February 2018, Kroll was hired to conduct independent investigations of alleged violations of the PRVSM.   "All investigation reports [were] prepared at [MSU's request] . . . and constitute the University's findings and dispositions as they relate to underlying claims."   FIR, p 4.   The portions of the FIRs that relate to those findings and dispositions have been blacked out and made unavailable for this RO's review.

Between the dates of the FIR's issuance and retention of this RO, the procedural events that led to this hearing have, by intention, not been clearly outlined to this RO. This RO is presiding over this matter pursuant to a strict and expedited schedule for commencement of Respondent's *Baum* hearing and completion of the RO's decision.

On May 2, 2019, a pre-hearing conference was held with Respondent and his attorney.  On May 6, 2019, a separate pre-hearing conference was held with ▮Jane Roe 2▮ ▮ attorney.  On May 9, 2019, a third pre-hearing conference was held with both ▮Jane Roe 2▮ and Respondent's Attorneys.

Cross-examination was conducted on May 13-15, 2019 in conformity with federal court order and MSU's Relationship Violence and Sexual Misconduct Policy Hearing Procedures.

**Alleged Violations of the PRVSM**

Respondent is accused of twice violating PRVSM § II by engaging in the prohibited act of sexual misconduct, as defined in PRVSM § VIII (D).

**Standard of Proof**

For this matter, MSU has adopted a Preponderance of the Evidence standard to find that Respondent has violated the PRSVM.

**Findings of Fact**

**Evidentiary Record to be Considered**

Pursuant to MSU policy, the record for consideration by the RO consists of the following:

- Hearing Case Files for Case Nos. 00500-2018 and 00530-2018.  Each of those files contains a FIR, with redactions, a PIR, and the reports' associated attachments.[5]

- The testimonial evidence presented at hearing on May 13-15, 2019.[6]

In Case # 00500-2018, Kroll indicates that they interviewed the following persons:



Jane Roe 2          Respondent  John Doe   K.B.          Dr. Angela Busch, Jane Roe 1          K.S.          and  L.T.          HCF-500, p 8.  In Case # 00530-2018, Kroll indicates they interviewed the following persons:  Jane Roe 1          Respondent

---

[5] Because there is no common page numeration in the Hearing Case Files, citations to them will include page numbering that corresponds to the page number as identified in the electronic PDF format of the document when viewed on Adobe Acrobat Reader DC.

[6] A record of the hearing was video and audio recorded by MSU.  To facilitate the timely issuance of this decision, MSU had the audio recordings transcribed and made available to this RO over the course of Friday June 17, 2019.  Volume one and three did not have page numbering and citations to them are based on the page number shown by the Adobe software used to view them.  Volume two had page numbering and citations to that volume include the page numbering as shown on the transcription.

John Doe   K.B.   [7], Dr. Angela Busch, Corey Koperski, Jane Roe 2   Holly Reed, K.S.   L.T.   and A.V.   [8].   HCF-530, p 9.   The PIR and FIR contain, almost exclusively, summaries of the interviews that were conducted; those summaries being interspersed with quotations of the interviewees.

The following exhibits were attached to the Investigation Reports, and were considered: a screenshot of text messages between Jane Roe 2   and Jane Roe 1   on April 23 and 24, 2016, provided by Jane Roe 1   screenshots of text messages between Respondent and Jane Roe 1   on April 27, 2016, provided by Jane Roe 1   Jane Roe 1   Block III Third Year Track Schedule Form 2017-2018, provided by Holly Reed; Jane Roe 2   typed statement regarding events of April 23, 2016 and her amended typed statement regarding events of April 23, 2016.

The live testimony, provided on May 13-15, of the following witnesses was also considered: Claimant Dr. Jane Roe 2   Claimant Jane Roe 1   Respondent John Doe   Dr. Angela Busch, K.S.   L.T.   A.V.   and A.R.   .

At hearing, all witnesses, except Mr. A.R.   [9], were asked to review Kroll's summary of their interview statements.  To facilitate use of the Kroll reports and to develop a record for cross examination, each witness was then asked to adopt the corresponding interview summary as their direct testimony, subject to any clarifications, corrections, and/or

---

[7] Mr. John Doe requested that K.B.   appear for cross-examination.  As permitted by MSU policy, he chose not to do so.  In light of *Baum*, the FIR statements attributed to Mr. K.B.   are not considered for the truthfulness of the matters asserted and, where included in this Decision, were considered for limited purposes; largely to provide context.
[8] Summations of statements made by Corey Koperski and Holly Reed were included in both Hearing Case Files.  Neither of these individuals were called to testify at hearing.  Their statements have limited probative value and were not considered in making this decision.
[9] Mr. A.R.   was not interviewed by Kroll.

additions that they wished to make.[10]   After developing their direct testimony, the witnesses were subject to cross examination, re-direct examination, and re-cross examination.

All information provided in the HCFs and at hearing was considered by this RO. Failure to identify specific parts of the record does not indicate it was overlooked, but may suggest it was not considered important to this decision.

This Decision was written under a tight timeline established by federal court order. It is the first such Decision made pursuant to *Baum* and with State of Michigan ALJs retained to serve as RO's.  While the tight timeline has negatively affected the quality of this written Decision, it provided sufficient time to assess the record and make the final conclusions.  This RO is satisfied that additional time to publish the Decision would not have affected the outcome of this matter.

**Overview of Events Surrounding Alleged Incidents.**

All the student actors in this case are acquainted with one another because of their status as students in the MSU College of Human Medicine.  Respondent was attending school at CHM's East Lansing campus.  Both Claimants and the other student witnesses were attending school at CHM's Grand Rapids campus.  Respondent was first introduced to Claimants, and other medical students, as a participant in a Spring Break, 2016, work service trip to Cuba.

The events that form the basis of this complaint took place during the evening of Saturday, April 23, 2016 and into the early A.M. hours of the following Sunday.  On the

---

[10] At the 3rd pre-hearing conference, counsel for the parties were advised of this procedure and asked to have their clients thoroughly review their interview summaries.  The procedure was subsequently added to the University's hearing procedures

23rd, both Claimants, the Respondent, and other CHM students gathered at the Grand Rapids home of K.B. ▓▓▓ for alcoholic drinks and pictures prior to the medical school's annual "Med Ball" (Ball) that marks the end of the school year.  After drinks, the twenty, or so, in attendance at the K.B. ▓▓ home proceeded to the masquerade themed Ball.

The Med Ball was located at Noto's, a Grand Rapids Italian Restaurant with a banquet hall.  The FIRs contain several witness descriptions of the general atmosphere at the ball.  To provide perspective and context for the relevant facts, the following descriptions of the Ball are included.  The Ball included a cocktail hour, a meal, an awards ceremony, dancing, and, seemingly, lots of alcohol.  Ms. Jane Roe 2 described the Ball as an event where her "fellow medical students were all 'drinking and celebrating.'"  HCF-530, p 6.  Respondent described the Med Ball as an event where "'everyone was inebriated'"[11] and there "was 'a lot of sexual energy within the group.'"  HCF-530, p 12.  Jane Roe 1 ▓▓▓ stated that "everyone, including her, was dropping their drinks on the dance floor."  HCF-530, p 13.  Ms. K.S. ▓▓ stated that "'[e]veryone was drinking that night; people let loose.'"  HCF-530, p 25.  Ms. L.T. described the Ball as an event where "everyone drank more than they should have."  HCF-530, p 28.  It was at the Med Ball that Jane Roe 1 alleges Respondent engaged her in sexual intercourse without her consent.

After the Med Ball, a number of medical students, including Jane Roe 2 Jane Roe 1 Respondent, Mr. K.B. Ms. K.S. and Ms. L.T. proceeded to The B.O.B., a well-known Grand Rapids entertainment establishment.

---

[11] In his direct testimony at hearing, Respondent made clear that he "did not consider [himself] or anyone else to be incapacitated." Tr 2, p 14.

Following their visit to The B.O.B, ███Jane Roe 2███ ███Jane Roe 1███ Respondent, and Mr. ██K.B.██ all eventually returned to Mr. ██K.B.██ home where they spent the night.  ███Jane Roe 2███ alleges it was at Mr. ██K.B.██ home that, in the wee hours of Sunday, April 24, 2016, Respondent engaged her in sexual contact without her permission.

**Claimants' and Respondent's Description of Events**

███Jane Roe 1███ indicated that "[f]ollowing the trip to Cuba and up to the night of Med Ball, ███Jane Roe 1███ and Mr. ██K.B.██ had been seeing each other on a non-exclusive basis for a few weeks."[12]  HCF-530, p 13.  On the night of the Med Ball, she was interested in continuing a romantic relationship with him.  Tr 1, p 50.  Up to the night of the Ball, Ms. ██Jane Roe 2██ was ███Jane Roe 1███ "closest friend".  Tr 1, p 52.

