# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

—————————————————————

**JOHN DOE**,

        Plaintiff,                   Case No.     1:19-cv-226

                                               Hon. Paul L. Maloney

vs.

**MICHIGAN STATE UNIVERSITY;**
**ROBERT KENT,** in his individual and official capacity,
**RICK SCHAFER,** in his individual and official capacity,
**ARON SOUSA, M.D.,** in his individual and official capacity,
jointly and severally,

        Defendants.

_____/

### SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

    **NOW COMES** the Plaintiff, John Doe, by and through counsel and for his

complaint against Defendants states as follows:

### INTRODUCTION

1. Plaintiff John Doe brings this action for violation of Title IX, violations of the

    Equal Protection Clause of the United States Constitution under 42 U.S.C.

    §1983, violation of the Due Process Clause of the United States Constitution

    under 42 U.S.C. §1983, and other related claims.

2. This case arises out of the decision of Michigan State University ("MSU") and the individual Defendants to impose disciplinary sanctions against John Doe in violation of his constitutional and statutory rights.

## PARTIES

3. Plaintiff John Doe was a medical student at the College of Human Medicine ("CHM") at MSU until February 12, 2019, when he was suspended, and then subsequently dismissed on July 15, 2019.

    a. John Doe is a citizen of Michigan with a residence in Grand Rapids, Michigan.

    b. On February 12, 2019, John Doe was near the end of his third year of medical school at the CHM. He would have graduated and entered residency in approximately one year.

    c. The disclosure of John Doe's identity will cause the student irreparable harm as this case involves matters of the utmost personal intimacy, including education records protected from disclosure by the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g; CFR Part 99.

4. Defendant Michigan State University is a land grant university established by the State of Michigan. The main campus of Michigan State University is located in East Lansing, Michigan. Michigan State University is the beneficiary of state appropriations and the recipient of state and federal grants.

5. Defendant Robert Kent is the Interim Associate Vice President, Office for Civil Rights and Title IX Education and Compliance for Michigan State University. He has a principal place of business at Olds Hall, 408 W. Circle Dr., Suite 4, East Lansing, Michigan 48824.

   a. Defendant Kent is sued in his individual and official capacities for declaratory and injunctive relief and for money damages.

   b. On information and belief, Defendant Kent is acting under the policies, procedures, and practices of Michigan State University.

   c. Defendant Kent is responsible for administering the Policy on Relationship Violence and Sexual Misconduct for Michigan State University.

6. Defendant Rick Schafer is the Associate Director of Student Conduct and Conflict Resolution for Michigan State University. He has a principal place of business at Student Services Building, 556 E. Circle Dr., Room 101, East Lansing, Michigan 48824.

   a. Defendant Schafer is sued in his individual and official capacities for declaratory and injunctive relief and for money damages.

   b. On information and belief, Defendant Schafer is acting under the policies, procedures, and practices of Michigan State University.

   c. Defendant Schafer is responsible for the administration of disciplinary action under the Policy on Relationship Violence and Sexual Misconduct for Michigan State University.

7.  Defendant Aron Sousa, M.D. is a Senior Associate Dean for the Michigan State University College of Human Medicine. He has a principal place of business at East Fee, 909 Fee Rd., A118, East Lansing, Michigan 48824.

   a.  Defendant Sousa is sued in his individual and official capacities for declaratory and injunctive relief and for money damages.

   b.  On information and belief, Defendant Sousa is acting under the policies, procedures, and practices of Michigan State University, including the Medical Student Rights and Responsibilities ("MSRR").

   c.  Defendant Sousa is responsible for administering the MSRR and imposing discipline for violations of conduct under the MSRR.

## JURISDICTION AND VENUE

8.  This case arises, in part, under the laws of the United States, specifically 42 U.S.C. § 1983 and Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 et seq. Accordingly, this Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1331 and 1343.

9.  This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. § 1391. The individual defendants are residents of the State in which this district is located and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTS

10. This case arises amidst both a national controversy stemming from the Federal Department of Education, Office of Civil Rights' ("OCR") threats to withhold

federal education funds to compel colleges and universities to address "sexual violence" on their campuses, and a sexual abuse scandal involving Dr. Larry Nassar, a Michigan State University employee who sexually abused hundreds of women and girls, and resulted in payment by Michigan State University of over a half billion dollars in settlements.

11. These two controversies have resulted in significant criticism of Michigan State University for being too lax in its investigations of campus sexual misconduct.

12. Michigan State University's response to this criticism has been to crack down on alleged perpetrators of sexual misconduct.

13. Michigan State University is ill-equipped to handle and adjudicate matters of alleged sexual misconduct, and their response to the criticism has gone too far, resulting in the deprivation of the rights of students accused of sexual misconduct.

14. Instead of requiring accusers to prove that they were assaulted, the accused students must prove that they had consent for sexual contact.

15. When adjudicating allegations of sexual assault, Michigan State University applies the lowest standard of proof available – preponderance of the evidence.

16. Michigan State University effectively treats male students accused of sexual misconduct with a presumption of guilt.

17. As detailed in this Complaint, Michigan State University's unlawful discipline of John Doe based on his gender is part of a troubling trend among American

universities which forces students to pursue litigation to clear their names and continue to pursue their educational and life goals.

**The Alleged Incidents with Jane Roe 1 and Jane Roe 2**

18. On April 23, 2016, John Doe, Jane Roe 1, Jane Roe 2, and K.B. were all first-year medical students at Michigan State University.

19. The four students, along with several other friends, planned to attend the Med Ball, which was taking place at Noto's Old World Italian Dining, a restaurant located in Grand Rapids, Michigan.

20. Prior to the Med Ball, John Doe, Jane Roe 1 and Jane Roe 2 gathered at the off-campus residence of K.B., where they all began to consume alcohol.

21. Prior to the night of the Med Ball, Jane Roe 1 had been engaged in a sexual relationship with K.B.

22. K.B. reported to investigators that his sexual relationship with Jane Roe 1 was not exclusive.

23. Jane Roe 1 believed her romantic relationship with K.B. to be ongoing at the time of the Med Ball.

24. Jane Roe 2 had planned to attend the Med Ball with her then-husband, J.M.

25. Jane Roe 2 and J.M. had gathered at K.B.'s home along with the other parties before leaving for the Med Ball.

26. After gathering at K.B.'s home, the parties all traveled by Uber to Noto's, the venue for the Med Ball.

27. While at the Med Ball, all of the parties report voluntarily consuming alcohol and dancing.

28. Jane Roe 1 and John Doe danced together.

29. John Doe taught Jane Roe 1 the steps to the Waltz and the Cha-Cha.

30. When dancing, John Doe and Jane Roe 1 discussed that they were the only ones at the Med Ball without a date.

31. Jane Roe 1 told John Doe, "I guess you're my date for the Med Ball."

32. John Doe and Jane Roe 1 continued to talk about friends, medical school stress, and drinking.

33. John Doe and Jane Roe 1 continued to dance with each other which progressed to sexually grinding on each other while on the dance floor.

34. Jane Roe 1 reported that she drank more than she usually does because Med Ball "was a big event to celebrate a stressful year."

35. John Doe, who was a first-year medical student at the time, had also had a particularly stressful year, as his mother had been recently diagnosed with breast cancer for the second time in addition to the obvious stressors of medical school.

36. Early in the evening, Jane Roe 2 and her then-husband, J.M., had a serious argument that led J.M. to ask Jane Roe 2 for a divorce and leave the venue.

37. Jane Roe 1 sought out Jane Roe 2 after Jane Roe 2's argument with J.M. in order to comfort her.

38. Later, Jane Roe 1 became separated from her group of friends and went looking for Jane Roe 2.

39. When Jane Roe 1 went outside the venue to search for Jane Roe 2, she discovered Jane Roe 2 and K.B. engaged in a kiss.

40. Jane Roe 1 ran back inside the venue and up a set of stairs where she sat down and began texting Jane Roe 2.

41. Jane Roe 1 wrote to Jane Roe 2, "Just done. Don't expect me to be ur friend anymore. I've done nothing but try to be a good friend to u and be supportive of whatever u need."

42. After Jane Roe 1 engaged in a text conversation with Jane Roe 2, John Doe approached her and sat down next to her on the stairway.

43. Jane Roe 1 recounted to John Doe what she had witnessed between Jane Roe 2 and K.B.

44. Their conversation continued, and eventually John Doe initiated a kiss with Jane Roe 1.

45. Jane Roe 1 responded by kissing John Doe back, using her tongue.

46. Jane Roe 1 and John Doe shared multiple kisses while sitting on the stairs.

47. John Doe and Jane Roe 1 had their hands on each other's arms and faces while kissing each other.

48. John Doe and Jane Roe 1 got up and moved from the stairway to the second floor of the venue.

49. John Doe and Jane Roe 1 then went into a stairwell off of the second floor of the venue.

50. John Doe and Jane Roe 1 began to kiss and "make out."

51. John Doe and Jane Roe 1 continued to progress from making out to touching underneath the clothes.

52. John Doe recalls Jane Roe 1 acting with eagerness while engaging in the sexual contact.

53. John Doe also recalls Jane Roe 1 taking off her own dress at this point in the interaction.

54. Jane Roe 1's memory does not dispute this assertion.

55. Jane Roe 1 then got down on her hands and knees, on her own accord, to present herself for sexual intercourse.

56. Jane Roe 1 asked John Doe if she could use his jacket to cushion her knees.

57. Jane Roe 1 and John Doe attempted to engage in sexual intercourse.

58. John Doe could not achieve a full erection due to his alcohol consumption and was unable to complete the act.

59. After approximately fifteen minutes of trying to achieve intercourse, John Doe told Jane Roe 1 that "it wasn't going to work."

60. John Doe and Jane Roe 1 got dressed and exited the stairwell.

61. John Doe and Jane Roe 1 stood in the lobby of the venue, arm in arm.

62. John Doe and Jane Roe 1 also held hands.

63. John Doe, Jane Roe 1, Jane Roe 2, and K.B. left the venue and headed to The B.O.B., a bar in Grand Rapids, Michigan.

64. In the Uber on the way to The B.O.B., Jane Roe 1 and John Doe continued to hold hands.

65. Jane Roe 1 placed her head on John Doe's shoulder during the car ride.

66. When the parties arrived at The B.O.B., Jane Roe 1 went downstairs with K.B. while their other friends, including John Doe and Jane Roe 2, went upstairs into the club.

67. Jane Roe 1 talked to K.B. about seeing him engaging in a kiss with Jane Roe 2.

68. Jane Roe 1 cried during this conversation with K.B.

69. K.B. observed that Jane Roe 1 was upset and attributed it to her being upset about seeing him kissing Jane Roe 2 at the Med Ball.

70. K.B. apologized to Jane Roe 1 about the kiss between himself and Jane Roe 2, telling her "sorry, that wasn't fair to you."

71. Jane Roe 1 did not tell K.B. that she had engaged in sexual contact with John Doe.

72. While Jane Roe 1 and K.B. were having this discussion downstairs at The B.O.B., Jane Roe 2 and John Doe were upstairs, together on the dance floor.

73. While on the dance floor together, Jane Roe 2 suggested to John Doe that he and Jane Roe 1 "would make a good couple."

74. John Doe indicated to Jane Roe 2 that he and Jane Roe 1 had already reached that conclusion on their own.

75. Despite this, while Jane Roe 2 and John Doe continued to dance in the club at The B.O.B., Jane Roe 2 told John Doe that he was "very cute."

76. Jane Roe 2 put her finger down the angle of John Doe's jaw and felt his stubble.

77. Jane Roe 2 kissed John Doe, with tongue, while on the dance floor.

78. Jane Roe 1, Jane Roe 2, K.B., and John Doe left The B.O.B. and went to the residence of K.S., another medical student.