At the pre-Ball gathering at Mr. ██K.B.██ home, Ms. ██Jane Roe 1██ indicated that she drank one glass of wine.   HCF-530, p 13.  Ms. ██Jane Roe 1██ is a vegetarian and the Med Ball's dinner course included few vegetarian options, so she recalled eating only "a little bit".  HCF-530, p 13.  After dinner, ███Jane Roe 1███ was on the dance floor with Respondent, who was teaching her to dance the waltz and the cha-cha.  Tr 1, p 70.  ███Jane Roe 1███ recalled Respondent "remarking that [she] was not able to do the steps" and her replying that she "was too drunk at that point to take anything from it."  Tr 1, p 70.  Ms. ██Jane Roe 1██ recalled dropping her drinks on the dance floor.  HCF-530, p 13.  To remedy this faux pas, she "would go to the bar and drink faster so that she would not have to bring her drinks out to the dance floor." HCF-530, p 13.  Ms. ██Jane Roe 1██ indicated that she drank five or six, and possibly more, whiskey and cokes while at the Med Ball.

---

[12] The record makes clear that this was a sexual relationship.

10

HCF-530, p 13.  Jane Roe 2 indicated that some time before the alleged sexual assault, she observed Jane Roe 1 in a bathroom and that she was "'definitely drunk'".  HCF-500, p 10.

Jane Roe 1 provided the following recitation of events, at HCF-530, p 13-14:

> Jane Roe 2 and her then-husband had a lot of marital issues and the "situation blew up early in the evening" at Med Ball. Jane Roe 1 "kept seeking [Jane Roe 2 out to see if she was alright." Toward the end of the night, she went outside to find Jane Roe 2 and found her and Mr. K.B. kissing.[13] Jane Roe 1 went back inside and climbed the stairs to the second floor. . . .[14]
>
> Jane Roe 1 was unsure of how long she had been sitting on the stairs when Respondent joined her at the top of the stairs.[15] She told him about seeing Jane Roe 2 kissing Mr. K.B. [16] From the top of the stairs, Respondent led Jane Roe 1 to a hallway on the second floor.  There were no other people on that floor.  He then led her to a stairwell that appeared to be part of a fire escape.[17]  As soon as they entered the stairwell, Respondent started kissing and making out with her. Jane Roe 1 does not recall Respondent asking her if it was okay to kiss her.  She recalled him making demands of her.  Respondent told her, "take off your dress."  Jane Roe 1 did not recall if she took her dress off.[18]  She remembers "flashes of being naked on the ground, and [Respondent] having sex with [her]."  She stated that "none of it is extremely clear."  Respondent never asked if he could have sex with her,

---

[13] Jane Roe 1 testified that seeing Jane Roe 2 and Mr. K.B. kissing was "painful" and "upsetting" and that she considered it a betrayal by both. Tr 1, p 53-54.

[14] Jane Roe 1 testified that upon discovering Jane Roe 2 and Mr. K.B. kissing, she walked quickly back into the restaurant and that she was "upset" and "crying at that point and . . . wanted to find somewhere to be alone." Tr 1, p 56. Jane Roe 2 indicated that, after Jane Roe 1 saw her kissing Mr. K.B. Jane Roe 1 "was upset and 'ran away dramatically'." Finding Jane Roe 1 reaction "out of character", she "followed Jane Roe 1 back inside and tried to find her." HCF-530, p 30.

[15] Jane Roe 1 testified that, when Respondent joined her at the top of the stairs, she was still crying. Tr 1, p 84.

[16] Jane Roe 1 testified that she explained to Respondent that she was crying because of the kissing she had witnessed between Jane Roe 2 and Mr. K.B. Tr 1, p 84. "So, she testified, "he knew about that situation and then his response was to lead me into a stairwell." Tr 1, p 84. Jane Roe 1 described herself as being "very drunk" at this time. Tr 1, p 58.

[17] Jane Roe 1 testified that she remembered Respondent "taking her hands and . . . lea[d]ing [her]" to the stairwell. She recalls that she did not know where she was being led and that Respondent merely stated "come here". Tr 1, p 86. When being led through the door, she did not know what lie on the other side. Tr 1, p 86-87.

[18] Jane Roe 1 has no recollection regarding how her clothes were removed or put back on. Tr 1, p 69-70.

11

he "just made demands." She recalled Respondent saying, "look at me," in a demanding tone. She thought that she was looking down and away from him. Respondent said this a few times, roughly. Jane Roe 1 does not recall clearly saying "no." She felt as if she "shut down," as a reaction to the hurt she felt from seeing Jane Roe 2 and Mr. K.B. kissing. While they were still in the staircase, but after the sex ended, Respondent took off Jane Roe 1 necklace and told her that he was going to keep it. Jane Roe 1 did not recall how long the encounter lasted. She remembered that when she was initially at the top of the stairs, there were many people downstairs. When she returned downstairs, it appeared that the event had ended. She went back downstairs with Respondent and she heard Mr. K.B. calling for her.

On cross-examination, Jane Roe 1 agreed that Respondent never held her down, but that she remembered "being against the wall with him in front of [her]. Tr 1, p 80. Further, she acknowledged that Respondent never hit her, nor did he threaten to hurt her, "but the language he used was very… he made demands in a threatening way." Tr 1, p 80. When asked by this RO to further explain her testimony about being against a wall, the following testimony was provided at Tr 1, p 81-82:

    ALJ/RO: . . . When you indicate he had you against the wall, what do you mean by that?
    MS. Jane Roe 1 I just mean that I remember that I was against a wall and he was kissing me.
    ALJ/RO: Were you restrained?
    MS. Jane Roe 1 I don't remember being pushed against the wall, but I just remember that physical situation.
    ALJ/RO: Did you feel free to leave at that time?
    MS. Jane Roe 1 I felt that I was shut down at that point. I felt that there was this person that a few minutes ago was trying to comfort me and then led me into a stairwell.
    ALJ/RO: Okay, when you say shut down… What does that mean?
    MS. Jane Roe 1 It means that that was my response. I felt that I could not react and that it was like this dissociation of I couldn't… I didn't know… this person that I did not think was threatening was doing this and I did not know what he was capable of at that point. He was… the language he was using… I just didn't know and I didn't feel… especially with the alcohol, I think, I just didn't… I couldn't react.

Jane Roe 1 further explained that her "shut down" reaction was likely a reaction to the combined experiences of seeing Jane Roe 1 and Mr. K.B. kissing and of having "someone [she] thought [she] could trust, and [with whom she] was talking to about what had just happened, leading [her] into a stairwell and responding in that way."  Tr 1, p 83.

Jane Roe 1 testified that she "knew before, during, and after that [she] did not want to engage in sexual activity with John Doe Tr 1, p 83.  She explained that she "knew that [she] did not want what was happening to be happening, but [she] felt powerless to do anything about it."  Tr 1, p 83.  She does not recall expressing these feelings to Respondent.  Tr 1, p 84.

Jane Roe 2 explained that, while Jane Roe 1 was away, she had been looking for her and that when she finally found her, Jane Roe 1 appeared to be "'much more drunk'" and "visibly distraught".  HCF-530, p 30, 41.

Ms. Jane Roe 1 Mr. K.B. and Respondent left the Med Ball together and proceeded to The B.O.B. by Uber.  HCF-530, p 14.  Jane Roe 1 claims that during the ride "Respondent did or tried to hold her hand" and "[s]he felt powerless that she could not tell Respondent to go away".  HCF-530, p 14.

While at The B.O.B., Ms. Jane Roe 1 engaged in a conversation with Mr. K.B. regarding the incident of Mr. K.B. and Ms. Jane Roe 2 kissing, which she described, at HCF-530, p 14, as follows:

> She talked to Mr. K.B. about what had happened between Jane Roe 2 and him, but she did not talk about what had just happened to her.  She was "just shut down."  During that conversation, Mr. K.B. told her, "sorry, that wasn't fair to you."  Jane Roe 1 was "pretty much just crying."  She did not think that she said very much at all.

█████████████ testified to limited interactions with ███████ ████████ at The B.O.B., but did indicate that Ms. ███████ was "very intoxicated at that point" and "looked 'glassy eyed.'" HCF-530, p 31.

Sometime later that evening, Mr. ███████ Ms. ████████ Ms. ████████ and Respondent eventually all made their way to Mr. ███████ home for the night. HCF-530, p 14.

Pursuant to the FIR, as adopted by Ms. ███████ Ms. ████████ provides, at HCF-530, p 14, the following description of events at Mr. ███████ home:

After they arrived at the house, ███████████████ immediately went to Mr. ███████ room "to get away." Respondent followed her to Mr. ███████ room and laid on the bed next to her for a while. She was facing the middle of the bed, and Respondent was lying next to her, facing her. ████████████ pretended to be asleep. She was unable to vocalize anything. She was "just trying to silently tell him to go." She did not recall Respondent touching her. She thinks that she fell asleep at that point. Mr. ███████ told her that he came into the room when Respondent was there, but she did not remember that happening.

At HCF-530, p 31, █████████████ described this portion of the evening, as follows:

███████████ ████████████ Mr. ███████ and Respondent were . . . in the kitchen for a while. At this point, █████████████ "could not even stand." Respondent was holding her up. Respondent and ███████████ went to Mr. ███████ bedroom at some point. ███████████ could not recall if they both came back to the kitchen later. Mr. ███████ stayed in the kitchen with █████████████ most of the time, though he may have gone into his bedroom at one point.

At HCF-530, p 14, █████████████ provided additional details addressing the following morning, as follows:

When she woke up in the morning, Mr. ███████ was in the bed with her. Respondent came into the room at some point before he left. ████████████ did not say anything at that point. Later that morning, Mr. ███████ said, "[Respondent] told me that you guys hooked up last night, is that true?" █████████████ told him yes and tried to explain what happened. She told him that Respondent was very demanding, and

that she did not remember anything clearly.  Mr. K.B. replied, "I hope you're not trying to tell me he raped you?"  His response "cut that conversation off."