79. Jane Roe 1, Jane Roe 2, K.B., and John Doe left the home of K.S. and returned to K.B.'s private residence in Grand Rapids, Michigan.

80. Jane Roe 1 went into K.B.'s bedroom.

81. Jane Roe 2, K.B., and John Doe spent some time hanging out and talking in the kitchen.

82. Later, after John Doe had left the kitchen, he walked by and observed Jane Roe 2 and K.B. having sexual intercourse in the kitchen.

83. John Doe went into K.B.'s bedroom in order to go to sleep.

84. John Doe laid down on the bed next to Jane Roe 1.

85. Jane Roe 1 and John Doe laid in the bed, facing each other.

86. John Doe did not touch Jane Roe 1.

87. John Doe was unable to fall asleep, so he later left the room and went to the living room.

88. When John Doe entered the living room, Jane Roe 2 was on the sectional couch.

89. Jane Roe 2 was awake and moved to make room for John Doe to lay down next to her on the couch.

11

90. John Doe laid down behind Jane Roe 2.

91. Jane Roe 2 began to grind her buttocks against John Doe's genitals.

92. Jane Roe 2 and John Doe began kissing, and engaged in touching of the waist, breast, and shoulders.

93. After several minutes, John Doe pulled Jane Roe 2's dress upward and placed his hand on her buttocks.

94. Jane Roe 2 stated "I'm tired" or "no."

95. John Doe did not continue to touch Jane Roe 2.

96. John Doe moved to another part of the couch, and John Doe and Jane Roe 2 slept the remainder of the night on separate parts of the couch.

97. The next morning, John Doe received a ride to his car from K.B.

98. John Doe revealed to K.B. during this car ride that he had sexual contact with Jane Roe 1.

99. Jane Roe 2 was picked up from K.B.'s home by her husband, J.M., the following morning.

100. When K.B. returned to his home from driving John Doe to his car, he confronted Jane Roe 1 about having sexual contact with John Doe.

101. During this conversation with K.B., Jane Roe 1, for the first time, begins to allude that her encounter with John Doe was not consensual when confronted by her paramour, K.B., with this information.

102. Later that morning, Jane Roe 1 texted John Doe and asked about condom use.

103.   Jane Roe 1 and John Doe discussed by text that Jane Roe 1 should obtain Plan B from a pharmacy in order to prevent a possible pregnancy.

104.   Jane Roe 1 later texts to John Doe, "Look, I need you to know that Saturday was a mistake and nothing like that can happen again."

105.   At no time during this text conversation with John Doe does Jane Roe 1 state that what happened between her and John Doe was not consensual.

106.   After John Doe asks Jane Roe 1 to lunch, she declines his invitation, indicating that she cared about K.B. and that is her priority.

107.   John Doe's contact with Jane Roe 1 after these text messages was limited to just seeing her at school functions.

108.   John Doe was later placed on a rotation for Obstetrics and Gynecology with Jane Roe 2.

109.   John Doe and Jane Roe 2 worked together in a professional manner, treating each other with courtesy and respect.

110.   Neither Jane Roe 1 or Jane Roe 2 had made their complaints at that point, and John Doe had no indication that either Jane Roe 1 or Jane Roe 2 had any issue with their interactions on the night of the Med Ball.

111.   It was nearly two years after the 2016 Med Ball that Jane Roe 1 and Jane Roe 2 reported their claim to the Office of Institutional Equity ("OIE") for Michigan State University.

112.   Jane Roe 2's report was made to OIE on February 26, 2018.

113.   Jane Roe 1's report was made to OIE on February 28, 2018.

**Michigan State University's Investigation Process**

114.    John Doe was first notified of Jane Roe 2's report to OIE via a letter from Kroll Associates, Inc. ("Kroll"), who was hired by OIE to investigate the allegations, on April 17, 2018.

115.    John Doe was interviewed regarding Jane Roe 2's report on April 20, 2018.

116.    John Doe was first notified of Jane Roe 1's report to OIE via a letter from Kroll on July 31, 2018.

117.    John Doe was interviewed regarding Jane Roe 1's report on August 15, 2018.

118.    Regarding Jane Roe 1's report, Kroll's investigators interviewed Jane Roe 1's witnesses K.B., A.B., C.K., E.P, H.R., K.S., L.T., and A.V.

119.    None of Jane Roe 1's witnesses were eyewitnesses to the actual alleged incident.

120.    Regarding Jane Roe 1's report, Kroll's investigators interviewed no witnesses for John Doe.

121.    Regarding Jane Roe 2's report, Kroll's investigators interviewed Jane Roe 2's witnesses K.B., A.B., E.R., K.S., and L.T.

122.    None of Jane Roe 2's witnesses were eyewitnesses to the actual alleged incident.

123.    Regarding Jane Roe 2's report, Kroll's investigators interviewed no witnesses for John Doe.

124.    Jane Roe 2 was first interviewed by Kroll's investigators on March 20, 2018.

125.   Jane Roe 2 had nearly a month to prepare for her initial interview with
investigators.

126.   Nearly a month after Kroll's interview with Jane Roe 2, on April 17, 2018,
Kroll investigator Nicole Y. Lamb-Hale send John Doe correspondence via email
notifying John Doe that Michigan State University intended to formally
investigate him for an alleged violation of the university's Relationship Violence
and Sexual Misconduct Policy ("RVSMP").

127.   Ms. Lamb-Hale's April 17, 2018 correspondence stated as to the allegations
against John Doe, "[Jane Roe 2] alleges that you engaged in sexual harassment,
and specifically made unwanted sexual contact with her in violation of Section X
of the University's RVSM policy on or about April 23, 2016 at a classmate's
house in Grand Rapids, Michigan."

128.   Ms. Lamb-Hale's April 17, 2018 correspondence provided John Doe only
vague and inadequate notice of the charges and allegations against him by Jane
Roe 2.

129.   John Doe, at the time he received the letter, was academically engaged in his
internal medicine rotation. He was engaged in furious preparation for the
internal medicine shelf exam, which is widely held to be the toughest shelf exam
faced by medical students.

130.   John Doe's internal medicine shelf exam took placed on April 20, 2018.

131.    Kroll scheduled the interview with John Doe for immediately following his internal medicine shelf exam on April 20, 2018, only three days after providing John Doe with the vague notice of the allegations.

132.    Given the rigorous nature of the requirements of the rotation and studying to pass the shelf exam, John Doe had no opportunity to engage in any preparation for this interview by Kroll, or to consult with an attorney or advisor regarding the interview.

133.    John Doe was not given adequate time, particularly given his rigorous academic requirements, to even read through the university's RVSMP.

134.    Further, the April 17, 2018 letter from Ms. Lamb-Hale did not detail the potential consequences that John Doe was facing as a result of these allegations.

135.    John Doe, going into the interview, had no idea that suspension or dismissal from the university were likely consequences if he were to be found responsible for the alleged sexual misconduct in violation of the RVSMP.

136.    When John Doe questioned Ms. Lamb-Hale and her fellow Kroll investigator, Tyler Falish, about the potential consequences, he was given a very vague answer in the vein of "many things," and was told that their largest concern was ensuring the safety of the parties going forward.

137.    When John Doe questioned whether he should continue with the interview or first obtain an attorney to represent him, Ms. Lamb-Hale and Mr. Falish downplayed the potential consequences and the need for legal representation in order to induce John Doe to engage in the interview that day.

138.   When John Doe walked into the interview on April 20, 2018, he did so without being given meaningful notice of the allegations for which he was being investigated.

139.   Despite the university's, and thereby Kroll's, obligation to conduct an impartial investigation, the vague notice provided to John Doe indicates that the investigation was tainted from the outset by gender bias and a presumption of John Doe's guilt.

140.   The April 17, 2018 letter from Ms. Lamb-Hale was the only notice John Doe was afforded prior to his interview.

141.   According to the letter, this meeting "is your opportunity to be heard. During the meeting you will have the opportunity to provide a statement, submit evidence, and identify potential witnesses."

142.   Given the vague and inadequate notice provided by the university regarding the underlying allegations, John Doe was placed at an immediate disadvantage in preparing for his interview with investigators.

143.   John Doe was not adequately given an opportunity to be heard, provide a complete statement, gather evidence to submit to investigators, or identify potential witnesses.

144.   With regard to Jane Roe 2's allegations, this interview constituted John Doe's only opportunity to be heard.

145.    Prior to the findings made by Kroll's investigators, John Doe was not offered a live hearing or an opportunity for live cross-examination of Jane Roe 2 or any of her witnesses.

146.    On February 28, 2018, two days after OIE received a complaint from Jane Roe 2, OIE received a complaint from Jane Roe 1.

147.    Jane Roe 1's case was closed on March 5, 2018 due to non-participation by Jane Roe 1.

148.    At no time did Kroll or Michigan State University notify John Doe of the claim by Jane Roe 1, either before the OIE's request for an interview regarding the claim by Jane Roe 2, or during the interview regarding the allegations surrounding Jane Roe 2.

149.    This was despite the fact that Kroll intended to interview Jane Roe 1 regarding Jane Roe 2's allegations.

150.    Jane Roe 1 requested to revive her claim against John Doe after being interviewed by Kroll regarding Jane Roe 2's allegations on June 15, 2018.

151.    John Doe was not given notice of Jane Roe 1's claim until he received a letter from Kroll's investigator, Nicole Lamb-Hale, on July 31, 2018.

152.    Once again, the notice provided by the university through Kroll was vague and inadequate.

153.    Ms. Lamb-Hale's July 31, 2018 correspondence stated as to the allegations against John Doe, "[Jane Roe 1] alleges that you engaged in sexual violence, and specifically raped her in violation of Section VIII(D) of the University's RVSM

18

policy attached, on or about April 23, 2016 at a restaurant in Grand Rapids, Michigan."

154. During the time frame that John Doe was notified of the allegations by Jane Roe 1, he had recently completed a difficult surgery rotation, and had been a few weeks into a pediatrics rotation.

155. John Doe was pulled off the pediatrics rotation as a result of his performance on the surgery rotation. John Doe had been under tremendous stress, not only dealing with the investigation into false allegations by Jane Roe 1 and Jane Roe 2, but also continuing to care for his mother who was recovering from breast cancer and had continued to deal with significant pain after her surgeries.

156. Dealing with possible academic dismissal and a facing a hearing in that matter, John Doe again was not afforded adequate time to sufficiently prepare for his interview with Kroll's investigators, and was required to complete his interview on August 15, 2018.

157. John Doe again appeared without counsel or an advocate, with no advance notice of the details of the allegations made by Jane Roe 1.

158. The vague and inadequate notice provided by Kroll to John Doe regarding Jane Roe 1's allegations again reflects that the investigation was tainted by gender bias and a presumption that John doe was guilty.

159. On February 8, 2019, Kroll completed their investigation and issued a Final Investigative Report.

160.   John Doe was not afforded a hearing or any opportunity to cross-examine either Jane Roe 1 or Jane Roe 2 prior to the findings issued by Kroll.

161.   Kroll, the same party who conducted the investigation, made the finding in this matter.

162.   Kroll purported to use a preponderance of the evidence standard in making their findings.

163.   Regarding Jane Roe 2's report, Kroll concluded that a preponderance of the evidence supported a finding that John Doe engaged in sexual contact with Jane Roe 2 without her consent and in violation of the Policy on Relationship Violence and Sexual Misconduct.

164.   Regarding Jane Roe 1's report, Kroll concluded that a preponderance of the evidence supported a finding that Respondent engaged in sexual intercourse with Jane Roe 1 while she was incapacitated in violation of the Policy on Relationship Violence and Sexual Misconduct.