"Later that day, Jane Roe 1 told her friend K.S. that Respondent had sex with her the previous night, and she had not consented to it."  HCF-530, p 14.

Immediately after the evening of the Med Ball, Respondent and Ms. Jane Roe 1 were in contact with one another via text messaging.  In the early A.M of Wednesday April 27, 2016, Ms. Jane Roe 1 texted the following to Respondent, "Look I need you to know that Saturday was a mistake and nothing like that can happen again".  FIR, Attach B.  Later that day, after other text exchanges between the two, Respondent again texted Ms. Jane Roe 1 inviting her to brunch on the upcoming Saturday.  FIR, Attach B.  Ms. Jane Roe 1 responded by stating, "Look the whole situation on Saturday just doesn't sit well with me, and I don't want to see each other.  I care about K.B. and that's my priority right now".  FIR, Attach B.  Ms. Jane Roe 1 described this as her way of "politely trying to get away from him in that situation."  HCF-530, p 15.

Respondent, Mr. John Doe provided a similar, but on critical points, a strikingly different account of the evening.  Like the other witnesses, Mr. John Doe adopted, as his direct testimony, the statements attributed to him in the FIRs, with a minor clarification, and with objection to the statements contained in the seventh and eighth paragraphs of page 14 of the FIRs.[19]   He provided extensive additional direct testimony and was subject to cross, re-direct, and re-cross.

---

[19] Beginning at Tr 2, p 18 and continuing to Tr 2, p 29 is the transcription of the examination of Mr. John Doe by this RO, to determine what portions of the 7th and 8th paragraphs he was actually objecting to.  This proved to be a much more difficult task than was expected with Mr. John Doe  Mr. John Doe was non-responsive on several occasions.  Mr. John Doe admitted that the first sentence of paragraph seven was accurate.  Tr 2, p 19.  Later, he admitted that the first sentence of paragraph eight was also accurate.  Tr 2, p 19.  Shortly thereafter, Respondent stated that he didn't "agree with the entirety of the seventh and eighth paragraphs".  Tr 2, p 25.  A statement that this RO noted was not accurate.  Tr 2, p 25.

Mr. ███████ describes his pre-Ball relationship with ███████████ as one in which he first met her on the Cuba trip and that, with regard to any romantic involvement, "there was 'perhaps a little bit of tension, but nothing physical. HCF-530, p 16.  He added that "'[i]t's a little bit nuanced; I think there was some attraction'".  HCF-530, p 16.  However, prior to the Ball, Mr. ███████ had not spoken to ███████ █████ "'for a while'". HCF-530, p 16.

At Mr. ████ house, Mr. ███████ describes himself as "'drinking a fair bit'". HCF-530, p 16.  At the Med Ball, Mr. ███████ described "'everyone [as being] very inebriated'".[20]  HCF-530, p 16.  At HCF-530, p 16, Mr. ███████ described dancing with ███████████ as follows:

> Respondent felt that [he and ████████████ "became closer" during [the time they danced].  Respondent . . . taught ██████████ the steps to the Waltz and the cha-cha.  Everyone was dancing at that time.  Respondent and ██████████ were the only two individuals [in their group] without dates.  At one point, ██████████ said to Respondent, "I guess you're my date for Med Ball."  He responded, "Yeah, I guess so."[21]  They talked about their friends, medical school stress and "how drunk [they] were."
> Respondent and ██████████ were dancing closely and grinding.[22]  Respondent stated that the threshold to grinding is not "very

---

Regarding whether he stated to the investigator that he was "a little aggressive with her about telling [him] what was going on, as it related to the possibility of her being pregnant", Respondent stated he "wasn't aggressive."   The text messages in Attachment B indicate that Mr. ███████ had gotten ███████ "word" that she would tell him if she was pregnant and that he pressed her on this issue.  See Attachment B.  Finally, Respondent admitted to the gist of the final sentence; that he had asked ███████ out for a meal.

[20] On direct examination, Respondent stated that he "felt like [everyone in his group] were all similarly inebriated and [he] did not have any impression that there was a single person in the friend group or [him]self who had drank too much."  Tr 2, p 33.

[21] Mr. ███████ considered ██████████ statement to be a form of flirtation.  Tr 3, p 108.

[22] At Tr 3, p 105-06, Respondent explained that grinding is a fairly common dance style for his "generation" and described it, as follows:

> It's — the man is behind if it is a male and female couple generally the man is standing behind the female.  The female is rubbing her butt onto the man — on to the front of the man including the genital area.  Her hands are usually reaching behind her to whatever she wishes to grab and the man reaches around in front of her to kind of stay the hip region and there is like a rocking motion with the beat of the music.

* * *

high in our generation."   They started grinding early in the evening. Respondent felt that the dancing "built up the sexual energy" between he and <span style="background:black;color:white">Jane Roe 1</span>             There was "a lot of sexual energy within the group, and that included [Mr. <span style="background:black;color:white">K.B.</span>      and there was a lot of flirting among members of the group.

Mr. <span style="background:black;color:white">John Doe</span> explained that later that evening he found <span style="background:black;color:white">Jane Roe 1</span>          sitting on the top of the stairs that led to the lobby.   HCF-530, p 16.  He described her as looking "hunched", "despondent", "somber", "upset", "sad" and "somnolent".  HCF-530, p 16.  Tr 2, p 33, 34.  At HCF-530, p 16, Respondent indicated that he did not recall <span style="background:black;color:white">Jane Roe 1</span> <span style="background:black;color:white"> </span>crying, stumbling, or slurring her words.  HCF-530, p 16.  However, on cross examination, Respondent contradicted this by agreeing that <span style="background:black;color:white">Jane Roe 1</span>          was crying at the top of the stairs.  Tr 3, p 81.  Respondent indicates that he and <span style="background:black;color:white">Jane Roe 1</span> <span style="background:black;color:white"> </span>"were both 'very drunk and saying things.  [Respondent] remembers talking very openly.'"  HCF-530, p 16.  "There were no walls."  HCF-530, p 16.  At HCF-530, p 17, Mr. <span style="background:black;color:white">John Doe</span> described the following interaction with <span style="background:black;color:white">Jane Roe 1</span>

<span style="background:black;color:white">Jane Roe 1</span>          told Respondent that she and Mr. <span style="background:black;color:white">K.B.</span>      had been sleeping together for the previous few weeks.  Mr. <span style="background:black;color:white">K.B.</span>      had brought his own date to Med Ball, and Respondent had not witnessed much interaction between <span style="background:black;color:white">Jane Roe 1</span>          and Mr. <span style="background:black;color:white">K.B.</span>      to that point in the evening.  <span style="background:black;color:white">Jane Roe 1</span>          told Respondent that she witnessed <span style="background:black;color:white">Jane Roe 2</span>      and Mr. <span style="background:black;color:white">K.B.</span>   making out, and that she was sad as a result.   <span style="background:black;color:white">Jane Roe 1</span>          sat close to Respondent, who said that <span style="background:black;color:white">Jane Roe 1</span>          was "somber in general, and she seemed exceptionally somber that night."  Respondent mused that her seeing someone she was sleeping with being intimate with someone else, made her sad.[23][24]
Respondent felt that the sexual energy between he and <span style="background:black;color:white">Jane Roe 1</span> <span style="background:black;color:white"> </span>had been building up throughout the night.[25] . . . Respondent

---

One could argue that it is the characterization of sex while standing.

[23] During direct-examination, Respondent indicated that he "was addressing the topic of why she appeared somnolent".
[24] During direct-examination, Respondent indicated that "[he and <span style="background:black;color:white">Jane Roe 1</span>      opened up about stresses of medical school, things going on in our lives… we talked for some time and there was like flirtation during this period of time."
[25] During direct examination, Respondent added that while at the top of the stairs "there was like flirtation

decided to see if he could kiss ▮▮▮▮Jane Roe 1▮▮▮▮ He did not ask her if he could kiss her. He placed his hand on her chin, turned her face towards his, and kissed her.[26] She did not resist and "responded completely, with her tongue." This was followed by a series of kisses, and they had their hands on each other's arms and faces. Respondent did not recall touching ▮▮▮Jane Roe 1▮▮▮ breasts at that point. The touching was all on top of the clothes.[27] Respondent stated that he could not "recall every little bit." Respondent did not know if anyone could see them from the lobby.

Respondent asked ▮▮▮Jane Roe 1▮▮▮ "Would you come with me?" ▮▮▮Jane Roe 1▮▮▮ took his hand and he led her to "somewhere more private on the second floor."[28] Respondent did not recall if ▮▮Jane Roe 1▮▮ ▮▮▮ said anything at this point. There were other people on the second floor, so he opened a door that led to a stairwell. When they were in the stairwell with the door closed, they began to make out again. They moved from making out, to touching under the clothes, to intercourse. There were very few words exchanged. Respondent felt that "everything was reciprocated. There was no hesitation. If anything, there was eagerness."