165.   Kroll's wildly biased interpretation of the evidence gathered in their investigation further demonstrates that Kroll approached this matter not as a neutral investigator, but rather as a prosecutor attempting to prove the guilt of John Doe.

166.   On February 12, 2019, as a direct result of the findings made by Kroll, the CHM issued an interim suspension of John Doe.

167.   CHM had previously been aware of these allegations for more than one year and had never taken action to suspend John Doe during the course of the investigation.

168.   In fact, CHM staff member, Dr. Angela Busch, made Jane Roe 2's report to OIE on February 26, 2018.

169.   On February 14, 2019, John Doe was given a one-hour "hearing" to address the imposition of the interim suspension.

170.   During this one-hour hearing, the hearing panel was given the Final Investigative Report issued by Kroll, including their findings that John Doe violated the RVSMP by a preponderance of the evidence.

171.   The purpose of the February 14, 2019 "hearing" was only for the purpose of determining whether CHM would continue the interim suspension.

172.   John Doe was not permitted to bring a challenge to the findings of Kroll and OIE during the February 14, 2019 "hearing."

173.   John Doe was only permitted to argue why the interim suspension should not continue.

174.   The February 12, 2019 interim suspension was imposed by Defendant Aron Sousa, M.D.

175.   Defendant Aron Sousa, M.D. then chose the three hearing panelists who decided the matter of the continuation of the interim suspension.

176.   Defendant Aron Sousa, M.D. ran the "hearing" for the panelists.

177.   Defendant Aron Sousa, M.D. acted as the prosecutor during the hearing, presenting evidence against John Doe and arguing to the panelists that the interim suspension should be continued.

178.   The MSRR provides that in order to impose an interim suspension, the fact-finder must find "sufficient evidence that the student has engaged in conduct of a sort that, if continued, threatens immediate or irreparable harm and no compelling evidence has been provided by the student that the conduct will be or has already been discontinued…."

179.   Defendant Aron Sousa, M.D. argued a standard for imposition of the interim suspension that did not comport with the standard imposed by the MSRR.

180.   Defendant Aron Sousa, M.D. stated in his closing argument to the hearing panel that "at some level while you could read this as a story of four dozen people behaving badly and hurting each other, the core story in here is, is about somebody who, um, based on the findings, took advantage of a friend, and um, when they were, at least not entirely, um, and that is the fundamental root of our concern and was why I thought the suspension was reasonable and should be continued."

181.   John Doe submitted a psychological evaluation and risk assessment at the "hearing" on the interim suspension which indicated that he was not a risk to the students, staff, or patients.

182. John Doe protested his innocence and stated his disagreement with the findings in the Final Investigative Report during the "hearing" but was not given the opportunity to meaningfully respond to the findings or question witnesses.

183. The panelists determined, based on Defendant Aron Sousa, M.D.'s erroneous argument and the Final Investigative Report, that the interim suspension should be continued.

184. The hearing panelists relied upon the findings in the Final Investigative Report in order to reach their conclusion that the interim suspension would be continued indefinitely.

185. The decision to impose the interim suspension resulted in John Doe being immediately pulled from his surgery rotation, of which he was within approximately two weeks of completion.

186. The decision to impose the interim suspension resulted in John Doe being unable to begin his scheduled six-week pediatric rotation.

187. The interim suspension prevented John Doe from taking his Step 2 examination, scheduled for May 22, 2019 and June 27, 2019, for which John Doe had already incurred expenses in the amount of $1,920.00.

188. On February 18, 2019, John Doe submitted his mitigation statement to the Dean of Students Office regarding the proposed sanction in this matter.

189. On February 26, 2019, John Doe received a notification from the Dean of Students Office recommending a sanction of dismissal.

190.   On March 2, 2019, John Doe presented himself to Tom Stewart, MA, LLP for a polygraph examination regarding the accusations of Jane Roe 1 and Jane Roe 2.

191.   Since Kroll's findings regarding Jane Roe 1 were that Jane Roe 1 was incapacitated at the time that she and John Doe had sexual contact, Mr. Stewart presented John Doe with relevant questions regarding Jane Roe 1's alleged incapacitation.

192.   First, Mr. Stewart tested John Doe regarding the question "Did you observe [Jane Roe 1] stumble or slur her speech before going to the stairwell?"

193.   John Doe answered the question "Did you observe [Jane Roe 1] stumble or slur her speech before going to the stairwell?" with a "No."

194.   Second, Mr. Stewart tested John Doe regarding the question "Did you observe [Jane Roe 1] acting confused or clumsy before going to the stairwell?"

195.   John Doe answered the question "Did you observe [Jane Roe 1] acting confused or clumsy before going to the stairwell?" with a "No."

196.   Mr. Stewart found that John Doe's answers regarding the questions presented concerning Jane Roe 1 indicated a pattern of truthfulness.

197.   Since Kroll's findings regarding Jane Roe 2 were that Jane Roe 2 was asleep when John Doe laid down on the couch with her, Mr. Stewart presented John Doe with relevant questions regarding Jane Roe 2's behavior at the time that John Doe laid down next to her on the couch.

198.   First, Mr. Stewart tested John Doe regarding the question, "Was [Jane Roe 2] awake when you laid down next to her on the couch?"

199.   John Doe answered the question "Was [Jane Roe 2] awake when you laid down next to her on the couch?" with a "Yes."

200.   Second, Mr. Stewart tested John Doe regarding the question "Did [Jane Roe 2] move over so there was room on the couch for you to lay next to her?"

201.   John Doe answered the question "Did [Jane Roe 2] move over so there was room on the couch for you to lay next to her?" with a "Yes."

202.   Mr. Stewart found that John Doe's answers regarding the questions presented concerning Jane Roe 2 indicated a pattern of truthfulness.

203.   On March 8, 2019, John Doe submitted his appeal of both the findings and the sanction issued by Michigan State University.

204.   On March 8, 2019, as part of his appeal, John Doe submitted the results of the March 2, 2019 polygraph examination.

205.   On March 8, 2019, after submission of his appeal, John Doe was notified that his appeal was placed "on hold" and that his case was being reviewed to determine whether a hearing should have been offered.

206.   On March 11, 2019, John Doe requested, through his counsel, that Michigan State University offer him a hearing and lift the sanction of interim suspension.

207.   On March 12, 2019, Michigan State University communicated to John Doe's counsel that the matter was still under review for hearing, but that if a hearing was offered, the interim suspension would not be lifted.

208.   On March 13, 2019, John Doe received a letter from OIE acknowledging that the process used to make findings against him did not comport with the law in the Sixth Circuit.

209.   The March 13, 2019 correspondence from OIE offered John Doe a hearing.

210.   The March 13, 2019 correspondence from OIE required that John Doe request a hearing by March 20, 2019.

211.   On March 20, 2019, John Doe requested a hearing in writing.

212.   On March 20, 2019, John Doe further requested, again through counsel, that the interim suspension be lifted.

213.   On March 20, 2019, John Doe requested through counsel that the finding against him be formally withdrawn.

214.   Despite acknowledging that an unconstitutional process was utilized to reach the findings against John Doe and offering a hearing, Defendant Michigan State University did not formally withdraw the finding against John Doe and refused to lift the interim suspension against John Doe.

215.   On March 20, 2019, along with his request for a hearing, John Doe objected through his counsel to the unconstitutional process used by Kroll to investigate the accusations in his case and to produce the Final Investigative Report.

216.   On March 20, 2019, John Doe demanded through counsel that MSU not provide the Resolution Officer with a copy of the unconstitutionally produced Final Investigative Report.

217.   On March 20, 2019, John Doe demanded through counsel that MSU comply with constitutional requirements and utilize a burden of proof of clear and convincing evidence rather than a preponderance of the evidence standard.

218.   On March 20, 2019, John Doe demanded through counsel that the claim regarding Jane Roe 2 be dismissed because Title IX does not confer jurisdiction to MSU over Jane Roe 2's claim.

219.   On March 20, 2019, John Doe demanded through counsel that he receive separate hearings regarding Jane Roe 1 and Jane Roe 2's claims.

220.   On April 12, 2019, MSU provided the case files to John Doe, which included a redacted version of the Final Investigative Report that redacted out the findings previously made by Kroll, but included the balance of the information regarding Kroll's investigation.

221.   On information and belief, the same redacted version of the Final Investigative Report was provided to Jane Roe 1, Jane Roe 2, counsel for Jane Roe 1 and Jane Roe 2, and the Resolution Officer.

222.   MSU did not comply with John Doe's demand that the Resolution Officer not be provided with the Final Investigative Report.

223.   On May 2, 2019, a Pre-Hearing Conference was held between Judge Mark Eyster, the Resolution Officer, John Doe, and counsel for John Doe by video conference.

224.   During the May 2, 2019 Pre-Hearing Conference, Judge Mark Eyster, the Resolution Officer, revealed near the end of the video conference that he had

reviewed information outside of the hearing record, including the pleadings in the instant case filed in the Western District of Michigan.

225.   During the May 2, 2019 Pre-Hearing Conference, Judge Mark Eyster, the Resolution Officer, also revealed near the end of the conference that he was aware of or had deduced from his review of the pleadings that a prior unfavorable decision had been made by Michigan State University against John Doe.

226.   The review of the information outside of the hearing record by the Resolution Officer created an unfair bias against John Doe by the Resolution Officer.

227.   The disclosure of the prior decision against John Doe to the Resolution Officer created an unfair bias against John Doe by the Resolution Officer.

228.   The review of information outside of the hearing record by the Resolution Officer and the disclosure of the prior decision against John Doe to the Resolution Officer predisposed the Resolution Officer to making a finding against John Doe.

229.   On information and belief, a separate Pre-Hearing Conference was held on May 6, 2019 with counsel for Jane Roe 2.

230.   On information and belief, no Pre-Hearing Conference was conducted with Jane Roe 1.

231.   As a result of the Resolution Officer's review of information outside the record and the disclosure of the prior decision against John Doe, John Doe's counsel requested on May 8, 2019 that the Resolution Officer recuse himself from

28

hearing John Doe's matter and that a new resolution officer be appointed by MSU.

232.   On May 9, 2019, a third Pre-Hearing Conference with held with the Resolution Officer, counsel for John Doe, and counsel for Jane Roe 2.

233.   Jane Roe 1 did not participate in the Pre-Hearing Conference on May 9, 2019.

234.   On May 10, 2019, the Resolution Officer issued a decision denying John Doe's request that he recuse himself and another resolution officer be appointed.

235.   On May 13, 2019, a hearing in front of Resolution Officer Judge Mark Eyster began.

236.   The Resolution Officer denied John Doe the opportunity to present testimony at the hearing regarding his character for good sexual morals.

237.   The Resolution Officer denied John Doe the opportunity to present testimony from Tom Stewart, the polygraph examiner who had administered the polygraph examination passed by John Doe.

238.   The Resolution Officer denied John Doe the opportunity to present evidence of the passed polygraph examination in the form of a report, despite being presented with legal authority that supported its admission.

239.   The Resolution Officer permitted Jane Roe 1 to participate in the hearing despite her lack of participation in a Pre-Hearing Conference as required by MSU's RVSMP.

240.   The Resolution Officer permitted the admission of the Final Investigative Report over the objection of John Doe.

241.   The Resolution Officer permitted Jane Roe 1 and Jane Roe 2 to admit evidence that consisted of hearsay, unreliable expert testimony without qualification of an expert, and unfounded opinion evidence during the hearing.

242.   The Resolution Officer requested that the parties review their statements in the Final Investigative Report prior to their testimony and be prepared to state any changes or additions to that statement that they wished to make. When John Doe attempted to provide changes and additions to his statement on request of the Resolution Officer, the Resolution Officer became irritated that John Doe wished to make changes and additions.