At one point, ▮▮▮Jane Roe 1▮▮▮ got down on her hands and knees for "that sort of intercourse." Because the floor was vinyl or hard rubber, ▮▮▮Jane Roe 1▮▮▮ asked Respondent to use his jacket for cushioning for her knees. Respondent stated that ▮▮▮Jane Roe 1▮▮▮ "got down on her hands and knees on her own accord and presented herself." Respondent did not recall if ▮▮▮Jane Roe 1▮▮▮ was naked. He recalled that her chest was bare. He did not recall what she was wearing. He was "pretty sure that she took the dress off herself." His jacket was off, and his shirt was open.

Respondent stated that the only position in which he and ▮▮Jane Roe 1▮▮ ▮▮▮ had sex was 'from behind." Respondent could not "get hard enough to penetrate ▮▮▮Jane Roe 1▮▮▮ He inserted his fingers into her

---

during this period of time". Tr 2, p 35. He also added that there had been flirtation earlier in the night, describing it as "[t]hings that we talked about, the manner in which they were said, and the vulnerability in what was communicated", including compliments on the "way that [he] was teaching her to dance." Tr 3, p 83-84. Respondent cited further instances he felt were flirtation, such as grinding on the dance floor, and, as he stated at Tr 3, p 85:

So while we are waltzing their natural position is on the right side — on the left side of the abdomen and holding my right hand and so while we are dancing and we are getting in a lot closer than is the more professional distance between waltz partners, we are a lot closer together and her hands are touching, reaching down a little bit towards my buttocks moving in such a way that the — I don't want to say rubbing but to that effect of moving around my body.

[26] On direct examination, Respondent expressed "lean[ing] over and initiat[ing] the kiss", rather than turning her head with his hand to kiss her.

[27] On direct, Respondent testified that this kissing and embracing went on for "multiple minutes". Tr 2, p 37.

[28] Up to this point of the evening, Respondent described ▮▮▮Jane Roe 1▮▮▮ as being self-ambulatory, steady on her feet, and speaking clearly without a slur. Tr 2, p 38-39.

vagina.[29] He told her that "it wasn't working."  They "tried for fifteen minutes."

* * *

Respondent did not recall if ███Jane Roe 1███ was wearing a necklace and did not recall taking her necklace off.[30]

After Respondent told ███Jane Roe 1███ that "it wasn't going to work," they dressed[31] and returned to the lobby.  While standing in the lobby, Respondent and ███Jane Roe 1███ were "arm-in-arm." They were both "very inebriated." Mr. ██K.B.██ and his date were in the lobby. Respondent remembered thinking that if he had to get home on his own at that point, he was not sure that he could, because he was very drunk. He was holding ███Jane Roe 1███ hand, as they had "just attempted to be together upstairs."

Mr. ██John Doe██ indicated that he went to The B.O.B. with ███Jane Roe 1███ Mr. ██K.B.██ and Mr. ██K.B.██ date.  HCF-530, p 18.  In his testimony, Respondent stated that, upon arrival at The B.O.B., he, ██Jane Roe 2██  ███Jane Roe 1███ and Mr. ██K.B.██ all got drinks and made their way to a "little enclave area where there is some seating, a table, and a wall.  Tr 2, p 47.  He testified that ███Jane Roe 1███ was "on the couch talking with Mr. ██K.B.██ Tr 2, p 47.  On the other hand, he also stated that, he "sat close to ███Jane Roe 1███ on a couch", but because of his "very inebriated" state he does not recall any specifics of conversation with her.  HCF-530, p 18.  Further, Respondent testified that, at this time, he and ███Jane Roe 2███ are engaged in conversation a "few steps away" from ███Jane Roe 1███ Tr 2, p 47.  Respondent testified that, at this time, ██Jane Roe 2██ kissed him.  Tr 2, p 48.  At Tr 2, p 50, Respondent provided the following testimony about this interaction:

> She steps closer to me, she reaches her hand up to my face, strokes my jaw line, and states along the lines of she finds me very attractive.  She's the one that, then, on her own volition, leans in and kisses

---

[29] On direct-examination, Respondent testified to the following: "One thing I remember is when my fingers entered, like, she slides her body back and forth on my fingers, so… I take these as signs that she is continuing to reciprocate my actions and participating."

[30] On direct-examination, Respondent made clear that he "did not take a necklace".  Tr 2, p 44.

[31] Respondent added on direct examination that that they individually put their clothes back on.  Tr 2, p 44.

me… this is not me taking the first step here… this is her leaning in and kissing me.

* * *

We continued to make out for a span of a couple, a few, seconds.[32]

Respondent testified that this was followed by dancing with Jane Roe 2 for a few minutes, "in the conventional provocative sense of the word… what we call grinding." Tr 2, p 51. He indicates that he and Jane Roe 2 "kissed again and made out on the dance floor." Tr 2, p 51. At some point Jane Roe 2 takes a break to use the bathroom and Respondent has "no other memories of anything happening at The B.O.B.". Tr 2, p 52.

Later that evening/morning, Mr. John Doe found himself at Mr. K.B. home in the kitchen with Jane Roe 2 and Mr. K.B. HCF-530, p 18. Like the Claimants, he provided statements and testimony regarding his interactions with Jane Roe 1 in Mr. K.B. bedroom. At HCF-530, p 18, Mr. John Doe explains that:

> [He] went to Mr. K.B. bedroom to go to sleep. Jane Roe 1 was in the bed and [he] climbed into the bed and was facing Jane Roe 1 They were both fully clothed. He "wanted to say that she was awake" because he tried to kiss her on the mouth and she gave him some clear signal that meant "no." Respondent tried to sleep, but he could not and so he left the room and went to sleep on the couch in the living room.

After receiving the PIR, Mr. John Doe was provided the opportunity to provide comment in the form of "feedback, additional information, or corrections to the draft report". HCF-530, p 77. Mr. John Doe chose to do so and, at HCF-530, p 77 (emphasis added), wrote the following:

---

[32] Respondent testified that all this was happening within a few steps of, and visible to, Jane Roe 1 Tr 2, p 47-48. He believes Jane Roe 1 saw this. Tr 3, p 109.

I must mention that **Mr. K.B. statement about walking in on Jane Roe 1 and myself in his bedroom is a <u>complete falsehood</u>** that doesn't align with either my or Jane Roe 1 accounts of the story. I have previously alluded to Mr. K.B. and me not having the best of relationships, but I was surprised to find a fabrication like that in his report.

Mr. John Doe above quoted feedback to the PIR was in response to the

following statement, found at HCF-530, p 89, that was attributed to Mr. K.B.

> Jane Roe 1 went into his bedroom. Mr. K.B. went to the bathroom, and when he returned Respondent was gone. Mr. K.B. walked into his bedroom and saw that Jane Roe 1 was lying on the edge of his bed, with Respondent behind her, "pretty much on top of her, trying to touch her and cuddle her." It looked as if Jane Roe 1 was crying and scared. Mr. K.B. asked what was going on, and Respondent replied, "Don't worry about it." Mr. K.B. told Respondent to get out of his room, and he did.

On cross-examination Respondent testified to a new version of these events. Mr.

John Doe acknowledged that when he crawled into bed with Jane Roe 1 he was

still interested in her, that he kissed her, that she said "no", and that he remained in the

bed. Tr 3, p 93-94. Finally, at Tr 3, p 94-95, Respondent offered the following:

> So I was sleeping on the other side of the bed at this time away from Ms. Jane Roe 1 Mr. K.B. enters the room and sleeps in between me and Ms. Jane Roe 1

> \* \* \*

> I don't like sleeping next to another man, so I left.

Mr. John Doe indicated that upon leaving Jane Roe 1 in Mr. K.B.

bedroom, he entered the living room to sleep on the couch. HCF-500, p 12. At HCF-500,

p 12-13, Mr. John Doe provided the following:

> [Upon entering] the living room, he saw that Jane Roe 2 was on the sectional couch and that she was not asleep. Jane Roe 2 moved closer to the back of the couch, making room for Respondent, and he laid down next to her. Respondent could not recall if they spoke but recalled that they were face-to-face. He recalled that they were both

intoxicated, and he initiated kissing and "above-the-belt touching."  [T]he kissing was reciprocated by ███Jane Roe 2███████ Respondent defined "above-the-belt touching" as touching her "waist, breast, shoulders." Respondent stated that, while he did not explicitly ask for consent at each stage, that he "must have felt" that Claimant consented, or he would not have "moved to the next stage."  He does not have a clear memory of every nuance in the interaction.

While Respondent and ██Jane Roe 2█████ were lying face-to-face, he reached his hand behind her and started reaching lower.  Respondent thought that he pulled up her dress and had his hands on the small of her back and slid them down to touch her upper buttocks.  He added that there was "no penetration," and it was more of a continuation of what was happening "above-the-belt."  Respondent stated, at this point, "a wall was hit," and he stopped.  He recalled that ██Jane Roe 2████ may have said something like, "I'm tired."  Some kind of clear cue was given.  He added that she may not have said anything.  She may have moved his hand away.  At that point, he got up and moved to a different part of the couch. It was 3:00 am, and they were "both tired and drunk." He "honestly didn't have the will or capacity to go to the penetration stage.  And maybe she wasn't into it."  There was "no pushback" on his end.  He spent the rest of the night on a different part of the couch.

During live direct examination, at Tr 2, p 53, Respondent described this incident,

as follows:

The ultimate place that I go to sleep at ██K.B.██ house is on the U-shaped sectional couch that ██Jane Roe 2███ is also sleeping on in the living room of ██K.B.██ house.