243.   The Resolution Officer permitted Jane Roe 1 to obtain an attorney partway through the hearing.

244.   The Resolution Officer permitted Jane Roe 1 to refuse to answer questions on cross-examination, without penalty or negative inference as a result.

245.   On information and belief, Jane Roe 1 refused to answer questions on cross-examination that were relevant to her credibility and to the issue of consent.

246.   The Resolution Officer denied John Doe the opportunity to ask relevant questions on cross-examination through his counsel.

247.   The Resolution Officer required that John Doe present his direct testimony out of order to accommodate the schedules of Jane Roe 1 and Jane Roe 2's witnesses, and then prevented John Doe from presenting testimony to rebut the false and misleading claims by those witnesses.

248.   For instance, the Resolution Officer denied John Doe the opportunity to present testimony to refute false and misleading claims by witness Dr. Angela Busch during the course of the hearing, which the Resolution Officer ultimately used to make a credibility determination regarding John Doe.

249.   The Resolution Officer appeared during the hearing to favor Jane Roe 1 and Jane Roe 2 over John Doe in his demeanor and his rulings.

250.   The hearing in front of Resolution Officer Judge Mark Eyster concluded on May 15, 2019.

251.   At the hearing, the Resolution Officer utilized a burden of proof of preponderance of the evidence.

252.   On May 22, 2019, the Resolution Office issued a decision.

253.   The Resolution Officer found by a preponderance of the evidence that John Doe had violated the RVSMP as to the accusations by Jane Roe 1.

254.   The Resolution Officer found by a preponderance of the evidence that John Doe had violated the RVSMP as to the accusations by Jane Roe 2.

255.   On June 4, 2019, John Doe submitted his updated mitigation statement to the Dean of Students Office regarding the proposed sanction in this matter.

256.   On June 11, 2019, John Doe received a notification from the Dean of Students Office recommending a sanction of dismissal.

257.   On June 20, 2019, John Doe submitted his appeal of both the findings and the sanction issued by Michigan State University.

31

258. On July 15, 2019, John Doe received notice from MSU that the Equity Review Officer had denied him relief on appeal of the findings and the sanction.

259. On July 19, 2019, John Doe received notice that he was permanently dismissed as a student from Michigan State University.

260. John Doe, during the course of the investigation in this matter, paid approximately $46,110.00 in tuition to Defendant Michigan State University.

261. John Doe has thus far incurred $283,319.83 in student loans for his medical education at Michigan State University, with interest rates of up to 7.6%.

262. During the pendency of this investigation, which lasted for nearly one year, Defendant Michigan State University continued to permit John Doe to pay tuition at a rate of $46,110.00 per year, and to continue to incur student loans in order to pay that tuition and living expenses.

263. John Doe, but for the interim suspension imposed by CHM and ultimate dismissal by MSU, would have completed his medical degree in 2020.

**The Bias That Caused Defendants' Unlawful Discipline of John Doe**

264. Larry Nassar ("Nassar") was a long-time USA Gymnastics national team doctor and osteopathic physician at Michigan State University.

265. A 2017 lawsuit alleges that Nassar first abused a victim at Michigan State University while a medical student at the university in 1992, under the guise of medical research. *See* ESPN, *Four new complaints filed against Larry Nassar, including one dating to '92,* April 19, 2017,

32

https://www.espn.com/olympics/story/_/id/19191934/new-complaints-larry-nassar-allege-sexual-abuse-dates-1992 (last accessed July 18, 2019).

266.    On information and belief, in 1993, Nassar received an osteopathic medical degree from Michigan State University.

267.    On information and belief, in 1997, Nassar was named gymnastics team physician and assistant professor at Michigan State University.

268.    It is alleged that in 1997 a 16-year old high school student saw Nassar for treatment after injuring her back at a youth gymnastics program held at MSU and was abused during treatment. The young woman told a coach, who then instructed her to tell Michigan State University gymnastics coach Kathie Klages ("Klages"). It is alleged that Klages was informed of Nassar's abuse and did nothing to report it. *See* Detroit News, *What MSU knew: 14 were warned of Nassar abuse*, January 18, 2018, https://www.detroitnews.com/story/tech/2018/01/18/msu-president-told-nassar-complaint-2014/1042071001/ (last accessed July 18, 2019).

269.    A 2017 lawsuit alleges that a Michigan State University cross country athlete told MSU athletic program staff that she was sexually assaulted by Nassar during treatment, but that her concerns were dismissed by the MSU coach who said that Nassar was "an Olympic doctor" and "knew what he was doing." *See* MLive, *MSU doctor's alleged victims talked for 20 years. Was anyone listening?*, February 8, 2017,

https://www.mlive.com/news/page/msu_doctor_alleged_sexual_assault.html (last accessed July 18, 2019).

270. A 2016 lawsuit alleges that in 2000, a Michigan State University softball player told three MSU athletic trainers and another staff member that Nassar was sexually inappropriate during medical treatments, and that the MSU employees failed to report Nassar. *See* MLive, *MSU officials told in 2000 of sexual abuse by Dr. Nassar, lawyer alleges*, December 21, 2016, https://www.mlive.com/news/page/msu_doctor_alleged_sexual_assault.html (last accessed July 18, 2019).

271. On information and belief, in 2004, Nassar is first reported to the police when a 17-year old young woman reports abuse during treatment to the Meridian Township Police Department.

272. On information and belief, in 2014, a Title IX complaint is filed against Nassar at Michigan State University by a MSU graduate. The Title IX investigation resulted in a finding that Nassar's conduct was not sexual in nature, and cleared him of any misconduct. *See* Detroit News, *What MSU knew: 14 were warned of Nassar abuse*, January 18, 2018, https://www.detroitnews.com/story/tech/2018/01/18/msu-president-told-nassar-complaint-2014/1042071001/ (last accessed July 18, 2019).

273. On information and belief, the same MSU graduate who made the 2014 Title IX complaint also filed a police report with the Michigan State University Police. During the 16 months that the case was under investigation by the MSU Police

34

Department, Nassar continued to treat patients at MSU. Ultimately, in December of 2015, prosecutors declined to file charges against Nassar. *See* Detroit News, *What MSU knew: 14 were warned of Nassar abuse*, January 18, 2018, https://www.detroitnews.com/story/tech/2018/01/18/msu-president-told-nassar-complaint-2014/1042071001/ (last accessed July 18, 2019).

274.    On information and belief, on August 29, 2016, a former MSU gymnast filed a complaint against Nassar with the Michigan State University Police Department. *See* Indianapolis Star, *Former USA Gymnastics doctor accused of abuse*, September 12, 2016,

https://www.indystar.com/story/news/2016/09/12/former-usa-gymnastics-doctor-accused-abuse/89995734/ (last accessed July 18, 2019).

275.    On information and belief, on August 30, 2016, Nassar was reassigned from all clinical duties at Michigan State University.

276.    On September 12, 2016, *The Indianapolis Star* ran a story wherein two former gymnasts accused Nassar of sexual abuse. *See* Indianapolis Star, *Former USA Gymnastics doctor accused of abuse*, September 12, 2016, https://www.indystar.com/story/news/2016/09/12/former-usa-gymnastics-doctor-accused-abuse/89995734/ (last accessed July 18, 2019).

277.    On September 20, 2016, Nassar was fired from Michigan State University.

278.    On November 22, 2016, Nassar was charged with three counts of first degree criminal sexual conduct by the Michigan Attorney General.

279.  On December 16, 2016, Nassar is indicted in a separate case on federal child pornography charges.

280.  On January 10, 2017, a lawsuit was filed against Michigan State University in the Western District of Michigan, with eighteen plaintiffs alleging that MSU knew about allegations of sexual abuse by Nassar and failed to take proper action. *See* Lansing State Journal, *18 more alleged victims sue MSU, Nassar*, January 10, 2017, https://www.lansingstatejournal.com/story/news/local/2017/01/10/larry-nassar-michigan-state-lawsuit/96246098/ (last accessed July 18, 2019).

281.  On February 13, 2017, Michigan State University gymnastics coach Kathie Klages was suspended over court records that showed that two women said that she discouraged them from filing sexual assault complaints against Nassar in the 1990s. *See* Lansing State Journal, *MSU suspends women's gymnastics coach*, February 13, 2017, https://www.lansingstatejournal.com/story/news/local/2017/01/10/larry-nassar-michigan-state-lawsuit/96246098/ (last accessed July 18, 2019).

282.  Klages retired from Michigan State University on February 14, 2017. *See* Lansing State Journal, *MSU gymnastics coach Kathie Klages retires as allegations stack up*, February 14, 2017, https://www.freep.com/story/news/local/michigan/2017/02/14/more-allegations-surface-against-msu-gymnastics-coach-kathie-klages/97898106/ (last accessed July 18, 2019).

283.   On February 22, 2017, 22 additional first-degree criminal sexual conduct charges were filed against Nassar in Ingham and Eaton counties related to his work at Michigan State University and a gymnastics club. *See* Lansing State Journal, *Schuette: Nassar is 'a monster' and more charges coming*, February 22, 2017, https://www.lansingstatejournal.com/story/news/local/2017/02/22/former-msu-doctor-larry-nassar-faces-23-new-sexual-assault-charges/98220438/ (last accessed July 18, 2019).

284.   On June 30, 2017, 23 more women joined a federal lawsuit against Michigan State University involving the allegations against Nassar. *See* Lansing State Journal, *23 more women, girls file lawsuit against MSU, Nassar*, June 30, 2017, https://www.lansingstatejournal.com/story/news/local/2017/06/30/23-more-women-girls-file-lawsuit-against-msu-nassar/443945001/ (last accessed July 18, 2019).

285.   On July 11, 2017, Nassar pled guilty to child pornography charges in federal court in the Western District of Michigan. *See* National Public Radio, *Doctor Accused of Molesting U.S. Gymnasts Pleads Guilty to Porn Charges*, July 11, 2017, https://www.npr.org/sections/thetwo-way/2017/07/11/536568612/doctor-accused-of-molesting-u-s-gymnasts-to-plead-guilty-to-other-charges (last accessed July 18, 2019).

286.   On November 20, 2017, Nassar pled guilty to seven counts of first-degree criminal sexual conduct in the Ingham County Circuit Court. *See* The Detroit News, *MSU doctor Nassar pleads guilty*, November 20, 2017,

https://www.detroitnews.com/story/news/local/michigan/2017/11/20/larry-nassar-guilty-plea-gymnast-rapes/107892648/ (last accessed July 18, 2019).

287.   On November 29, 2017, Nassar pled guilty to three counts of first-degree criminal sexual conduct in the Eaton County Circuit Court. *See* Lansing State Journal, *Nassar pleads guilty to 3 more sexual assault charges*, November 29, 2017, https://www.lansingstatejournal.com/story/news/local/2017/11/29/larry-nassar-sexual-assault-guilty/897950001/ (last accessed July 18, 2019).

288.   On December 7, 2017, Nassar was sentenced to 60 years in prison on the federal child pornography charges. *See* Lansing State Journal, *Larry Nassar sentenced to 60 years in federal child pornography case*, December 7, 2017, https://www.lansingstatejournal.com/story/news/local/2017/12/07/larry-nassar-sentenced-60-years-federal-child-pornography-case/908838001/ (last accessed July 18, 2019).

289.   On January 19, 2018, Michigan State University's Board of Trustees sent a letter to Michigan Attorney General Bill Schuette requesting that the AG open an investigation into MSU's handling of the Nassar allegations. *See* SBNation, *A comprehensive timeline of the Larry Nassar case*, January 16, 2019, https://www.sbnation.com/2018/1/19/16900674/larry-nassar-abuse-timeline-usa-gymnastics-michigan-state (last accessed July 19, 2019).