* * *

██Jane Roe 2█████ is lying on the couch, her back is against the… her face is toward where your back rests on a couch… that is the direction she is facing, not the other way… she is facing toward where your back is on a couch.

* * *

██Jane Roe 2██████ was awake.]  She sees me enter the room.

* * *

She looks at me, she moves closer to the back cushions of the couch to make room for me to lie down behind her in the spooning position. I did not crawl over her to spoon her without waking her up… I laid down in the spooning position behind her.

* * *

So, I am the one that is closest to, like, where your feet would rest on the couch.

* * *

22

[Her body language indicate that she wants [me] to lie down with her.]

\* \* \*

[W]hen I laid down to spoon her she reciprocates that action.  She moves her body in such a way that her buttocks are in close proximity to my genitals.

\* \* \*

I put my arm around her waist and I touch her on top of her clothes.

\* \* \*

At some point, she turns around, she faces me, we briefly kiss, and then a few seconds later ▮Jane Roe 2▮makes this statement to the effect of, you know, I'm tired.  At this point, like, I'm really tired too… it's like 5 in the morning.  So, this is me taking her signal as, like, this… I don't want to go any further.  So, I get up and I move to the other end of the couch, like a few feet away from her, and I go to sleep… and ▮Jane Roe 2▮goes to sleep as far as I know she falls asleep where she originally was on the couch.  I leave her position.  This whole thing on the couch… this whole interaction is like less than a minute.  It is 30 seconds to a minute.

During Cross-examination, Respondent acknowledged that ▮Jane Roe 2▮ did not verbally invite him to join her on the couch.  Tr 3, p 99.

During Cross-examination, Mr. ▮John Doe▮ stated that he remembers ▮Jane Roe 2▮ ▮leaving in the morning.  Tr 3, p 102.

Dr. ▮Jane Roe 2▮provided a different description of the events that occurred after she returned[33] to Mr. ▮K.B.▮ house.  At HCF-500, p 12, she explained that:

Because she did not have a ride home, [she] decided to sleep on one side of a U-shaped sectional couch.  The couch was in a common room, and "not a secluded area."  When she fell asleep, she was alone and still wearing her formal dress. . . . [S]he woke up with Respondent positioned behind her on the couch, "spooning her."  Respondent was pulling up her dress, putting his hands on her hips and under her underwear.  Respondent was attempting to kiss her and became more persistent.  At this point, ▮Jane Roe 2▮ was fully awake, and told Respondent "no." ▮Jane Roe 2▮ then got up and moved to a different room.  Respondent did not follow her.

---

[33] Prior to arriving back at Mr. ▮K.B.▮ ▮Jane Roe 2▮ walked a friend home from The B.O.B.  Tr 1, p 34.  From there, Ms. ▮Jane Roe 2▮took an Uber to Mr. ▮K.B.▮ home to continue hanging out with friends as she was unprepared to return to her husband with whom she had had a falling out with at the Med Ball.  Tr 1, p 15, 35.

Jane Roe 2 does not know the length of time for this interaction with Respondent.  Tr 1, p 37.  For the part that she was awake, she agreed that the interaction was "relatively short".  Tr 1, p 37.  Eventually, the interaction stopped, but Dr. Jane Roe 2 was unsure if the interaction ended "exactly after [she] said stop or if [she] had pushed his hands away."  Tr 1, p 38.  Dr. Jane Roe 2 believes this incident to place at "4:00 maybe 5:00 a.m."  Tr 1, p 39.

Dr. Jane Roe 2 testified that, at no time, did she invite Respondent to lie on the couch with her and added, "I was the first one to kind of go lie down on the couch and then I just promptly fell asleep."  Tr 1, p 44.  Jane Roe 2 claims that at no point did she verbally consent to any physical or sexual contact from Respondent. Tr 1, p 8.  Further, she asserts, she is not aware of having voluntarily engaged in any "physical or sexual contact with the Respondent."  Tr 1, p 8.  On redirect, at Tr, p 44-45, Jane Roe 2 provided the following:

> MS. FRAZHO: Did you invite him to lie on the couch with you at any point?
> MS. Jane Roe 2 No.
> MS. FRAZHO: And were your eyes open or did you roll around to face him when he…when you discovered he was behind you on the couch?
> MS. Jane Roe 2 I distinctly remember…I just remember my back being to him.  He slid in between me and then the back of the couch.
> MS. FRAZHO: And did you ask him at any point to place his hands under your dress or in your underwear?
> MS. Jane Roe 2 No.
> MS. FRAZHO: And did you ever move his hands under your dress or into your underwear?
> Jane Roe 2 I remember pushing them away.
> MS. FRAZHO: But not placing them there?
> MS. Jane Roe 2 No.
> MS. FRAZHO: And did you kiss him while you were lying on the couch?
> MS. Jane Roe 2 No, not that I remember.
> MS. FRAZHO: And did you sexually touch him?

MS. [Jane Roe 2] No.

MS. FRAZHO: And the only touch you had with the Respondent was when you pushed him away?

MS. [Jane Roe 2] Yes.

MS. FRAZHO: And you distinctly remember saying "No" to him?

MS. [Jane Roe 2] Yes.

Ms. [Jane Roe 2] testified that, over the course of the evening, she consumed alcohol and it affected her memory.  At Tr 1, p 21-22, she explained:

> I don't remember fully all of the exact details from basically arriving at The B.O.B.  There are parts at The B.O.B. that I do not remember because we were drinking there.  I remember more or less the scenarios of sitting at [K.B.] house, but I do not remember exactly what people were saying between alcohol and the fact that it was two years ago, three years ago now.

**Evidence Presented by Other Witnesses**

<u>Dr. Angela Busch</u>

"Dr. Busch is the Community Assistant Dean for the MSU College of Human Medicine in Grand Rapids.  She oversees third- and fourth-year medical students and their clinical experiences."  HCF-500, p 21.   At HCF-500, p 21, she explained:

> At the end of the students' second year, they are placed in groups, and through that process students can request not to be with other students.  If a student makes such a request, it typically involves an ex-boyfriend or ex-girlfriend.
>
> In February 2018, . . . Dr. Busch [learned] that two female medical students, [Jane Roe 2] and [Jane Roe 1] had both requested not to be placed with . . . Respondent.  Dr. Busch reached out to [Jane Roe 2] and [Jane Roe 1] individually and asked that they speak with her about their requests.  At the time, she did not know if their reasons were related or if the two knew each other.

Dr Busch did meet with both Claimants.  Ms. [Jane Roe 2] met with her "right away".  HCF-500, p 22.  Dr. Busch, indicated that when meeting with [Jane Roe 2] she "'could immediately tell this was not an ex-boyfriend situation.'"  [Jane Roe 2] was very

'uptight, and her mouth was dry.'"[34]  HCF-500, p 22. ███Jane Roe 2███ informed Dr. Busch that she "fell asleep on the couch, and when she woke up Respondent was laying behind her, grinding his hips on her, and had his hands up her shirt and down her pants."  HCF-500, p 22.  Dr. Busch informed ███Jane Roe 2███ that she would have to report this incident to OIE.  HCF-500, p 22.

Dr. Busch also met with ███Jane Roe 1███  She describes Ms. ███Jane Roe 1███ as appearing "'noticeably pale,' and it was clear that 'she did not want to be there.'"[35]  HCF-500, p 22.  At HCF-500, p 22, Dr. Busch explained that:

> . . . she wanted to be sure she understood why ███Jane Roe 1███ did not want to rotate with Respondent.  ███Jane Roe 1███ replied, "I'm not telling anyone.  I can't be with him.  He is horrible.  I'm not going to court for this.  I'm never talking about this again."  It was clear to Dr. Busch that "some form of sexual misconduct" had been inflicted upon her.  ███Jane Roe 1███ "was upset and was not going to talk about it."  Dr. Busch was struck by how "physically and emotionally upset" ███Jane Roe 1███ was.  Dr. Busch told her that she needed to report to OIE that she was fearful of another student.

Dr. Busch also had interactions with Mr. ███John Doe███  At HCF-530, p 104, she indicated that:

> Respondent had failed a clerkship and had some "professional problems with surgery."  Dr. Busch urged him to get some coaching, and he did.  His coach was "teaching him about reading nonverbal"

---

[34] At hearing, Dr. Busch described ███Jane Roe 2███ demeanor, as follows:
> And so when she came in she was I would say visibly shaken, kind of very dry mouth, kind of that nervous pale, kind of holding her body close to herself.  You know like her arms wrapped around herself kind of thing.  She was much more worried than I had expected she would be when she walked in the door.