290.   During victim impact statements given at the Ingham County Circuit Court in mid-January of 2018 during the Nassar sentencing, many Nassar victims placed blame on Michigan State University for ignoring earlier complaints about

Nassar's misconduct and failing to take responsibility for their role in the continuing abuse. *See* CNN, *Victims confront Larry Nassar in court: 'Little girls don't stay little forever',* January 16, 2018,

https://www.cnn.com/2018/01/16/us/larry-nassar-sentencing-gymnastics/index.html (last accessed July 19, 2019).

291.   During the victim impact statements at the Nassar sentencing in January of 2018, Michigan State University was heavily criticized on Twitter after a 15-year old testified in court that she was assaulted by Nassar one week prior to his firing, and it was reported that the MSU Sports Clinic was still attempting to bill the girl's family for the treatment. *See, e.g.*

https://twitter.com/DanMurphyESPN/status/955462977314082816 (last accessed July 19, 2019).

292.   At Nassar's sentencing, Michigan State University was accused of turning a "blind eye" to the ongoing abuse by Nassar. *See, e.g.* PBS News Hour *Sexual abuse survivors confront former USA Gymnastics doctor: 'Little girls don't stay little girls forever',* January 16, 2018

https://www.pbs.org/newshour/nation/sexual-abuse-survivors-confront-former-usa-gymnastics-doctor-little-girls-dont-stay-little-girls-forever (last accessed July 16, 2019).

293.   On January 23, 2018, the National Collegiate Athletic Association (NCAA) sent a letter of inquiry to MSU regarding the Nassar case. *See* Lansing State Journal, *NCAA sends letter of inquiry to Michigan State over Larry Nassar case,*

January 23, 2018,

https://www.lansingstatejournal.com/story/sports/college/msu/2018/01/23/ncaa-investigation-michigan-state-larry-nassar/1060448001/ (last accessed July 19, 2019).

294. On January 24, 2018, Nassar was sentenced in the Ingham County Circuit Court to 40 to 175 years in prison. *See* Lansing State Journal, *'Just signed your death warrant': Larry Nassar sentenced to 40 to 175 years*, January 24, 2018, https://www.lansingstatejournal.com/story/news/local/2018/01/24/larry-nassar-makes-apology-before-sentence/1060107001/ (last accessed July 19, 2019).

295. On January 24, 2018, Michigan State University President Lou Anna K. Simon resigned from her position in the wake of the Nassar scandal. *See* SBNation, *MSU President Lou Anna Simon resigns in wake of Larry Nassar scandal*, January 24, 2018, https://www.sbnation.com/2018/1/24/16930700/michigan-state-president-lou-anna-simon-resigns-larry-nassar (last accessed July 19, 2019).

296. On January 26, 2018, Michigan State University Athletic Director Mark Hollis announced his retirement, stepping down after ten years as MSU's AD in the wake of the Nassar scandal. *See* SB Nation, *Michigan State athletic director Mark Hollis steps down*, January 26, 2018, https://www.sbnation.com/2018/1/26/16936570/michigan-state-mark-hollis-ad-retires-nassar (last accessed July 21, 2019).

297.   On February 5, 2018, Nassar was sentenced to 40 to 125 years in prison in the Eaton County Circuit Court. *See* Associated Press, *Latest: Work with investigators, Engler tells MSU employees*, February 5, 2018, https://apnews.com/a8e014fb553d4b9682f32d89eaa4d71b?utm_campaign=Social Flow&utm_source=Twitter&utm_medium=APCentralRegion (last accessed July 21, 2019).

298.   On February 26, 2018, The United States Department of Education announced a new investigation into Michigan State University's Title IX compliance related to the Nassar matter. *See* https://www.ed.gov/news/press-releases/us-department-education-launches-new-directed-investigation-msu-title-ix-compliance (last accessed July 21, 2019).

299.   On the same day that the U.S. Department of Education announced the new investigation into Michigan State University, Dr. Angela Busch reported the accusations of Jane Roe 2 to the Office of Institutional Equity at MSU.

300.   On March 27, 2018, Nassar's former boss and former dean of the College of Osteopathic Medicine at MSU was arrested for felony misconduct in office, fourth-degree criminal sexual conduct, and willful neglect of duty, related to his own alleged sexual misconduct with students and to passing details of the school's 2004 Title IX investigation to Nassar. *See* SBNation, *Former Michigan State dean William Strampel arrested for sexual misconduct*, March 27, 2018, https://www.sbnation.com/2018/3/27/17168860/former-michigan-state-dean-

william-strampel-arrested-sexual-misconduct-larry-nassar (last accessed July 21, 2019.

301.    On April 13, 2018, one of Nassar's victims spoke at a Michigan State University board meeting and alleged that interim president John Engler attempted to coerce her into taking a settlement and drop the civil case against MSU. *See* The State News, *Survivor accuses Engler of trying to settle lawsuit without attorney present*, April 13, 2018, https://statenews.com/article/2018/04/nassar-survivor-kaylee-lorincz-accuses-engler-of-trying-to-settle-lawsuit-without-her-attorney-present (last accessed July 21, 2019).

302.    On May 16, 2018, Michigan State University agreed to pay a $500 million settlement to over 300 victims of Nassar. *See* SBNation, *Michigan State to pay $500M to survivors of abuse by Larry Nassar,* May 16, 2018, https://www.sbnation.com/2018/5/16/17360888/michigan-state-500-million-settlement-larry-nassar-sexual-abuse-trial (last accessed July 21, 2019).

303.    On August 23, 2018, former MSU gymnastics coach Kathy Klages was charged with two counts of lying to police regarding allegations that she was aware of abuse by Nassar but told police she had no knowledge of being told about the abuse by Nassar victims. *See* SB Nation, *Former MSU coach Kathie Klages charged with lying to investigators in LN case*, August 23, 2018, https://www.sbnation.com/2018/8/23/17773968/msu-coach-kathie-klages-charged-lying-to-investigators-larry-nassar (last accessed July 21, 2019).

304.   On November 20, 2018, former MSU president Lou Anna Simon was charged
with lying to the state police during the Nassar investigation. *See* Associated
Press, *Ex-MSU president charged with lying to police about Nassar,* November
20, 2018, https://apnews.com/fc230ddb8e024374beb73db4bc5460a2 (last accessed
July 21, 2019).

305.   On December 14, 2018, a U.S. Department of Education report finding that
Michigan State University was in violation of the Clery Act, 20 U.S.C. § 1092(f),
was sent to MSU's general counsel. The Clery Act violations could subject MSU
to significant fines and loss of millions of dollars in federal financial aid. *See*
Lansing State Journal, *MSU cited for 'serious noncompliance' with Clery Act
related to Nassar, crime reporting*, January 30, 2019,
https://www.lansingstatejournal.com/story/news/2019/01/30/msu-cited-
violations-clery-act-related-larry-nassar/2725326002/ (last accessed July 19,
2019).

306.   On information and belief, the U.S. Department of Education report that was
sent to MSU's general counsel on December 14, 2018 that could result in
significant fines and the loss of millions of dollars in federal financial aid to MSU
came out during the middle of the investigation into the accusations by Jane Roe
1 and Jane Roe 2 against John Doe, and only weeks prior to MSU's first findings
against John Doe in the Final Investigative Report.

307.   A December 21, 2018 report from the Michigan Attorney General alleged that
numerous MSU staff, athletic trainers, and doctors were told of concerns

43

regarding Nassar and failed to report. *See* Lansing State Journal, *Special prosecutor: MSU actions 'made it virtually impossible to know' truth about Nassar,* December 21, 2018,

https://www.lansingstatejournal.com/story/news/local/2018/12/21/larry-nassar-michigan-state-university-attorney-general-investigation/2380754002/ (last accessed July 21, 2019).

308.    On January 16, 2019, Michigan State University's interim president, John Engler, resigned following public pressure over his handling of the Nassar scandal. *See* Lansing State Journal, *Engler's impending departure from Michigan State prompts strong reactions*, January 16, 2019,

https://www.lansingstatejournal.com/story/news/local/2019/01/16/msu-fire-john-engler-michigan-state-larry-nassar-survivors/2581373002/ (last accessed July 22, 2019).

309.    Michigan State University faced intense public scrutiny over its handling of the Nassar abuse scandal. *See, e.g.*, Lansing State Journal, *Special prosecutor: MSU actions 'made it virtually impossible to know' truth about Nassar*, December 21, 2018,

https://www.lansingstatejournal.com/story/news/local/2018/12/21/larry-nassar-michigan-state-university-attorney-general-investigation/2380754002/ (last accessed July 21, 2019); The Chronicle of Higher Education, *The Nassar Scandal and the Crisis of Michigan State's President*, January 17, 2019,

https://www.chronicle.com/specialreport/The-Nassar-Scandalthe/179 (last

accessed July 22, 2019); Corporate Counsel, *Critical Federal Report Faults*
*Michigan State's General Counsel Office in Nassar Scandal*, January 31, 2019,
https://www.law.com/corpcounsel/2019/01/31/critical-federal-report-faults-
michigan-states-general-counsel-office-in-nassar-
scandal/?slreturn=20190622204250 (last accessed July 22, 2019); Chicago
Tribune, *Resignations, firings, charges filed: How the Larry Nassar abuse*
*scandal has shone a spotlight on others*, January 16, 2019,
https://www.chicagotribune.com/sports/college/ct-spt-larry-nassar-scandal-
others-affected-20190116-story.html (last accessed July 22, 2019); Inside Higher
Ed, *New President, Same Fears*, May 29, 2019,
https://www.insidehighered.com/news/2019/05/29/fears-about-athletics-sexual-
violence-and-transparency-abound-michigan-state-names (last accessed July 22,
2019); The Atlantic, *Michigan State University Is Botching Its Reputation-Rehab*,
March 19, 2018,
https://www.theatlantic.com/education/archive/2018/03/michigan-state-
university-is-botching-its-reputation-rehab/555932/ (last accessed July 22, 2019);
San Francisco Chronicle, *Michigan State abuse scandal continues to shock,*
*disgust*, January 16, 2019,
https://www.sfchronicle.com/sports/annkillion/article/Michigan-State-abuse-
scandal-continues-to-shock-13539523.php?psid=dPFTdn (last accessed July 22,
2019).

310.   On information and belief, Michigan State University engaged in gender bias against male students like John Doe in part based on pressure associated with the critical press coverage related to the Nassar scandal.

311.   On information and belief, Michigan State University engaged in bias in favor of students who accuse other students of sexual misconduct like John Doe in part based on pressure associated with the critical press coverage related to the Nassar scandal.

312.   On information and belief, Michigan State University engaged in gender bias against male students and bias in favor of students who accuse other students of sexual misconduct in part based on pressure associated with complaints filed with the United States Department of Education's Office of Civil Rights (OCR) which alleged Michigan State University violated the rights of females who alleged males engaged in sexual misconduct.

313.   Evidence supporting the allegations in the preceding paragraph includes, but is not limited to, a complaint for investigation by OCR filed on July 21, 2011, based on a June 9, 2011 complaint, on information and belief, filed by a female student at MSU who alleged that MSU failed to respond appropriately when she reported that she was sexually assaulted by a male student.

314.   Evidence supporting the allegations in ¶312 includes, but is not limited to, a complaint for investigation filed by OCR in response to, on information and belief, a January 29, 2014 complaint by a female student at MSU who alleged

46

that MSU discriminated on the basis of sex when it failed to promptly and

equitably respond to complaints of sexual violence by a male student.

315.    Evidence supporting the allegations in ¶312 includes, but is not limited to, a

complaint for investigation by OCR filed on February 26, 2018 regarding MSU's

handling of the accusations against Dr. Larry Nassar.