[35] At hearing, Dr, Busch described this interaction with ███Jane Roe 1███, as follows:
> So she was ill, like physically distraught.  It took her a little bit longer to come in.  She did not want to talk to me, mouth was dry, wouldn't tell me what happened exactly.  Just kind of kept saying again and again, I cannot go through this again.  I cannot go to trial.  I can't do this.  I can't do this.  I can't do this.  And it was just kind of — so she never actually told me specially what happened.   Very dry mouth, very pale, trembling, crying, really shaken up and I could tell immediately that something was wrong.

communication.  The coach later told Dr. Busch that Respondent had no insight into reading nonverbal communication.[36]

This topic was also the subject of examination at hearing.  At Tr 3, p 53-54, she testified:

> [I]f you are a medical student if you are struggling with a physical exam skill or if you are struggling with doing presentations, we will urge somebody to get coaching. In the case of ▮John Doe▮ what had come up was that he had had some concerns from a surgeon who did not like his behavior in the operating room.  It seemed like a consistent pattern of behavior that ▮John Doe▮ was struggling a little bit with which was I don't know maybe not being able to read body language[37] well so I suggested that he get some coaching from a previous surgeon who might be able to help him just understand the ways to behave in the operating room so that was what I was talking about.
>
> * * *
>
> And his coach had reached out to me after meeting with ▮John Doe▮ and said, you know it seems like he has a little bit of a problem reading nonverbal communications, so it seemed like a consistent pattern for us.

**▮K.S.▮**

Ms. ▮K.S.▮ noted that, at the time of the Ball, "▮Jane Roe 1▮ and Mr. ▮K.B.▮ were sleeping together but not dating. ▮Jane Roe 2▮ was married. ▮Jane Roe 1▮ had 'a lot of insecurities about whether something was going on between [▮Jane Roe 2▮ and [Mr. ▮K.B.▮ HCF-530, p 24.

Ms. ▮K.S.▮ invited Respondent to attend the Ball and offered her home, where she lived with her boyfriend, as a place for Respondent to spend the night.  HCF-530, p 24.  She indicates that "[m]ost people drank two beers at Mr. ▮K.B.▮ house.  No one

---

[36] Dr. Busch testified that this type of review of student performance was a regular part of her job.  When negative comments come in from a doctor, about a student, she undertakes measures to assist the student. Tr 3, p 68-69.  At Tr 3, p 69, Dr. Busch testified to the following regarding the complaints about Mr. ▮John Doe▮

> I have never had this kind of comment, but I have had other comments where people were not acting as part of a team, but I have never had this particular comment like that before.

[37] Dr. Busch described Mr. ▮John Doe▮ OB/GYN clerkship, where "there were also some evaluations or feedback that said that he would make inappropriate comments at the wrong time in front of patients."  Tr 3, p 56.

was taking shots or drinking heavily.   Ms. ██████████ may have had one beer at Mr. ██████ house; she is not a "'big beer drinker.'"  HCF-530, p 24.

Ms. ██████ had limited interactions with ████████████ at the Ball and "did not know how much ██████████ had to drink that night".  HCF-530, p 25.

At The B.O.B., Mr. ██████ had limited interactions with ████████████ but, at HCF-530, p 25, provided the following:

> [W]hile she was upstairs at The B.O.B., she looked across the dance floor and saw ██████████ ████████ Respondent, and possibly Mr. ██████  Ms. ██████ spoke to them briefly.  "None of them looked happy.  They were kind of standing sullen in the corner."  Ms. ██████ did not speak to ██████████ directly, and at this point she did not know that anything had happened.  ████████████ was standing on her own and seemed to be able to "ambulate and function."  Ms. ██████ gave her house key to Respondent and told him that he could sleep on the couch.  ██████████ ████████ Respondent, and Mr. ██████ left shortly thereafter.  They were not at The B.O.B. for very long.  Ms. ██████ went out for pizza with her boyfriend, Ms. ████ and another friend, and when she arrived at home Respondent was not there.

On the next morning, April 24, 2016, Ms. ██████ had breakfast with her boyfriend, Mr. ██████ and ████████████ HCF-530, p 25.   At HCF-530, p 25-26, she described the breakfast and subsequent interactions with ████████████ as follows:

> "It was very awkward."  Mr. ██████ was not looking at or speaking to ██████████  ████████████ seemed "really down and depressed."  She seemed "shell-shocked" and "out of it."
> Mr. ██████ was angry with ████████████ and, after breakfast, Ms. ██████ asked him what happened.  Mr. ██████ told her that ██████████ had slept with Respondent and he did not like that she slept with someone he knew.  Mr. ██████ was angry with ████████ "as if what happened was consensual." . . .
> Later the same day, Ms. ██████ spoke to ████████████ who told her what happened the previous night.  ████████████ said that she stepped outside at Med Ball and saw Mr. ██████ and ████████ making out.  She was extremely upset.  Mr. ██████ and ████████ knew that ██████████ had seen them, and ████████ went back inside and up the stairs.  Respondent saw that

Jane Roe 1 was upset and followed her up the stairs. [Mr. K.B. later told Ms. K.S. that he tried to go speak to Jane Roe 1 at this point, and Respondent stopped him and told him that "she doesn't want to talk to you."]

Jane Roe 1 was crying and "shell-shocked" while she described to Ms. K.S. what had happened. Jane Roe 1 described the incident as an "out-of-body experience." She said that Respondent "moved on her while she was extremely upset, and she felt frozen." She "never consented, never said yes."

Ms. K.S. did not know the "exact details, movement by movement" of what Respondent did.[38] Jane Roe 1 told her that she "did not want it to be happening the entire time," and "she felt frozen." After it was over, Respondent "ripped her necklace off and kept it."[39] Jane Roe 1 told Ms. K.S. that, later that night, she was at Mr. K.B. house. When she got there, she went directly to Mr. K.B. room to go to sleep. Respondent crawled into bed with her, which "made her extremely uncomfortable." Respondent did not ultimately sleep there; he slept on the couch. Jane Roe 1 told Ms. K.S. that when she told Mr. K.B. what happened with Respondent, Mr. K.B. said, "Are you trying to tell me that he raped you?"

After Jane Roe 1 told her the story, Ms. K.S. told her, "this sounds like rape." Jane Roe 1 was "hesitant to admit that. She didn't want to accept that is what happened." At no point did Jane Roe 1 tell Ms. K.S. that what happened with Respondent was okay or consensual. . . .

The same day, Jane Roe 1 came to Ms. K.S. apartment and together they went to purchase Plan B for Jane Roe 1. Ms. K.S. remembered that they discussed that it was better to be safe than to worry about it or wait.

As to Jane Roe 2 matter, at HCF-530, p 26, Ms. K.S. recounts a conversation she had with Jane Roe 2 as follows:

> Following Med Ball, Ms. K.S. did not speak to Jane Roe 2 often. Perhaps a few weeks after Med Ball, Jane Roe 2 told her that on the night of Med Ball, Respondent "made moves on [Jane Roe 2 on the couch and touched her." Jane Roe 2 called her then-husband to pick her up at 4:00 am because she did not feel comfortable sleeping on the couch with him.

---

[38] On cross-examination, Ms. K.S. testified that Jane Roe 1 was able to recount "movement by movement" what happened up to Jane Roe 1 sexual encounter with Respondent, but was unable to recount in such detail the actual sexual encounter with Respondent. Tr 1, p 115.

[39] On cross-examination, Ms. K.S. testified that that she recalled seeing the necklace before the Med-Ball and that "it is in all of the pictures". Tr 1, p 121. She testified that she did not see the necklace after the Med-Ball and added "[n]o one has". Tr 1, p 121.

**L.T.**

Ms. **L.T.** is a medical student at MSU. Tr 1, p 138.  Ms. **L.T.** described **Jane Roe 1**

as her best friend[40]. HCF-530, p 26.   Ms. **L.T.** testified that she was at Mr.

**K.B.** house prior to the Ball where everyone had two drinks.  HCF-530, p 26-27.

She testified that, at the Ball, "everyone drank more than they should have. They were

out with their medical school class, and 'it should have been a safe place to just let go.'"

HCF-530, p 27.  At HCF-530, p 27, she added the following regarding the Ball:

> **Jane Roe 1** does not drink beer; she drinks whiskey.[41]
> **Jane Roe 1** is "tiny; probably 100 pounds soaking wet."  **Jane Roe 1**
> was drinking glasses of alcohol.  She could not walk straight and
> was "definitely unsteady."  Ms. **L.T.** "knows how she gets when she's had
> too much.  Her body language opens up a bit more."  **Jane Roe 1**
> was "out there dancing with us.  She would never dance, she hates groups
> of more than ten people."  **Jane Roe 1** "comes across as a bit
> confused" normally, and "alcohol amplifies that."  The only time Ms. **L.T.**
> has seen **Jane Roe 1** as drunk as she was the night of Med Ball
> was when they went camping together.
>
> Med Ball "was a big party, and [they all] lost sight of each other."
> There were fights.  **Jane Roe 2** and her then-husband got into a fight,
> and he threw his ring at her and stormed out.  **Jane Roe 1** and Mr.
> **K.B.** were "kind of in a relationship," and at some point, **Jane Roe 1**
> ran away crying.

Ms. **L.T.** provided testimony regarding **Jane Roe 1** deteriorating mental

health during the first half of 2016 school year.  See HCF-530, p 27.  During winter break,

Ms. **L.T.** encouraged **Jane Roe 1** to seek counseling.  HCF-530, p 27.  At HCF-

530, p 27-28, Ms. **L.T.** explained the circumstance under which she learned of the

allegations made by **Jane Roe 1** as follows:

> Prior to the orientation that marked the beginning of the third year
> of medical school in the summer of 2017, **Jane Roe 1** told Ms. **L.T.**

---

[40] From the record, it is unclear when Ms. **L.T.** came to consider **Jane Roe 1** her best friend.
[41] Prior to adopting the FIR as her testimony, she clarified that **Jane Roe 1** doesn't drink a lot and normally drinks "very little whiskey". Tr, p 141.

that she had included a request not to be placed on a rotation with two individuals when she submitted her rotation paperwork.  She told Ms. L.T. that as long as she was not on a rotation with those two people, she would be fine.