316.    Evidence supporting the allegations in ¶312 includes, but is not limited to, an

April 11, 2011 "Dear Colleague" letter issued by OCR which instructed how

colleges and universities must investigate and resolve complaints of sexual

misconduct under Title IX. ("2011 Dear Colleague Letter") (available at

https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html (last

accessed July 22, 2019). This letter manifests indirect evidence of gender bias in

part by equating complainants in sexual misconduct proceedings as being

females who must receive preferential treatment. For instance, the 2011 Dear

Colleague Letter:

  (a) Suggests educational institutions seek grants from the U.S. Department

      of Justice's Office on Violence against Women which require institutions

      'develop victim service programs and campus policies that ensure victim

      safety, [and] offender accountability ...." (p.19)

  (b) Warns education institutions that they must "never" view the "victim at

      fault for sexual violence" if she has been using "alcohol or drugs." In fact,

      OCR asks "schools to consider" providing students who violate alcohol or

drug policies with amnesty if they allege they were sexually assaulted while consuming alcohol or drugs. (p.15)

(c) Requires educational institutions "minimize the burden on the complainant." (p.15-16)

317.   The 2011 Dear Colleague Letter also manifests indirect evidence of gender bias by making it more difficult for males accused of sexual misconduct to defend themselves. For example, the 2011 Dear Colleague Letter required schools to adopt the lowest burden of proof – "more likely than not" – in cases involving sexual misconduct. Several colleges had been using "clear and convincing" and some, like Stanford, applied the criminal standard of "beyond a reasonable doubt."

318.   Evidence supporting the allegations in ¶312 includes, but is not limited to, an OCR directive signed by OCR's then Asst. Sec. of Ed. Catherine E. Lhamon ("Sec. Lhamon") titled "Questions and Answers on Title IX and Sexual Violence" (OCR's 2014 Q&A) (available at https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf) (last accessed July 22, 2019). This OCR directive manifests indirect evidence of gender bias in part because it hampered the accused student's ability to defend himself by reducing or eliminating the ability to expose credibility flaws in the allegations made against him. For example, OCR's 2014 Q&A states universities:

(a) "[M]ust not require a complainant to be present" at sexual misconduct disciplinary hearings. (p.30)

(b) May decide to eliminate all opportunities for "cross examination." (p. 31)

(c) Must avoid "revictimization" by minimizing the number of times a victim is interviewed so "complainants are not unnecessarily required to give multiple statements about a traumatic event." (p.30, 38)

319.   Upon information and belief, Michigan State University institutionalized OCR's indirect evidence of gender bias into MSU's implementation of MSU's policies. Evidence supporting this allegation includes, but is not limited to, threats made by Sec. Lhamon when she told college officials attending a conference at the University of Virginia that schools need to make "radical" change. According to the Chronicles of Higher Education, college presidents suggested afterward that there were "crisp marching orders from Washington." *See*, Chronicles of Higher Education, *Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases*, February 11, 2014, https://www.chronicle.com/article/Colleges-Are-Reminded-of/144703/ (last accessed July 22, 2019).

320.   Evidence supporting the allegation in ¶312 includes, but is not limited to, the fact that OCR's investigations of Michigan State University put millions of dollars in federal student aid at risk. This is because the Department of Education/OCR can impose civil penalties and/or suspend institutions from participating in federal student financial aid programs if the Department of

Education/OCR finds a university, such as MSU, did not do enough to discipline males alleged to have engaged in sexual misconduct with female students. Sec. Lhamon confirmed this risk of losing federal funds at a national conference at Dartmouth when she said, "I will go to enforcement, and I am prepared to withhold federal funds." *See*, National Public Radio, *How Campus Sexual Assaults Came to Command New Attention*, August 12, 2014, https://www.npr.org/2014/08/12/339822696/how-campus-sexual-assaults-came-to-command-new-attention (last accessed July 22, 2019).

321.   Similarly, Sec. Lhamon told a Senate Committee, "[t]his administration is committed to using all its tools to ensure that all schools comply with Title IX…." In addition, Sec. Lhamon noted:

> "If OCR cannot secure voluntary compliance from the recipient, OCR may initiate an administrative action to terminate and/or refuse to grant federal funds or refer the case to the DOJ to file a lawsuit against the school. To revoke federal funds – the ultimate penalty – is a powerful tool because institutions receive billions of dollars a year from the federal government for student financial aid, academic resources and many other functions of higher education. OCR has not had to impose this severe penalty on any institution recently because our enforcement has consistently resulted in institutions agreeing to take the steps necessary to come into compliance and ensure that students can learn in safe, nondiscriminatory environments."

322.   On information and belief, for Michigan State University, the withdrawal of federal funding would be catastrophic, in part, because, in academic year 2017-2018 MSU undergraduate students received more than 111 million dollars in federal student loans.

(https://nces.ed.gov/collegenavigator/?id=171100#finaid) (last accessed

July 22, 2019).

323. Similarly, evidence supporting the allegation in ¶312 includes, but is not

limited to, the fact that at least 19 courts identified OCR pressure on defendant

universities as establishing plausible evidence of gender bias sufficient to reject

motions to dismiss Title IX claims. *See, Doe v Baum*, 903 F.3d 575 (6th Cir. 2018)

(reversing dismissal of Title IX erroneous result in part because "[a]round two

years before Doe's disciplinary proceeding, the federal government launched an

investigation to determine whether the university's process for responding to

allegations of sexual misconduct discriminated against women."); *Miami Univ.*,

882 F.3d 579, 592-94 (6th Cir. 2018) (finding plaintiff established a "pattern of

gender-based decision-making in part because plaintiff alleged defendant

university faced "external pressure" from the federal government, President

Obama's Administration, and/or OCR); *Schaumleffel v Muskingum University*,

No. 2:17-cv-463-GCS-KAJ, 2018 WL 1173043, *16 (S.D.OH. Mar. 6 2018)

(rejecting motion to dismiss Title IX claim because plaintiff alleged he was

erroneously expelled in part because DOE pressure caused university to "fear" a

loss of "federal funding."); *Gischel v Univ. of Cincinnati*, No. 1:17-cv-475, 2018

WL 705886, *9 (S.D.W.D.OH. Feb. 5, 2018) (rejecting motion to dismiss in part

because of alleged gender bias pressure linked to OCR Title IX investigation

since "[t]he Sixth Circuit has recognized that being investigated by the federal

government for potential Title IX violations is a relevant allegation suggesting

that the university might be induced to discriminate against males in disciplinary hearings for alleged sexual assault."); *Doe v Ohio State Univ.*, No. 2:16-cv-171, 2017 WL 951464, *15, 17 (S.D.OH. Mar. 10, 2017) (noting Title IX plaintiff alleged indirect/circumstantial evidence of gender bias in part by alleging "pressure from the executive branch of the Federal government … [related to] the temporal connection between … [DOE's] investigation of OSU and OSU's investigation of" plaintiff); *Doe v Marymount Univ.*, Case No. 1:17-cv-401-TSE-MSN, 2018 WL 1352158, *10 (E.D.VA. Mar. 14, 2018) (rejecting motion to dismiss in part because plaintiff alleged: "Marymount's sexual assault policy was influenced by [OCR's] Dear Colleague Letter and other political forces and that the University's procedures were designed to convict male students of sexual assault, whether they were guilty or not . . . ."); *Doe v. Syracuse Univ.*, No.17-cv-787, 2018 WL 4440530, *9 (N.D.N.Y. Sept. 16, 2018)(rejecting MTD Title IX claim because a "reasonable inference could be drawn" that university investigators and adjudicators were "'motivated to refute [public] criticisms [of Syracuse's handling of sexual abuse allegations] by siding with the accusing female and against the accused male.' . . . In part because of prior OCR investigations of Syracuse)(internal citations omitted); *Neal v. Col. St. Univ.,* No. 16-cv-873-(RM)(CBS), 2017 WL 633045, *14 (D.Col. Feb. 16, 2017)( rejecting motion to dismiss in part because plaintiff alleged his erroneous outcome involved university succumbing to "pressure to avoid DOE investigation and loss of federal funding . . . ."); *Doe v. Washington & Lee Univ.,* No. 6:14-cv-00052,

2015 U.S. Dist. LEXIS 102426, *29 (W.D.Va., Aug. 5, 2015) (refusing to dismiss Title IX claim in part because plaintiff alleged university was "under pressure from the government to convict male students of sexual assault, [therefore] a reasonable fact finder could plausibly determine that Plaintiff was wrongly found responsible for sexual misconduct and that this erroneous finding was motivated by gender bias."); *Wells v. Xavier Univ*., 7 F. Supp. 3d 746, 747, 751 (S.D.OH. 2014)( rejecting motion to dismiss in part because plaintiff alleged university made him a "scapegoat" in reaction to OCR's investigations of the university)); *Collick v. William Paterson Univ.* No. 16–471(KM)(JBC), 2016 WL 6824374, *12 (D.N.J. Nov. 17, 2016) (refusing to dismiss a Title IX claim in part because plaintiff alleged OCR pressure may have caused university to "believe it was in the spotlight" and therefore erroneously disciplined plaintiff to show it would sanction males accused of sexual misconduct)(affirmed in part, remanded in part on different grounds by *Collick v. William Paterson Univ.,* 699 Fed.Appx. 129 (3rd Cir. 2017)); *Doe v. Lynn Univ. Inc.* 235 F.Supp.3d 1336 (S.D.FL. 2017) (refusing to dismiss Title IX claim where plaintiff alleged his discipline occurred in part because of pressure related to DOE directives interpreted by university as mandating discipline of male students accused of sexually assaulting female students); *Doe v. Salisbury Univ.,* 123 F. Supp. 3d, 748, 768 (D.Md. 2015)(same); *Doe v. Regents of Univ. of California*, No. 2:15-cv-02478-SVW-JEM (C.D.CA June 8, 2017) (rejecting motion to dismiss because plaintiff alleged university faced "growing local and national pressure" to discipline male students generated in

part by female students' OCR complaints alleging the university "failed to adequately handle their complaints of sexual assault.") (reversed on other grounds by *Doe v. Regents of Univ. of California*, 2018 WL 1476666 (9th Cir. 2018). *Doe v. George Washington Univ.* No.18-cv-553, 2018 WL 6700596, *7 (D.C. Dec. 20, 2018)(rejecting motion to dismiss Title IX claim in part because plaintiff established plausible gender bias by alleging multiple OCR investigations against defendant university); *Norris v. Univ. of Colorado, Boulder,* Civil Case No. 1:18-cv-02243-LTB, 2019 WL 764568, *11 (D. Co. Feb. 21, 2019)(rejecting motion to dismiss Title IX claim because plaintiff alleged OCR/federal pressure on defendant university similar to – or less egregious than – that in Doe's Complaint); *Noakes v. Syracuse Univ.,* No. 5:18-cv-43 (TJM/DEP), 2019 WL 936875 *12 (N.D.N.Y. Feb. 26, 2019)(same); *Doe v. Rollins Coll.,* No. 6:18-cv-1069-Orl-37KRS, 2019 WL 208283, *3 (M.D. Fla. Jan. 16, 2019)(same); *Jia v. Univ. of Miami,* No.1-17-cv-20018, Docket 160, p.10 (S.D.Fla. Feb. 12, 2019)(same).

324.   Michigan State University's legitimate goal of preventing sexual assault is not the issue in, nor is it the basis for, this Complaint. Rather this Complaint addresses how Michigan State University's gender bias and bias in favor of students who accuse other students of sexual misconduct caused them to (a) afford females like Jane Roe 1 and Jane Roe 2 preferential treatment regarding Title IX and/or other MSU policies; (b) severely discipline male students like John Doe who are alleged to have engaged in sexual misconduct regardless of

their innocence, and (c) equate "victim/complainants" in sexual misconduct proceedings as being females who receive preferential treatment over the males they accuse of sexual misconduct.