On the day of orientation, the "entire track was together for the first time."  Jane Roe 1 and Ms. L.T. had just sat down in the small room when Respondent entered the room.  Jane Roe 1 "started freaking out. Her face got red, she got fidgety."[42]  Jane Roe 1 ran out of the room and to the bathroom.  Ms. L.T. went with her.  When Ms. L.T. saw her in that condition, she "had no idea what to expect."  In the bathroom, Jane Roe 1 "could not quite get words out."  She told Ms. L.T. that the problem was with Respondent.  She was terrified.[43]  She told Ms. L.T. that "she couldn't do it; she didn't want to be on a track with [Respondent] or [Mr. K.B. Ms. L.T. did not yet know what was going on.  Jane Roe 1 said, "Did I ever tell you about Med Ball?  I thought I did, I'll tell you later, but I can't…it's [Respondent]."

Later that day, [after taking Jane Roe 1 to speak with school officials], Ms. L.T. and Jane Roe 1 both cried when Jane Roe 1 told her the following:

Jane Roe 1 was having fun at Med Ball, and she saw Jane Roe 2 kissing Mr. K.B.  She and Jane Roe 2 were good friends, and Jane Roe 1 "got pissed."  She ran back inside and up the stairs.  Mr. K.B. later told Jane Roe 1 that he tried to follow her up the stairs, but Respondent stopped him at the bottom of the stairs and said, "I can take care of this; she's too mad at you."

At the top of the stairs, Respondent started to command Jane Roe 1 to take off her dress.  She told Ms. L.T. "I don't know why I did it.  I didn't know what was going on."  Jane Roe 1 told Ms. L.T. that she did not have a clear continuous memory of the entire night.  She "wished that she had a full memory or none at all."  Jane Roe 1 remembered snippets.  She would hear something or feel something, and then "it would go black again."  Ms. L.T. asked her if she ever gave Respondent consent.  Jane Roe 1 said "no, I would have never thought of doing that."  Jane Roe 1 told Ms. L.T. that Respondent "assaulted her and penetrated her, and that she has never been in so much pain after sex before."  She was in pain for a while after the incident.  After Respondent was done, he took a piece of jewelry from Jane Roe 1 that had belonged to her sister.  She "got herself together and went downstairs."

---

[42] On cross-examination, Ms. L.T. testified that Jane Roe 1 "looked like she was having a serious panic attack… like a meltdown or something".  Tr 1, p 150.
[43] On cross-examination, Ms. L.T. added that Jane Roe 1 was crying.  Tr 1, p 150.

As to Jane Roe 2 claim, Ms. L.T. was not able to testify to any of the actual events, but did provide testimony regarding how she learned of the alleged conduct.  At HCF-500, p 28-29, she stated:

> During the fall of 2017, [She] was hanging out with a group of girls, including Jane Roe 2 It was the third year of medical school, so there were students who had started at East Lansing there as well.  One of the students from East Lansing, Sasha Collins, said she knew of some girls who had "come across some trouble with [Respondent]."  Another girl said that she "would never be alone with him."  Ms. L.T. said that she knew about a girl that Respondent had assaulted in Grand Rapids.  After Ms. L.T. said this, Jane Roe 2 said, "you know about me?"  Jane Roe 2 then told Ms. L.T. that on the night of Med Ball, she went to sleep on the couch at Mr. K.B. house, and she "woke up to [Respondent] groping her and trying to get on top of her, and she screamed and left."

A.V.

Ms. A.V. is a limited license psychologist who has been treating Jane Roe 1 since January, 2017[44].  HCF-530, p 29.  Without objection, Witness A.V. testified to a number of matters relating to trauma and the Med-Ball incident and added, in relation to the investigative report,  that "[she] was speaking and answering the questions regarding trauma based upon [her] previous training with individuals who have experienced trauma, not on the basis of being an expert witness.  I am not an expert witness regarding trauma."  Tr 3, p 9.  Ms. A.V. has diagnosed Jane Roe 1 as having "Adjustment Disorder with mixed depression and anxiety".  Tr 3, p 19.  During treatment, Jane Roe 1 shared, with Ms. A.V. her experiences regarding the alleged acts, which, at HCF-530, p 29-30, Ms. A.V. describes, as follows:

> [A]t an event on April 23, 2016, Jane Roe 1 had become upset by "other interpersonal situations happening."  She went upstairs to get some space.  Respondent followed her and they spoke briefly.  He became aggressive and took her to a fire escape.  He told her to take off her dress.  He demanded that she look at him and he proceeded to engage

---

[44] There was a nine month break in services while Ms. Jane Roe 1 studied in Europe.  Tr 3, p 18.



in sexual activities that were not wanted.  After it was over, he took her necklace.

████ Jane Roe 1 ████ had difficulty sharing with Ms. █ A.V. █ the specific details of the sexual act that took place.  She recalled ██ Jane Roe 1 ██ ████ telling her that she was penetrated . . . .

████ Jane Roe 1 ████ described feeling "frozen and numb" during the incident. . . .

\* \* \*

████ Jane Roe 1 ████ told Ms. █ A.V. █ that there were parts of the encounter she could not remember. . . . In the year and nine months Ms. █ A.V. █ has been speaking to ████ Jane Roe 1 ████ about the incident, "she never wavered in the details she shared."

Ms. █ A.V. █ explained that, when the alleged incident had ended, ██ Jane Roe 1 ██

████ "experienced emotional immobility, shame, and a feeling that what had

occurred was her fault." HCF-530, p 25.  ████ Jane Roe 1 ████ sense of "guilt and self-

blame" was increased because she "tried to talk to someone about the incident soon after

it occurred, and she got a negative response".  HCF-530, p 29.  "After that, Respondent

wanted to take her to get Plan B[45] and invited her to breakfast, and she was further jarred

by that."  HCF-530, p 29.

When asked whether it was "common" or "uncommon" for the victim of sexual

assault to suffer memory loss of the incident, Ms. █ A.V. █ testified, at Tr 3, p 19, that:

> I would say it is in the middle.  It's not everyone, but sometimes that will happen with different individuals.  Sometimes in circumstances like these from my experience from talking to previous individuals who experienced trauma memories can manifest later or they are just not there.  So, it depends on a situation.  That's the hard part, [it's] very situational.

To explain ████ Jane Roe 1 ████ description of being frozen during the incident, at

HCF-530, p 29, Ms. █ A.V. █ testified:

---

[45] Respondent was unwilling to admit to knowing whether he discussed Plan B with ████ Jane Roe 1 ████ and, when asked about this, indicated his preference that the RO rely on text messages that he knew not to be in evidence.  Tr 3, p 89.  However, at one point when asked if he contacted ██ Jane Roe 1 ██ about Plan B, testified that, "I understand that — I don't know."  Tr 3, p 89.

"[S]ometimes our bodies will freeze so that we can survive a situation."[46]  Freezing can occur during sexual assault.  [It sounds] as if that was what happened to ████████ when she was in the fire escape stairwell.  Freezing can lead to guilt in survivors, because they look back and think, "why didn't I fight?"  [T]he immobility ████████ was experiencing likely hindered her ability to fight, but one can also engage in that state.  "Part of the survival response is to go along with some of what is happening."  [I believe] ████████ was trying to move through the situation and respond in a way that would allow her to survive.

Ms. ████ indicated that she had no "concerns or questions" about Ms. ████ "[b]ecause of the consistency of the nature and the physical responses I have noticed, it seems to me that it was a — it fell into the category of a response from experiencing trauma".  Tr 3, p 21.

████

Respondent called his brother-in-law, ████, as a character witness.  See Tr 3, p 31-34.  His testimony was not found probative.

## Analysis and Findings

### Credibility of the Witnesses

With the exception of Respondent, all of the witnesses testifying, including both Claimants, were credible.  Given their clouded memories, caused by the passage of time and the consumption of alcohol, their individual testimony appears consistent over time and consistent with one another.  Their demeanors at hearing suggested they were testifying truthfully.  The same cannot be said for Respondent.  At hearing, Respondent's demeanor left this RO feeling that he was being less than fully truthful.  Most problematic

---

[46] In live direct examination, Ms. ████ added that: "In circumstances like these, people can have these symptoms."  Tr 3, p 8.  She described this behavior as part of a "fight, flight or freeze response".  Tr 3, p 20.  She testified that ████ behavior "sounded like a freeze response from what she reported to [her] and from [her] previous experience."  Tr 3, p 20.

34

for Respondent's credibility, however, was his contradictory claims regarding what took place in Mr. K.B. ███ bedroom and whether Jane Roe 1 ███ was crying at the top of the stairs at the ball.  Other instances of contradictory testimony were noticed, but will not be recounted.  In short, were conflicting evidence was presented on critical issues, Respondent is not to be believed.

**Hearing Case File 00530-2018**

Respondent admits to intentionally engaging in sexual intercourse, at the Med Ball, with Jane Roe 1 ███ by penetrating her vagina with his fingers.  His admission is accepted as fact.