### COUNT I
### VIOLATION OF TITLE IX
### (DEFENDANT MICHIGAN STATE UNIVERSITY)

325.   Plaintiff repeats and incorporates all of the allegations of this Complaint, as if fully set forth herein.

326.   This count is brought against Defendant Michigan State University.

327.   Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 et seq., and its implementing regulations, 34 C.F.R. Part 106, prohibit discrimination on the basis of sex in education programs or activities operated by recipients of Federal financial assistance. Title IX provides in pertinent part: "No person … shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

328.   Michigan State University is an education program or activity operated by recipients of Federal financial assistance.

329.   Title IX bars the imposition of university discipline where gender is a motiving factor in the decision to discipline.

330.   Michigan State University committed impermissible gender bias against the Plaintiff in the investigation and adjudication of Jane Roe 1 and Jane Roe 2's accusations.

331.   Michigan State University committed impermissible bias in favor of students who accuse other students of sexual misconduct in the investigation and adjudication of Jane Roe 1 and Jane Roe 2's accusations.

332.   The investigators and reviewing administrators reached conclusions that were incorrect and contrary to the weight of the evidence.

333.   Particular circumstances suggest that gender bias was a motiving factor behind the erroneous findings and the decision to impose discipline upon John Doe. These circumstances include:

   a.   The Office of Institutional Equity ("OIE"), who conducts investigations under Title IX for Defendant Michigan State University, trains its investigators in a trauma-informed, victim-centered approach. This creates a general atmosphere at Michigan State University and OIE that those who lodge a complaint of sexual misconduct are immediately treated as "survivors" and, as a result, believed without any further investigation or questioning.

   b.   The training of OIE investigators and decision-makers from victims' advocates in an inappropriate manner designed to produce results against males accused of sexual misconduct.

   c.   The decision of Defendant Michigan State University to ignore significant evidence that tended to exonerate accused students.

   d.   Improper pressure upon investigators to make findings against male students accused of sexual misconduct.

e. The reluctance of Defendant Michigan State University to amend its RVSMP to permit a hearing and cross-examination in cases where male students have been accused of sexual misconduct.

334. Defendant Michigan State University committed impermissible gender bias against John Doe in the investigation and adjudication of the Complainants' accusations. The inference of bias is drawn from the following:

a. Michigan State University has been subject to significant public scrutiny based upon its handling of reports of sexual violence against its former employee, Dr. Larry Nassar, as well as other complaints of sexual misconduct.

b. Michigan State University is subject to an investigation by the Office of Civil Rights ("OCR").

i. On information and belief, Michigan State University was under pressure as a result of the OCR investigation to avoid Title IX liability, the possible loss of federal funding, and further public criticism; this has led to a disciplinary system that is biased against males.

ii. On information and belief, Michigan State University pursued the matter against John Doe as a direct result of the OCR investigation. This belief is based upon the timeline of events: Members of MSU CHM were aware of the claims by Jane Roe 1 and Jane Roe 2 in late 2017 and early 2018, but did not file a complaint

with OIE until February 26, 2018 – the exact same date that the United States Secretary of Education Betsy Devos announced a new Title IX directed investigation into Michigan State University's handling of reports of sexual violence against former employee, Dr. Larry Nassar.

c. There has been substantial criticism of Michigan State University, both in the student body and in the public media, including on the internet, accusing Michigan State University of not taking seriously complaints of female students alleging sexual misconduct by male students. On information and belief, the Michigan State University administration was cognizant of, and sensitive to, these criticisms. As a result, Michigan State University's decision-makers and its investigators were motivated to favor the accusing females over the accused male, so as to protect themselves and Michigan State University from accusations that they had failed to protect female students from sexual assault.

d. On information and belief, having been severely criticized in the student body and in the public press for tolerating sexual misconduct directed at female students, Michigan State University was motivated in this instance to accept the females' accusations of sexual misconduct so as to show the student body and the public that Michigan State University is serious about protecting female students from sexual misconduct by a male student. The investigator and administration adopted a biased

stance in favor of the accusing female and against the defending male in order to avoid further fanning the criticisms that Michigan State University turned a blind eye to such assaults.

e.  In response to the criticism that Michigan State University faced as a result of the Nassar scandal, MSU began to engage in a campaign designed to encourage members of their community to believe women who make accusations of sexual misconduct against men. MSU did not similarly engage in a campaign to encourage members of their community to believe men who made accusations of sexual assault against women. Among other things, this is evidenced by:

i.  The Michigan State University Museum featured an exhibit entitled, "Finding Our Voice: Sister Survivors Speak," which featured female victims of sexual misconduct. *See*, The Detroit News, *'Finding Our Voice: Sister Survivors Speak' exhibition opens at MSU,* April 17, 2019, https://www.detroitnews.com/story/news/local/michigan/2019/04/16/findi ng-our-voice-sister-survivors-speak-exhibition-opens-michigan-state/3487796002/ (last accessed September 29, 2019).

ii. Michigan State University's Alumni Magazine issued a "teal issue" addressing the issue of sexual misconduct in the wake of the Larry Nassar scandal. All of the authors listed in the issue were women, and many of the articles specifically addressed women as victims of sexual misconduct. MSU did not similarly address male victims of female sexual

misconduct. *See,* Spartan, Michigan State University Alumni Magazine, Special Issue 2018,

http://www.onlinedigitalpubs.com/publication/?i=577397#{%22issue_id%22:577397,%22page%22:0} (last accessed September 29, 2019).

iii. Michigan State University's website provides information about how to be supportive of survivors of sexual assault. *See*

https://centerforsurvivors.msu.edu/sexual-assault/how-to-be-supportive/ (last accessed September 29, 2019). A link to a recommended article regarding to how to support of survivor of sexual assault provides information about how to support a survivor of violence against women, which includes a recommendation about speaking to men about being perpetrators of sexual assault. *See,* The Pixel Project, December 8, 2013, *16 Ways You Can Support a Survivor of Violence Against Women*, https://16days.thepixelproject.net/16-ways-you-can-support-a-survivor-of-violence-against-women/ (last accessed September 29, 2019). MSU does not similarly provide information about how to support men who are survivors of sexual assaults by women, or recommendations regarding speaking to women about being perpetrators of sexual assault.

335. Michigan State University, encouraged by federal officials, has instituted solutions to sexual misconduct against women that abrogate the civil rights of men and treat men differently than women.

336.   Michigan State University has only focused on instituting solutions to sexual misconduct against women perpetrated by men. Michigan State University has done nothing to address sexual misconduct perpetrated by women.

337.   As a result, men who face accusations of sexual misconduct are treated differently than women who face accusations of sexual misconduct.

338.   Michigan State University officials and administrators who had the authority to institute corrective measures had actual notice of and failed to correct the misconduct. The imposition of discipline on John Doe is the result of a flawed and biased process. This resulted in a deprivation of access to educational opportunities at Michigan State University and CHM.

339.   The decision of the Resolution Officer against John Doe resulted in an erroneous outcome and a sanction of dismissal, which was the direct result of a flawed and biased proceeding.

   a.   In a fair and unbiased system, whether someone is a "victim" is a conclusion to be reached at the end of a fair process, not an assumption to be made at the beginning. Michigan State University has reversed this process and assumed that John Doe was guilty because he was a male accused of sexual misconduct rather than evaluating the case on its own merits.

   b.   On information and belief, women rarely, if ever, are accused of sexual misconduct by Michigan State University.

340.   Michigan State University has discriminated against John Doe because of sex. This discrimination is intentional and is a substantial or motivating factor for Michigan State University's actions in this case.

341.   As a direct and proximate result of Michigan State University's violations of John Doe's rights under Title IX, John Doe has suffered severe and substantial damages. These damages include diminished earnings capacity, lost career opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court.

342.   Defendant Michigan State University is liable to John Doe for his damages.

343.   Pursuant to 42 U.S.C. §1988, John Doe is entitled to his attorney's fees incurred in bringing this action.

**COUNT II**
**42 U.S.C. §1983 – VIOLATION OF EQUAL PROTECTION CLAUSE OF UNITED STATES CONSTITUTION – GENDER DISCRIMINATION (DEFENDANTS KENT, SHAFER, AND SOUSA)**

344.   Plaintiff repeats and incorporates all of the allegations of this Complaint, as if fully set forth herein.

345.   This count is brought against individual Defendants Robert Kent, Rick Schafer, and Aron Sousa, M.D., in their individual and official capacities.

346.   The Fourteenth Amendment to the United States Constitution provides in pertinent part:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

347.   During John Doe's interview with Kroll, John Doe disclosed that he drank alcohol on the night in question.

348.   John Doe disclosed that he drank enough alcohol that it should have raised questions for OIE about whether John Doe was incapacitated by his use of alcohol on the night in question, as they questioned whether Jane Roe 1 and Jane Roe 2's use of alcohol rendered them incapacitated.

349.   John Doe's incapacitation is supported by the fact that he could not achieve an erection during his sexual contact with Jane Roe 1.

350.   John Doe reported to Kroll's investigators that Jane Roe 2 initiated a kiss with him, with tongue, at The B.O.B., before the group returned to K.B.'s home.

351.   John Doe reported to Kroll's investigators that while at K.B.'s home, Jane Roe 2 grinded her buttocks against his genitals.

352.   John Doe had been consuming alcohol throughout these time periods and reported being "drunk."

353.   The actions reported by John Doe regarding Jane Roe 2 were violations of the Relationship Violence and Sexual Misconduct Policy by Jane Roe 2.

354.   OIE, through Kroll, failed to investigate Jane Roe 2's violations of the RVSMP.

355.   John Doe also reported these factual accusations to the College of Human Medicine during the hearing regarding his interim suspension.

356.   CHM failed to investigate Jane Roe 2's violations of the RVSMP and MSRR.

357.   Jane Roe 2 was a female, similarly situated student to John Doe.

358.   Jane Roe 2 was treated more favorably by MSU's OIE and CHM as a result of her gender.

359.   The allegations of gender discrimination made in this Complaint further demonstrate that Defendants violated Plaintiff's clearly established right not to be discriminated against on the basis of sex, in violation of the Fourteenth Amendment, and therefore, 42 U.S.C. § 1983.

360.   As a direct and proximate result of Defendants' violations of John Doe's rights under the Fourteenth Amendment, John Doe has suffered severe and substantial damages. These damages include diminished earnings capacity, lost career opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court.

361.   Defendants are liable to John Doe for his damages.

362.   Pursuant to 42 U.S.C. §1988, John Doe is entitled to his attorney's fees incurred in bringing this action.

**COUNT III**
**42 U.S.C. §1983 – VIOLATION OF EQUAL PROTECTION CLAUSE OF UNITED STATES CONSTITUTION – BURDEN OF PROOF (DEFENDANTS KENT, SHAFER, AND SOUSA)**

64

363.   Plaintiff repeats and incorporates all of the allegations of this Complaint, as if fully set forth herein.

364.   This count is brought against individual Defendants Robert Kent, Rick Schafer, and Aron Sousa, M.D., in their individual and official capacities.

365.   The Fourteenth Amendment to the United States Constitution provides in pertinent part:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

366.   The individual Defendants, as agents of Michigan State University, have a duty to provide Michigan State University's students equal protection by and through any and all policies and procedures set forth by Michigan State University.

367.   Plaintiff obeyed all institutional rules when he was wrongly suspended and later dismissed by Michigan State University.

368.   The conduct of medical students at MSU's CHM is governed by the policy outlined in the MSRR.

369.   The policies of the MSRR govern the adjudication of accusations of sexual misconduct against medical students at MSU's CHM.

370.   The policies of the MSRR govern the adjudication of accusations of other types of misconduct against medical students at MSU's CHM.