The question remains as to whether the act of sexual intercourse amounted to an act of Sexual Assault or Rape and, thus, by definition, an act of sexual violence.  For this act of sexual intercourse to be found a Sexual Assault or Rape, it must have been effectuated under one of the three following circumstances:  1) by use of force or the threat of force; 2) without consent; or 3) where the individual is incapacitated.  The record does not support a conclusion that Respondent used or threatened to use force in order to engage in sexual intercourse with Jane Roe 1 ███ [47].  Further, while the record suggests the parties involved were all under the influence of alcohol, the record does not support a conclusion that Ms. Jane Roe 1 was incapacitated by alcohol.  Under the circumstance of this case, it is Jane Roe 1 ███ consent that is most in question.

Having considered the entire record, I find that Jane Roe 1 ███ did not consent to the act of sexual intercourse with Respondent and that the interaction meets MSU's definition of sexual assault.

---

[47] It is noted, however, that Respondent used force to make his initial sexual contact that Jane Roe 1 ███ However, that violation of the PRVSM is subsumed by the larger charge, explained below.

Claimant was clear that she never wanted to have sex with Respondent and the parties agree that she never verbally stated a desire to do so.

At the time this sexual assault began, Claimant had isolated herself at the top of a set of steps, was very drunk, and was crying. She had just witnessed her best friend, Ms. Jane Roe 2 kissing her sexual partner, Mr. K.B. who had brought a date, not being Jane Roe 1 nor Ms. Jane Roe 2 to the Ball. In short, Ms. Jane Roe 1 was a drunken emotional wreck crying in a semi-private spot at the top of a stairwell. Respondent, who admits to being attracted to Jane Roe 1 amid an evening of, at least for him, rising sexual energy, joined her at the top of the steps. Rather than being content with acting the gentleman to console Ms. Jane Roe 1 in her moment of need, Mr. John Doe admits to forcefully turning Ms. Jane Roe 1 head toward him so that he could begin kissing and making out with her.

Under the circumstances, it should go without saying that Respondent's behavior was fraught with danger. Jane Roe 1 could have fought back by, for instance, slapping him. She could have fled the area to find solitude, an action Respondent knew she had just done when confronted by the trauma of seeing her lover and best friend kissing. Or, she could freeze, which, as explained below, is what she did.

Mr. John Doe claims that Ms. Jane Roe 1 actively participated in all actions that ensued after he forced the first kiss on her. This, he claims, is how he knew Ms. Jane Roe 1 had granted him consent to engage in sexual intercourse. However, that is not how Ms. Jane Roe 1 recalls the interaction, nor how I find.

Jane Roe 1 admits to gaps in her memory of the event. None-the-less, she was able to provide a general explanation of the events and how she felt during them.

Ms. ███████ described having shut down at this point. During the events, Ms. ███████ felt she could not react and that she dissociated from the experience. As she explained it, " . . . this person that I did not think was threatening was doing this and I did not know what he was capable of at that point. He was… the language he was using… I just didn't know and I didn't feel… especially with the alcohol, I think, I just didn't… I couldn't react."

While Ms. ███████ reaction may be hard to understand and accept, Ms. ███████ provided an explanation. First, she explained it is not uncommon for the victim of a sexual assault to suffer memory loss. More helpful was her testimony regarding a fight, flight or freeze response. She explained that sometimes the victims of sexual assault will "freeze" as a survival mechanism. Based on her experience as a psychologist and her treatment of Ms. ███████ it is Ms. ███████ opinion that Ms. ███████ froze during the sexual assault. As she stated at HCF-530, p 29, it was her opinion:

> Freezing can occur during sexual assault. [It sounds] as if that was what happened to ███████ . . . . [T]he immobility ███████ was experiencing likely hindered her ability to fight, but one can also engage in that state. "Part of the survival response is to go along with some of what is happening." [I believe] ███████ was trying to move through the situation and respond in a way that would allow her to survive.

I am convinced by and accept ███████ and Ms. ███████ explanation of the event.

For whatever reason, Respondent was either unable to properly assess Ms. ███████ reaction to his unwanted sexual advancements or he chose to ignore them. While his motives make no difference to the outcome of this matter, it is worth discussing. Respondent admits he was intoxicated by alcohol and it's quite likely this affected his judgment and ability to properly assess the dangerous waters he had waded into. Further,

Dr. Busch provided uncontested testimony, indicating that Respondent has some sort of difficulty reading non-verbal communication.  This raises the possibility that Respondent was simply not able to properly process and understand the non-verbal signals that Ms. Rousikis was communicating.  It also could have been a combination of alcohol and some inherent problem processing non-verbal communication that led Respondent astray.  Or, he simply might not have cared.  In the end it really doesn't matter.  What does matter is that Respondent isolated a distraught Ms. Jane Roe 1 he then made unwanted sexual contact with a her, and then, after she froze from the trauma he was experiencing, he raped her.

In sum, I find that the evidence supports a finding, by at least a preponderance of the evidence, that Ms. Jane Roe 1 did not wish to engage in sexual activity with Respondent, nor did she provide verbal or non-verbal consent to engage in sexual intercourse with Respondent.    Rather, when Ms. Jane Roe 1 was confronted with Respondent's unwanted sexual contact, she froze as a survival mechanism to experiencing a traumatic event.  Respondent, not recognizing or ignoring the fact that he had no consent, engaged in sexual intercourse with Ms. Jane Roe 1 the entire act being against her will and without her consent.

Thus, in the early morning hours of Sunday, April 24, 2016, while at the Med Ball, Respondent, Mr. John Doe engaged in sexual misconduct in violation of Section II of the University Policy on Relationship Violence & Sexual Misconduct.  Specifically, Respondent violated Section II by committing an act of Sexual Violence by engaging in sexual intercourse with Jane Roe 1 without her consent, as defined in Section VIII of the University Policy on Relationship Violence & Sexual Misconduct.

**Hearing Case File 00530-2018**

Respondent admits to intentionally engaging in sexual contact with Ms. [Jane Roe 2] The question to be decided is whether the act of sexual contact amounted to an act of sexual violence.  To be found an act of sexual violence, the contact must be an intentional contact with the intimate parts of another . . . or the disrobing or exposure of another without permission.   Having considered the entire record, I find that Claimant Pompa did not give permission to Respondent to engage her in sexual contact.  Rather, I find that Respondent committed a sexual assault by making sexual contact with a sleeping victim.

In short, this is a classic he said, she said.  Respondent claims he engaged in consensual sexual contact with Ms. [Jane Roe 2] until she stated she was no longer interested; at which time he ceased his actions.  On the other hand, Dr. [Jane Roe 2] claims she fell asleep on a couch, only to later awake partially disrobed with Respondent's hands in her undergarments.

Respondent's defense relies entirely upon acceptance of his version of the facts. I find that not possible.  In general, Respondent was not particularly credible.  His version of the events surrounding this incident are particularly not credible because of Respondent's conflicting accounts of what happened with [Jane Roe 1] in Mr. [K.B.] bedroom.  As outlined above, Respondent provided inconsistent testimony about these bedroom activities; activities that took place immediately prior to his sexual contact with Ms. [Jane Roe 2] Because of this and, more importantly, because Dr. [Jane Roe 2] provided credible testimony, I find Dr. [Jane Roe 2] description of the events convincing.

After review of the entire record, I find the following.  Respondent entered Mr. [K.B.] bedroom to be with [Jane Roe 1] Respondent got into bed with Ms.

39

██████████and, he claims, kissed her without her prior permission.[48]     After ██████████

█████████rebuffed his sexual advancements, Respondent proceeded to the living room

where he would find his next victim.  There, on the couch, was Ms. ████████who was

sleeping off a long night of drinking.  His night not yet complete, Respondent set out on

another sexual mis-adventure by cozying up to her and engaging her in sexual contact

by partially disrobing her, by placing his hands in or on her undergarments, and by kissing

her; all while she was sleeping or slowly returning to consciousness from her drunken

slumber.

This behavior amounts to sexual contact without consent and is a form of sexual

violence, as defined by Section VIII of the PRVSM and is banned under Section II of the

PRVSM.

**Conclusion**

It is found, by a preponderance of the evidence, that Respondent, Mr. ████████

██████████violated Section II of the University Policy on Relationship Violence & Sexual

Misconduct by engaging in sexual intercourse with Ms. ██████████████without her

consent.

---

[48] While this might be considered a separate count of sexual assault, ███████████does not recall being kissed by Respondent and this incident did not appear to be the focus of the parties, so no decision is being rendered about this encounter.

It is also found, by a preponderance of the evidence, that Respondent, Mr. John Doe

████████ violated Section II of the University Policy on Relationship Violence & Sexual

Misconduct by engaging in sexual contact with Dr. Jane Roe 2 without her permission.


MICHIGAN OFFICE OF ADMINISTRATIVE
HEARINGS AND RULES
For Michigan State University

# Mark D. Eyster

Digitally signed by: Mark D. Eyster
DN: CN = Mark D. Eyster email =
eysterm@michigan.gov C = US O
= MAHS OU = MAHS PSC
Date: 2019.05.22 16:16:24 -04'00'

_____
Mark D. Eyster
Administrative Law Judge, serving as
Resolution Officer for Michigan State University


Issued:
May 22, 2019
Lansing, Michigan

41