371.   Nothing in the MSRR requires that accusations of sexual misconduct be adjudicated under a different policy.

372.   The MSRR requires that all accusations of misconduct, including sexual misconduct, be adjudicated using a standard of clear and convincing evidence.

373.   MSU has a general policy governing the adjudication of accusations of sexual misconduct, the RVSMP.

374.   The RVSMP adjudicates accusations of sexual misconduct using a preponderance of the evidence standard.

375.   Clear and convincing evidence is a higher burden of proof than a preponderance of the evidence standard.

376.   Nothing in MSU's policies provide a justification or requirement that medical students who are accused of sexual misconduct be adjudicated under the RVSMP rather than the MSRR.

377.   In this case, MSU and the individual defendants applied a preponderance of the evidence standard in determining the outcome of the claims against John Doe, a medical student at CHM, using the policies of the RVSMP.

378.   According to the MSRR, John Doe's matter should have been adjudicated using a standard of clear and convincing evidence, a higher burden of proof.

379.   MSU and the individual defendants have created two classes of medical students who are accused of misconduct: (1) medical students who are accused of sexual misconduct ("MSSM") and (2) medical students who are accused of other types of misconduct ("MSOM").

380.    MSU and the individual defendants are treating MSSMs differently than MSOMs.

381.    MSSMs are adjudicated using a preponderance of the evidence standard.

382.    MSOMs are adjudicated using a clear and convincing evidence standard.

383.    There is no rational basis for treating MSSMs differently than MSOMs.

384.    While the statutory text of Title IX does not dictate a standard of evidence to be used by universities in investigations of sexual misconduct, equal protection requires the use of a clear and convincing evidence standard.

385.    Although civil litigation matters generally use the preponderance of the evidence standard, the Title IX grievance processes lack certain protections that promote reliability in civil litigation. For example, there are no rules of evidence in Title IX grievance processes, there is no right to counsel in Title IX grievance processes, and Title IX grievance processes do not afford parties discovery to the same extent required by the rules of civil procedure in courts throughout the country.

386.    Title IX grievance processes are analogous to other kinds of civil administrative proceedings, which often employ a clear and convincing evidence standard. *See, e.g. Nguyen v Washington Dept. of Health,* 144 Wash. 2d 516 (2001) (requiring clear and convincing evidence in sexual misconduct case in a professional disciplinary proceeding for a medical doctor as a way of protecting due process); *Disciplinary Counsel v Bunstine*, 136 Ohio St. 3d 276 (2013) (clear and convincing evidence applied in sexual harassment case involving lawyer).

387.   Where a finding of responsibility carries particularly grave consequences for a respondent's reputation and ability to pursue a profession or career, a higher standard of proof is warranted.

388.   At least one court has held that in student disciplinary cases involving serious accusations like sexual assault, where the consequences of a finding of responsibility would be significant, permanent, and far-reaching, a preponderance of the evidence standard is inadequate. *Lee v University of New Mexico,* no. 1:17-cv-01230-JB-LF (D. N.M. Sept. 20, 2018) ("Moreover, the Court concludes that preponderance of the evidence is not the proper standard for disciplinary investigations such as the one that led to Lee's expulsion, given the significant consequences of having a permanent notation such as the one UNM placed on Lee's transcript.").

389.   The imposition of a preponderance of the evidence standard in John Doe's case was violative of the equal protection clause of the Fourteenth Amendment of the United States Constitution.

390.   MSU and CHM have singled out medical students who are respondents in sexual misconduct matters (MSSMs) for uniquely unfavorable treatment, compared with medical students who face allegations of any other type of misconduct (MSOMs).

391.   While for any other type of disciplinary complaint a MSOM would receive the benefit of the application of a clear and convincing evidence standard (*see* §5.2.4 of the MSRR), when sexual misconduct is alleged, the matter is instead referred

to OIE for investigation, so that the university may apply a preponderance of the evidence standard to the MSSM.

392.   MSOMs are afforded the application of a clear and convincing evidence standard in disciplinary proceedings.

393.   MSSMs receive only a preponderance of the evidence standard in disciplinary proceedings.

394.   The allegations regarding the application of the burden of proof made in this Complaint further demonstrate that Defendants violated Plaintiff's clearly established right to equal protection under the law, in violation of the Fourteenth Amendment, and therefore, 42 U.S.C. § 1983.

395.   As a direct and proximate result of Defendants' violations of John Doe's rights under the Fourteenth Amendment, John Doe has suffered severe and substantial damages. These damages include diminished earnings capacity, lost career opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court.

396.   Defendants are liable to John Doe for his damages.

397.   Pursuant to 42 U.S.C. §1988, John Doe is entitled to his attorney's fees incurred in bringing this action.

**COUNT IV**
**42 U.S.C. §1983 – VIOLATION OF DUE PROCESS PROVISIONS OF**
**UNITED STATES CONSTITUTION**
**(DEFENDANTS KENT AND SHAFER)**

69

398.  Plaintiff repeats and incorporates all of the allegations of this Complaint, as
      if fully set forth herein.

399.  This count is brought against individual Defendants Robert Kent and Rick
      Schafer, in their individual and official capacities.

400.  The Fourteenth Amendment to the United States Constitution provides that
      no state shall "deprive any person of life, liberty, or property, without due
      process of law."

401.  In this case, Defendants Kent and Schafer are state actors subject to the
      Fourteenth Amendment.

402.  42 U.S.C. § 1983 provides in pertinent part:

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of  any State or Territory or the
> District of Columbia, subjects, or causes to be subjected, any
> citizen of the United States or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party
> injured in an action at law, suit in equity, or other proper
> proceeding for redress ….

403.  A person has a protected liberty interest in his good name, reputation, honor,
      and integrity, of which he cannot be deprived without due process.

404.  A person has a protected property interest in pursuing his education, as well
      as in future educational and employment opportunities and occupational liberty,
      of which he cannot be deprived without due process.

405.  Plaintiff's constitutionally protected property interest in his continued
      enrollment at Michigan State University's College of Human Medicine and his

70

right to complete his medical degree at Michigan State University was violated by the actions of Defendants.

406. Plaintiff has a constitutional right to be free from arbitrary suspension, dismissal, or restrictions on his ability to enter the Michigan State University campus.

407. It is well established that Fourteenth Amendment due process protections are required in higher education disciplinary proceedings.

408. A person who has been admitted to a public university has a protected property interest in continuing his education at that university until he has completed his course of study. The state cannot deprive a person of this interest without due process.

409. As a result, if Plaintiff, as a Michigan State University medical student, faced disciplinary action that included the possibility of suspension or dismissal if found responsible for the alleged sexual misconduct, then the Due Process provisions of the Fourteenth Amendment to the United States Constitution applied to the disciplinary process that Michigan State University used.

410. The individual Defendants, as agents of Michigan State University, have a duty to provide Michigan State University's students due process of law by and through any and all policies and procedures set forth by Michigan State University.

411. Plaintiff obeyed all institutional rules when he was wrongly suspended and later dismissed by Michigan State University.

412.   Under both federal and state law, Plaintiff had a constitutionally protected property interest in completing his medical education at the Michigan State University College of Human Medicine at the time that he was disciplined by Michigan State University and in the future.

413.   Plaintiff was entitled to a meaningful opportunity to be heard and process commensurate with the seriousness of the allegations and the potential discipline, sanctions, and repercussions he was facing. The allegations in this case have resulted in sanctions that will have lifelong ramifications for Plaintiff.

414.   Plaintiff was entitled to fundamentally fair procedures to determine whether he was responsible for the alleged sexual misconduct.

415.   Initially, Michigan State University made findings and imposed discipline upon John Doe without the benefit of or opportunity for a live hearing.

416.   In the course of such investigation and adjudication, Defendants flagrantly violated Plaintiff's clearly established rights under the Due Process Clause of the Fourteenth Amendment through its deprivation of the minimal requirements of procedural fairness by denying Plaintiff the opportunity for a live hearing.

417.   It was only after John Doe filed an appeal with Michigan State University and indicated that he intended to litigate this matter that MSU relented and offered a "hearing."

418.   Even after providing John Doe with a hearing, MSU continued to violate John Doe's clearly established due process rights under the Fourteenth Amendment of the United States Constitution, as follows:

a. On the first morning of John Doe's hearing, John Doe was provided with "updated hearing procedures" from OIE.

b. The "updated hearing procedures," among other things, provided in part that "[c]laimants, respondents, and witnesses may choose to participate or not to participate in the hearing process. Parties may choose to answer some or all of the questions posed to them during the hearing." (*See* Michigan State University Relationship Violence and Sexual Misconduct Policy Hearing Procedures, Section V(B)).

c. The "updated hearing procedures" go on to state, "If any party exercises the option to not participate or not answer specific questions, it will not preclude the Resolution Officer from making a determination of credibility and issuing a finding." (*See* Michigan State University Relationship Violence and Sexual Misconduct Policy Hearing Procedures, Section V(B)).

d. Specifically, Jane Roe 1 refused to answer multiple questions on cross examination, presented to her by John Doe's counsel.

e. On information and belief, Jane Roe 1 refused to answer questions about her attire on the evening in question.

f. On information and belief, Jane Roe 1 refused to answer questions about her physical size on the evening in question.

g. On information and belief, Jane Roe 1 refused to answer other questions on cross-examination.

73

h. The questions presented to Jane Roe 1 on cross-examination were relevant to her credibility and to consent.

i. Jane Roe 1 had removed her own clothing on the night in question. The attire that she was wearing and the fact that she was able to and chose to remove those clothing items herself bear directly upon the issue of consent.

j. Jane Roe 1's relative size to John Doe also was relevant to the issue of consent. On information and belief, the hearing testimony supported that John Doe weighed approximately 95 pounds on the night in question. Jane Roe 1's relative size to John Doe was relevant to John Doe's ability to intimidate or force Jane Roe 1 to engage in a sexual act.

k. On information and belief, other questions which Jane Roe 1 refused to answer were relevant to the issues of credibility and consent.

l. Michigan State University is in sole possession of the recording of the hearing in this matter.

m. John Doe was prohibited from recording the hearing.

n. There may be other relevant questions that Jane Roe 1 refused to answer that are currently unknown to John Doe because he does not have access to the recording of the hearing.

o. The Resolution Officer permitted Jane Roe 1 to refuse to answer questions on cross-examination by John Doe's counsel, without penalty and without a negative inference as a result of her refusal to answer.

p.  The policy implemented by OIE resulted in the inability of John Doe to fully cross-examine Jane Roe 1, without penalty and without a negative inference as a result of her refusal to answer.

419.   As a direct and proximate result of Defendants' violations of John Doe's rights under the Fourteenth Amendment, John Doe has suffered severe and substantial damages. These damages include diminished earnings capacity, lost career opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court.

420.   Defendants are liable to John Doe for his damages.

421.   Pursuant to 42 U.S.C. §1988, John Doe is entitled to his attorney's fees incurred in bringing this action.

## PRAYER FOR RELIEF

Plaintiff respectfully requests the following relief:

- On Counts I, II, and III, and IV Judgment in favor of John Doe awarding damages in an amount to be determined at trial;
- Court costs and other reasonable expenses incurred in maintaining this action, including reasonable attorney's fees as authorized by 42 U.S.C. §1988;
- Any other relief which may be appropriate.

## JURY DEMAND

Plaintiff requests a jury for all issues so triable in this case.

Respectfully submitted,

/s/ Keeley D. Blanchard

Dated: October 3, 2019

_____

Keeley D. Blanchard (P68661)
**BLANCHARD LAW**
Attorneys for Plaintiff
309 S. Lafayette St., Ste 208
P.O. Box 938
Greenville, MI 48838
(616) 773-2945
keeley@blanchard.law